# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY WATTS, PRIYANK GARG, MELISSA VOTER, JIM SMAARDYK and RATNA KAMMULURI, derivatively on behalf of OCUGEN, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SHANKAR MUSUNURI, SANJAY SUBRAMANIAN, JESSICA CRESPO, QUAN VU, MICHAEL BREININGER, RAMESH KUMAR, JUNGE ZHANG, UDAY KOMPELLA, MARNA C. WHITTINGTON, KIRSTEN M. CASTILLO, PRABHAVATHI FERNANDES, and MANISH POTTI, <br><br> Defendants, <br><br> and <br><br> OCUGEN, INC., <br><br> Nominal Defendant. | Case No: 24-2234 <br><br> **RATNA KAMMULURI'S AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Ratna Kammuluri ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of Nominal Defendant Ocugen, Inc. ("Ocugen" or the "Company"), submits this Amended Verified Shareholder Derivative Complaint against Shankar Musunuri ("Musunuri"), Kirsten M. Castillo ("Castillo"), Prabhavathi Fernandes ("Fernandes"), Uday Kompella ("Kompella"), Ramesh Kumar ("Kumar"), Junge Zhang ("Zhang"), Marna C. Whittington ("Whittington"), Sanjay Subramanian ("Subramanian"), Manish Potti ("Potti"), Jessica Crespo ("Crespo"), Quan Vu ("Vu"), and Michael Breininger ("Breininger") (the "Individual Defendants" and together with Ocugen, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

1

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of filings by Ocugen with the United States Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts and shareholder communications, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought against certain current and former Ocugen officers and members of Ocugen's Board of Directors (the "Board") to remedy wrongdoing committed by the Individual Defendants from May 8, 2020 through April 1, 2024, both dates inclusive (the "Relevant Period").

2.      Ocugen is a biotechnology company that focuses on discovering, developing, and commercializing gene and cell therapies and vaccines for rare eye diseases.

3.      During the Relevant Period, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its co-development and commercialization agreement with CanSinoBIO Biologics Inc. ("CanSinoBIO") with respect to the development and commercialization of Ocugen's modifier gene therapy product candidates for retinal diseases, resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue,

R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's financial statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

4.    Ocugen failed to apply the appropriate authoritative accounting guidance to the CanSinoBIO agreement. Consequently, the Company failed to account for this agreement by analogy to the revenue recognition guidance and failed to provide appropriate disclosures in Ocugen's financial statements, as required. As a result of its failures, Ocugen was able to embellish its financial statements by significantly understating its current liabilities and accumulated deficit, overstating its stockholders' equity, and understating its research and development ("R&D") costs, losses from operations, net losses, and losses per share.

5.    On August 15, 2023, after the market closed, Ocugen filed a Form 8-K with the SEC signed by Defendant Musunuri, stating that CFO Vu was no longer with the Company, as well as a Notification of Late Filing on Form 12b-25 with respect to its second quarter 2023 Form 10-Q.

6.    On this news, Ocugen's stock fell $0.04 per share, or 8.3%, to close at $0.44 per share on August 16, 2023.

7.    On April 1, 2024, Ocugen filed a current report on Form 8-K with the SEC, announcing that the Company had "identified certain accounting errors related to the application of U.S. GAAP to certain agreements with one of its business partners related to a collaboration agreement." As a result:

the Company's previously-issued audited consolidated financial statements for each fiscal year beginning January 1, 2020 and its previously-issued unaudited interim condensed consolidated financial statements for each of the first three quarters in such years, as well as the associated earnings releases and investor presentations or other communications describing such financial statements, were materially misstated.

8.     The April 1, 2024 8-K further revealed that the Company would be issuing restatements of its financial statements "as of and for the year ended December 31, 2022" and "for the first three quarters of 2023 and 2022 in its 2023 Form 10-K." Specifically, "the identified errors will result in a restatement of the following financial statement line-item captions: Collaborative arrangement revenue, Research and development expenses, Other income (expense), net and Accrued expenses and other current liabilities."

9.     Also on April 1, 2024, Ocugen filed a Notification of Late Filing on Form 12b-25 with the SEC with respect to its 2023 Form 10-K, which stated that "[g]iven the scope of the process to prepare the restatements and related disclosures, the Company requires additional time" and "is unable to complete and file the 2023 Form 10-K by the required due date of April 1, 2024."

10.     On this news, Ocugen's stock price declined 10.38%, from a closing price of $1.54 per share on April 1, 2024, to a closing price of $1.38 per share on April 2, 2024.

11.     Defendants Musunuri, Castillo, Kompella, Subramanian, Zhang, Fernandes, Kumar, and Potti further breached their fiduciary duties by engaging in insider sales of Company common stock while the share price was artificially inflated.

12.     Ocugen and Defendant Musunuri are named as defendants in a federal securities fraud class action lawsuit pending in this Court, captioned *In re Ocugen, Inc. Securities Litigation,* Case No. 2:24-cv-01500-KBH (the "Securities Class Action."). The Securities Class Action has further subjected Ocugen to the need to undertake internal investigations and the need to implement adequate controls, as well as exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 14(a) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78n(a)(1) and 78u-4(f)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) Ocugen maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

18.     Plaintiff is a current shareholder of Ocugen and has continuously held Ocugen

common stock at all relevant times, including prior to the beginning of the Relevant Period.

19.     Nominal Defendant Ocugen is a Delaware corporation with its principal executive offices located at 11 Great Valley Parkway, Malvern, Pennsylvania 19355. The Company's common stock trades on the NASDAQ under the ticker symbol "OCGN."

20.     Defendant Musunuri is a co-founder of Ocugen and has served as Chairman of the Board since 2013 and as the Company's CEO since 2015. He also served as the interim principal financial officer at times specified herein. According to the proxy statement filed on Schedule 14A with the SEC on May 28, 2024 (the "2024 Proxy Statement"), in 2022 and 2023, Defendant Musunuri received $7,662,810 and $4,535,231, respectively, in total compensation from the Company.

21.     Defendant Castillo has served as a director of Ocugen since 2020. Defendant Castillo also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee, the Compensation Committee, and the Science and Technology Committee. According to the 2024 Proxy Statement, in 2023, Defendant Castillo received $110,821 in total compensation from the Company.

22.     Defendant Fernandes has served as a director of Ocugen since 2020. Defendant Fernandes also serves as the Chair of the Compensation Committee and as a member of the Audit Committee and the Science and Technology Committee. According to the 2024 Proxy Statement, in 2023, Defendant Fernandes received $124,625 in total compensation from the Company.

23.     Defendant Kompella co-founded Ocugen in 2013 and has served as a director of Ocugen since 2019. Defendant Kompella also serves as Chair of the Science and Technology Committee and as a member of the Nominating and Corporate Governance Committee and the Compensation Committee. According to the 2024 Proxy Statement, in 2023, Defendant Kompella

received $102,125 in total compensation from the Company.

24.     Defendant Zhang has served as a director of Ocugen since 2019. Defendant Zhang also serves as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, in 2023, Defendant Zhang received $87,125 in total compensation from the Company.

25.     Defendant Whittington has served as a director of Ocugen since 2022. Defendant Whittington also serves as Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2024 Proxy Statement, in 2023, Defendant Whittington received $103,321 in total compensation from the Company. Defendant Whittington holds a Master and Ph.D. in Quantitative Methods from the University of Pittsburgh and a Bachelor of Arts in Mathematics from the University of Delaware. Defendant Whittington previously served as Chief Financial Officer of the University of Pennsylvania, as well as the Secretary of Finance for the State of Delaware. As such, Defendant Whittington is deemed a "financial expert" in the Company's Amended Annual Report filed on Form 10-K/A in April 2024.

26.     Defendant Kumar served as a director of Ocugen from September 2019 until his resignation on June 28, 2024. According to the 2024 Proxy Statement, in 2023, Defendant Kumar received $144,013 in total compensation from the Company.

27.     Defendant Potti served as a director of Ocugen from September 2019 until his resignation in June 2022. While a director, Defendant Potti served as a member of the Audit Committee. According to the proxy statement filed on Schedule 14A with the SEC on April 20, 2023 (the "2023 Proxy Statement"), in 2022, Defendant Potti received $167,970 in total compensation from the Company.

28.    Defendant Breininger has served as Ocugen's Corporate Controller since August 2023 and served as the Interim Chief Accounting Officer ("CAO") beginning in September 2023. According to the 2024 Proxy Statement, in 2023, Defendant Breininger received $226,935 in total compensation from the Company. According to the Company's website, Defendant Breininger "has been providing accounting and financial consulting services with a focus in the life sciences and industrial products industries" and "has executed a variety of projects including extensive ASC 606 and ASC 842 implementations, carve-out reporting for a pharmaceutical company, and various technical accounting analysis."

29.    Defendant Subramanian served as Ocugen's Chief Financial Officer ("CFO") and Head of Corporate Development from October 2019 until his resignation, effective March 18, 2022. According to the proxy statement filed on Schedule 14A with the SEC on April 28, 2022 (the "2022 Proxy Statement"), in 2021, Defendant Subramanian received $2,602,661 in total compensation from the Company.

30.    Defendant Crespo served as Ocugen's CAO from March 18, 2022, until her resignation, effective March 10, 2023. According to the 2024 Proxy Statement, in 2023, Defendant Crespo received $712,300 in total compensation from the Company. Defendant Crespo is a Certified Public Accountant ("CPA") and has held various accounting roles throughout her career, including working at Ernst & Young, Ocugen's independent auditor.

31.    Defendant Vu served as Ocugen's Chief Business Officer ("CBO") from February 2023 and as CFO from March 2023 until his resignation from both roles, effective August 14, 2023. According to the 2024 Proxy Statement, in 2023, Defendant Vu received $790,113 in total compensation from the Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of their positions as officers, directors, and/or fiduciaries of Ocugen and because of their ability to control the business and corporate affairs of Ocugen, the Individual Defendants owed Ocugen and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ocugen in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ocugen and its shareholders.

33.     Each director and officer of Ocugen owes to Ocugen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of Ocugen and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

34.     The Individual Defendants, as officers and/or directors of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, had a duty to promptly disseminate accurate and truthful information regarding Ocugen's operations, finances, financial condition, financial statements, performance, growth, earnings, internal controls, and present and future business prospects so that the market price of Ocugen's stock would be based on truthful, accurate, and fairly presented information.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ocugen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Ocugen. Because of their advisory, executive, managerial and directorial positions with Ocugen, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper

representations of Ocugen.

36.    The Individual Defendants, as officers and/or directors of Ocugen, were required to discharge their duties by exercising reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of Ocugen. By virtue of such duties, the officers and directors of Ocugen were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, ethical, and businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide the public, investors, and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of internal legal, financial, and management controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

37.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Ocugen and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

38.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ocugen, the absence of good faith on their part, and a reckless disregard for their duties to Ocugen and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.    The Individual Defendants breached their duties of loyalty and good faith by causing Ocugen to issue false and misleading statements concerning its financial condition.  As a result, Ocugen has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## THE CODE OF BUSINESS CONDUCT AND ETHICS

40.    Ocugen's Code of Business Conduct and Ethics (the "Code of Conduct"), which applies to all employees, executive officers, and directors of Ocugen, states that it exists as a "reaffirmation" of its "commitment to conducting [Ocugen's] business ethically, with integrity, and to observe applicable laws, rules and regulations."

41.    The Code of Conduct goes on to provide the following explanation of its purpose:

The Code is designed to promote (i) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, (ii) full, fair, accurate, timely, and understandable disclosure in reports and documents the Company files with, or submit to, the

Securities and Exchange Commission (the "SEC") and in our other public communications, (iii) compliance with applicable governmental laws, rules and regulations, (iv) prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code and (v) to ensure accountability for adherence to the Code. It also serves as a guide to help us achieve our goals and set expectations by highlighting many of the laws, rules and regulations that affect our industry. But, more importantly, it helps protect our reputation by ensuring to our business partners, investors and patients that together we are committed to a culture of compliance. The Company's Chief Financial Officer or other person performing similar duties (such person is referred to herein as the "Chief Financial Officer") has been designated to be the compliance officer (the "Compliance Officer") for purposes of the implementation, interpretation and administration of the Code.

42.    Under the sub-heading "Your Responsibilities," the Code of Conduct provides:

The Code is meant to familiarize you with our commitment to conducting our business ethically and with integrity and to observe applicable laws, rules and regulations. It is of the upmost importance that you read, understand and comply with the Code. We expect all employees, executive officers and directors to:

- Understand and comply with the Code and all other Ocugen policies;

- Act with integrity, honesty and high ethical standards in conducting Ocugen business;

- Always treat colleagues with respect;

- Seek guidance if you are unsure about what to do in a particular situation;

- Promptly report any suspected violations of this Code to the appropriate persons; and

- Fully cooperate with any Company investigation of alleged misconduct.

43.    Under the sub-heading "Additional Responsibilities of Supervisors, Executive

Officers and Directors," the Code of Conduct states:

Supervisors, executive officers and directors have additional responsibilities and are expected to serve as a positive role model for employees. Supervisors, executive officers and directors must:

- Create an environment where employees are encouraged to ask questions and raise concerns without fear of retaliation;

- Demonstrate commitment to maintaining high ethical standards;

- Enforce and comply with the Code; and

- Promptly report any suspected violations of this Code to the appropriate persons.

44.    Under the sub-heading titled "Reporting," the Code of Conduct states:

Every employee, executive officer and director has the responsibility to ask questions, seek guidance, report suspected violations and express concerns regarding the enforcement of the Code, the law and other Company policies.

Any employee, executive officer or director who knows or believes that any other employee or agent of the Company has engaged, or is engaging, in conduct that violates applicable law, this Code or Company policy should report such information to their supervisor, a Human Resources representative, our Compliance Officer or anonymously by submitting such concerns via the Whistleblower Hotline. All employees have access to the Company's Whistleblower Hotline, via telephone at +1 844-684-5525 or online at ocugen.ethicspoint.com, through which suspected violations may be reported confidentially and anonymously. Human Resources will monitor the Whistleblower Hotline. Human Resources or the relevant supervisor to whom concerns were reported must promptly report concerns of suspected violations to the Compliance Officer (unless the report concerns the Compliance Officer, in which case the report may be made directly to the Audit Committee). Any concerns involving directors or executive officers will be reported by the Compliance Officer to the Audit Committee. While we prefer that you identify yourself when reporting violations so that we may follow up with you, as necessary, for additional information, you may report anonymously.

While it is our desire to address matters internally, nothing in the Code should discourage you from reporting any illegal activity, including any violation of securities laws, antitrust laws, environmental laws or any other federal, state or foreign law, rule or regulation, to the appropriate regulatory authority.

45.    Under a sub-heading titled "Compliance with Laws, Rules, and Regulations Worldwide," the Code of Conduct states:

Our industry is highly regulated, and regulation affects virtually every functional area of our business.

Ocugen and all of our employees are required to comply with all laws, rules and regulations that apply to the operations of our Company including, but not limited to, laws, rules and regulations that govern the development, manufacturing and clinical distribution of products; securities laws; privacy laws; employment laws; and local, state and federal laws, including those relating to duties owed by corporate officers and directors.

In certain aspects of our business activities, we have made further commitments to comply with generally accepted industry codes of conduct. Because Ocugen may operate outside of the United States, the laws and regulatory requirements of more than one country may apply to certain activities. In the event local laws and regulatory requirements differ from the Code or other Company policy, the stricter requirements generally apply.

46.     Under a sub-heading titled "Insider Trading," the Code of Conduct states:

You are prohibited from buying, selling or engaging in any other transaction with respect to securities of Ocugen or any other company, including the Company's suppliers and customers, while in possession of material, non-public information. Material information is any information that a reasonable investor would consider important in making an investment decision. You must also refrain from sharing, tipping or disclosing material, non-public information with others.

You should be aware that stock market surveillance techniques are becoming increasingly sophisticated, and the probability that U.S. federal or other regulatory authorities will detect and prosecute even small level trading is significant. Insider trading rules are strictly enforced, even in instances where the financial transactions seem small. Violations of the U.S. securities laws may result in civil and criminal penalties, including disgorgement of profits, civil judgments, fines and jail sentences.

All directors, executive officers and employees are also subject to our Insider Trading Policy, which is available on our intranet site. You should review and be familiar with the Insider Trading Policy. If you are uncertain about the constraints on your purchase or sale of any securities by virtue of your relationship with Ocugen, you should consult with our Chief Financial Officer or our Compliance Officer before making any such purchases or sale.

47.     Under a sub-heading titled "Accuracy of Books and Records and Public Reports,"

the Code of Conduct states:

The Company has an obligation to make and keep books, records and accounts that, in reasonable detail, accurately and fairly reflect the Company's transactions and to maintain tax records and prepare tax returns that comply with applicable laws, rules and regulations. The Company must also maintain a system of internal accounting controls that meet generally accepted accounting principles and applicable laws, rules and regulations. All employees who are responsible for any aspect of the Company's internal accounting controls and financial and tax reporting systems (including, but not limited to, the Chief Executive Officer, Chief Financial Officer, the principal Financial Officer, the principal accounting officers and persons performing similar functions) must conduct themselves using the

highest ethical standards of integrity and honesty, in a manner that allows the Company to meet accounting and legal requirements and to prepare financial reports and financial statements that are not false or misleading, and that present full, fair, accurate, timely and understandable disclosure in the Company's periodic reports and other public communications.

You must honestly and accurately report all business transactions. You are responsible for the accuracy of your records and reports. Accurate information is essential to our ability to meet legal and regulatory requirements.

All Company books, records and accounts will be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. No employee, executive officer or director may override, or direct others to override, the Company's established system of internal controls over financial reporting and disclosure. The financial statements of the Company must conform to generally accepted accounting rules and the Company's finance policies. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries should be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property should be made without adequate supporting documentation. Transactions of the Company are to be executed only in accordance with management's general or specific authorizations.

It is our policy to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the SEC and in other public communications.

## THE AUDIT COMMITTEE CHARTER

48.     Ocugen also maintains an Audit Committee Charter (the "Charter"), which sets

forth additional responsibilities of the members of the Board's Audit Committee.

49.     According to the Charter, the purpose of the Audit Committee is "to assist the

Board's oversight of the Company's accounting and financial reporting processes and the audits

of the Company's financial statements."

50.     Under a sub-heading titled "Authority and Responsibilities," the Charter outlines

the Audit Committee's responsibilities as follows:

The Audit Committee shall discharge its responsibilities, and shall assess the information provided by the Company's management and the Company's registered public accounting firm (the "independent auditor"), in accordance with

its business judgment. Management is responsible for the preparation, presentation, and integrity of the Company's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by the Company and for establishing and maintaining adequate internal control over financial reporting. The independent auditor is responsible for auditing the Company's financial statements and, when required, the Company's internal control over financial reporting and for reviewing the Company's unaudited interim financial statements. The authority and responsibilities set forth in this Charter do not reflect or create any duty or obligation of the Audit Committee to plan or conduct any audit, to determine or certify that the Company's financial statements are complete, accurate, fairly represented, or in accordance with generally accepted accounting principles or applicable law, or to guarantee the independent auditor's reports.

51.    Under a sub-heading titled "Oversight of Independent Auditor," the Charter

outlines the Audit Committee's responsibilities as follows, in relevant part:

- Selection. The Audit Committee shall be solely and directly responsible for appointing, evaluating, retaining and, when necessary, terminating the engagement of the independent auditor. The Audit Committee may, in its discretion, seek stockholder ratification of the independent auditor it appoints.

- Independence. The Audit Committee shall take, or recommend that the full Board take, appropriate action to oversee the independence of the independent auditor. In connection with this responsibility, the Audit Committee shall obtain and review the requirements of the Public Company Accounting Oversight Board (the "PCAOB") regarding the independent auditor's communications with the Audit Committee concerning independence. The Audit Committee shall actively engage in dialogue with the independent auditor concerning any disclosed relationships or services that might impact the objectivity and independence of the auditor.

- Compensation. The Audit Committee shall have sole and direct responsibility for setting the compensation of the independent auditor. The Audit Committee is empowered, without further action by the Board, to cause the Company to pay the compensation of the independent auditor established by the Audit Committee

- Preapproval of Services. The Audit Committee shall preapprove all audit services to be provided to the Company, whether provided by the principal auditor or other firms, and all other services (review, attest and non-audit) to be provided to the Company by the independent auditor; provided,

  however, that de minimis non-audit services may instead be approved in

accordance with applicable SEC rules

- Oversight. The independent auditor shall report directly to the Audit Committee, and the Audit Committee shall have sole and direct responsibility for overseeing the work of the independent auditor, including resolution of disagreements between Company management and the independent auditor regarding financial reporting

52.     Under a sub-heading titled "Audited Financial Statements," the Charter outlines the

Audit Committee's responsibilities as follows:

- Review and Discussion. The Audit Committee shall review and discuss with the Company's management and independent auditor the Company's audited financial statements, including the matters required to be discussed by AS 16.

- Recommendation to Board Regarding Financial Statements. The Audit Committee shall review and discuss the Company's annual audited financial statements, interim financial statements and any certification, report, opinion or review rendered by the independent auditor with the Company's management and the independent auditor. The Audit Committee shall recommend to the Board whether the annual audited financial statements and related notes should be included in the Company's annual report on Form 10-K

- Audit Committee Report. The Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.

53.     Under a sub-heading titled "Review of Other Financial Disclosures," the Charter

outlines the Audit Committee's responsibilities as follows:

Independent Auditor Review of Interim Financial Statements. The Audit Committee shall direct the independent auditor to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Audit Committee and Chief Financial Officer any matters identified in connection with the auditor's review of interim financial information which are required to be discussed by applicable auditing standards. The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent auditor's review of interim financial information.

## SUBSTANTIVE ALLEGATIONS

**Company Background**

54.    Ocugen was founded in 2013 and purports to be focused on "discovering, developing, and commercializing a pipeline of innovative therapies that address rare and underserved eye diseases."

55.    Since its inception, Ocugen has suffered from recurring net losses and negative cash flows and has failed to generate any revenues through the sale of its products. Instead, Ocugen has had to fund its operations through the sale of its common stock, warrants to purchase common stock, the issuance of convertible notes, debt, and grant proceeds.

56.    Throughout the Relevant Period, Ocugen announced that it would need to raise significant additional capital to fund its future product development and operations.

57.    Ocugen was able to fund its operations and increase the balance of its cash through stock issuances. By December 31, 2020, Ocugen had $24.2 million in cash, cash equivalents, and restricted cash. As of December 31, 2021, that number increased to $95.1 million. This cash position, however, was insufficient (by the Company's own admission) to meet its capital requirements during the subsequent twelve-month period. As of December 31, 2022, the Company had a cash and cash equivalents balance of $77.6 million, which, again, the Company admitted was insufficient during the subsequent twelve-month period.

58.    In May 2023, Ocugen sold 30 million shares of its common stock at a public offering price of $0.50 per share, receiving $14.8 million in net proceeds. In the days following its May 2023 public offering, its stock price plunged 36%. As of December 31, 2023, Ocugen had a cash and cash equivalents balance of $39.5 million, again insufficient to meet the Company's capital requirements over the subsequent twelve-month period.

**The CanSinoBIO Collaborative Agreement**

59.     Ocugen uses business partnerships and licensing opportunities to expand the reach of its products. These strategies often take the form of collaboration arrangements with pharmaceutical or other biotechnology companies.

60.     The Financial Accounting Standards Board ("FASB") originally defined the term "collaborative arrangement" as part of its Accounting Standards Codification ("ASC") Topic 808. A collaborative arrangement is a contractual arrangement where two or more parties actively participate in a joint operating activity and are exposed to significant risks and rewards that depend on the activity's commercial success. These types of collaborative arrangements are common in the life sciences industry and between biotech companies and pharmaceutical firms, where different companies often join forces to develop and commercialize new products and services.

61.     In September 2019, Ocugen entered into a co-development and commercialization agreement with CanSinoBIO with respect to the development and commercialization of OCU400, one of Ocugen's modifier gene therapy product candidates for retinal diseases. In September 2021 and November 2021, that agreement was amended to include OCU410 and OCU410ST, respectively. The agreement provides that CanSinoBIO is responsible for chemistry, manufacturing, and controls development, the manufacture of clinical supplies of such products, and associated costs. The agreement further provides that CanSinoBIO has an exclusive license to develop, manufacture, and commercialize Ocugen's modifier gene therapy platform in and for China, Hong Kong, Macau, and Taiwan and maintains exclusive development, manufacturing, and commercialization rights with respect to the Company's modifier gene therapy platform outside of the aforementioned territories.

62.     Ocugen failed to properly account for its collaborative agreement with CanSinoBIO

in order to inflate the Company's financials.

**Accounting for Collaborative Agreements**

63.    In May 2014, the FASB issued ASU Topic 606, *Revenue with Contracts from Customers,* which provides a unified model to determine how revenue is recognized. ASU 606 provides that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services.

64.    ASC 808, *Collaborative Arrangements,* provides guidance for the presentation and disclosure of transactions in collaborative agreements, requiring:

> In the period in which a collaborative arrangement is entered into … and all annual periods thereafter, a participant to a collaborative arrangement shall disclose all of the following:
>
> a. Information about the nature and purpose of its collaborative arrangements
> b. Its rights and obligations under the collaborative arrangements
> c. The accounting policy for collaborative arrangements in accordance with Topic 235
> d. The income statement classification and amounts attributable to transactions arising from the collaborative arrangement between participants for each period an income statement is presented.
>
> Information related to individually significant collaborative arrangements shall be disclosed separately. ASC 808-10-50-1.

65.    On November 5, 2018, FASB issued Standards Update 2018-18, which amended Topic 808 to clarify when a transaction between entities in a collaborative arrangement should be accounted for as a contract with a customer and, thus, within the scope of the new revenue guidance contained in ASC 606 (which became effective for public companies during 2018). The new guidance for collaborative arrangements became effective for calendar 2020.

66.    Pursuant to the new guidance, transactions between collaborative arrangement participants are within the scope of ASC 606 when the collaborative arrangement participant is a

customer in the context of a unit of account (*i.e.*, a distinct good or service). In such situations, all aspects of ASC 606 should be applied, including its recognition, measurement, presentation, and disclosure requirements.

67.    For collaborative agreements that are wholly or partially outside the scope of other accounting standards, including ASC 606, the account and financial statement presentation for the parts of the agreement beyond the scope of other authoritative accounting literature must be based on analogy to authoritative accounting literature or otherwise a reasonable, rational, and consistently applied account policy election.

68.    The new guidance also prohibited revenue from collaborative agreements from being presented with regular revenue. However, revenue from collaborative arrangements could still be presented separately from revenue from contracts with customers (as "collaboration revenue") on the income statement.

69.    On November 6, 2018, Ocugen's independent auditor, Ernst & Young, published a document analyzing FASB's Accounting Standards Update 2018-18. In a section entitled "What you need to know," EY noted that:

- The FASB amended ASC 808 and ASC 606 to clarify that certain transactions between participants in a collaborative arrangement should be accounted for under ASC 606 when the counterparty is a customer.
- The guidance precludes an entity from presenting consideration from a transaction in a collaborative arrangement as revenue from contracts with customers if the counterparty is not a customer for that transaction.
- The guidance amends ASC 808 to refer to the unit-of-account guidance in ASC 606 and requires it to be used only when assessing whether a transaction is in the scope of ASC 606.
- The guidance is effective for public business entities in fiscal years beginning after 15 December 2019, and interim periods therein, and for all other entities, in fiscal years beginning after 15 December 2020, and interim periods beginning the following fiscal year. Early adoption is permitted for entities that have adopted ASC 606.

70.    Ocugen adopted the FASB update effective January 1, 2020. The 2020 10-K stated:

In November 2018, the FASB issued ASU No. 2018-18, *Collaborative Arrangements (Topic 808): Clarifying the Interaction between Topic 808 and Topic 606*. This standard clarifies that certain transactions between collaborative arrangement participants should be accounted for as revenue under ASC 606 when the collaborative arrangement participant is a customer in the context of a unit of account. In those situations, ASC 606 guidance should be applied, including recognition, measurement, presentation, and disclosure requirements. The standard adds unit-of-account guidance to ASC 808 to align with the guidance in ASC 606 when an entity is assessing whether the collaborative arrangement or a part of the collaborative arrangement is within the scope of ASC 606. The standard also precludes a company from presenting transactions with collaborative arrangement participants that are not directly related to sales to third parties with revenue from contracts with customers recognized under ASC 606 if the collaborative arrangement participant is not a customer. ***This standard was effective for the Company on January 1, 2020.***[1] Consistent with the guidance in this standard, the Company assesses whether collaboration arrangements are within the scope of ASC 606. For collaboration arrangements that are not within the scope of ASC 606, applicable transactions with collaborative arrangement participants are presented as collaboration revenue rather than revenue from contracts with customers. See above and Note 4 for additional information.

71.     Ocugen was required to evaluate its CanSinoBIO agreement at inception and throughout its lifespan to determine whether it was a collaborative arrangement within the scope of ASC 808.

72.     While the CanSinoBIO agreement clearly is a collaborative arrangement within ASC 808's scope, Ocugen failed to recognize it as such from 2019 through 2021. Even after acknowledging, in 2022, that the CanSinoBIO agreement was a collaborative arrangement, the Company still failed to follow ASC 808 and account for the arrangement by analogy to appropriate authoritative accounting standard which, in the restatement, Ocugen acknowledged was ASC 606.

73.     As a result of its failure to apply the relevant account and disclosure provisions of ASC 606, Ocugen, as it acknowledged, "had not appropriately accounted for its collaboration arrangements, including the determination of the transaction price, calculating the process towards the satisfaction of the performance obligations under the collaborative arrangements, and

---

[1] All emphasis added unless otherwise noted.

determining the value of the non-cash consideration received and recognized as research and development expense." Ocugen also failed to separately present the revenue within "Other income (expense), net" line item on the income statement.

74.    As a result of its failures and improper application of ASC 606 and ASC 808, Ocugen was able to significantly understate its current liabilities and accumulated deficit, overstate its stockholders' equity, and inflate its current ratio. Moreover, Ocugen understated its R&D expense, losses from operations, net losses, and losses per share.

75.    As detailed above, Defendants Whittington, Crespo, and Breininger have extensive experience and expertise in the financial and accounting industries. Furthermore, according to the Company's Amended Annual Report filed with the SEC on Form 10-K/A in April 2024, each member of the Audit Committee – Defendants Whittington, Castillo, and Fernandes – is considered "financially literate." Accordingly, these Individual Defendants are, or should be, familiar with applicable accounting standards and accounting treatment of, *inter alia*, collaborative arrangement revenue, R&D expenses, other income (expense), net and Accrued expenses and other current liabilities. This is especially true for the above-named Individual Defendants who are CPA's and/or have extensive accounting experience with collaborative agreements within the life sciences industry.

**Materially False and Misleading Statements Issued During the Relevant Period**

*The 1Q20 10-Q*

76.    On May 8, 2020, Ocugen filed a quarterly report on Form 10-Q with the SEC for the first quarter of 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendants Musunuri and Subramanian. Attached to the 1Q20 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Musunuri and Subramanian, that attested to the

accuracy of financial reporting, the disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

77.    The 1Q20 10-Q contained the following statement regarding Ocugen's Internal controls:

> ***We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) (the "Exchange Act"), as of March 31, 2020.*** Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, ***our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms,*** and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

78.    The 1Q20 10-Q contained purported financial results of the Company, reporting, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $3,314,998, accumulated deficit of $55,423,643, and total stockholder's equity of $7,297,105; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $0[2], R&D expenses of $1,652,318, loss from operations of $3,929,102, other income (expense), net[3] of ($14,717), net loss of $3,943,819, and loss per share of $0.07.

79.    On May 8, 2020, Ocugen filed with the SEC a current report on Form 8-K signed

---

[2] The "collaborative revenue" line item on the Company's Income Statements only appears in the 2Q20 10-Q, 3Q20 10-Q, and 2020 10-K (all defined herein).
[3] The terms "Other income (expense), net" and "Total other income (expense)" are interchangeably used on the Company's Income Statements.

by Musunuri with an attached press release that disclosed the financial results reported in the 1Q20 10-Q.

80.     The statements in or referred to in ¶¶76-79 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholders' equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**The 2Q20 10-Q**

81.     On August 14, 2020, Ocugen filed a quarterly report on Form 10-Q with the SEC for the period ending June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendants Musunuri and Subramanian. Attached to the 2Q20 10-Q were SOX certifications signed by Defendants Musunuri and Subramanian that attested to the accuracy of financial reporting, the disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

82.     The 2Q20 10-Q contained the following statement regarding the Company's

internal controls:

> *We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) (the "Exchange Act"), as of June 30, 2020.* Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms,* and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

83.    The 2Q20 10-Q contained purported financial results of the Company, reporting, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $7,041,353, accumulated deficit of $59,037,618, and total stockholder's equity of $14,623,027 in the Company's unaudited Condensed Consolidated Balance Sheets; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $42,620, R&D expenses of $1,629,869, loss from operations of $3,366,265, other income (expense), net of ($247,710), net loss of $3,613,975, and loss per share of $0.19.

84.    On August 14, 2020, Ocugen filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release that disclosed the financial results reported in the 2Q20 10-Q.

85.    The statements in or referred to in ¶¶ 80-84 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material

adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholders' equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

### The 3Q20 10-Q

86.    On November 6, 2020, Ocugen filed a quarterly report on Form 10-Q with the SEC for period ending September 30, 2020 (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendants Musunuri and Subramanian. Attached to the 3Q20 10-Q were SOX certifications signed by Defendants Musunuri and Subramanian that attested to the accuracy of financial reporting, the disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

87.    The 3Q20 10-Q contained the following statement regarding the Company's internal controls:

> *We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of September 30, 2020.* Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of

the end of the period covered by this report, ***our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

88.    The 3Q20 10-Q contained purported financial results of the Company, reporting, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $4,130,787, accumulated deficit of $69,511,645, and total stockholder's equity of $14,421,645; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $0, R&D expenses of $1,477,382, loss from operations of $10,181,980, other income (expense), net of ($291,867), net loss of $10,473,847, and loss per share of $0.01.

89.    On November 6, 2020, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release that disclosed the financial results reported in the 3Q20 10-Q.

90.    The statements in or referred to in ¶¶ 86-89 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholders' equity in the Company's unaudited Condensed Consolidated Balance Sheets and

collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

***The 2020 10-K***

91.     On March 19, 2021, Ocugen filed its Annual Report on Form 10-K with the SEC for the year ending December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Musunuri, Subramanian, Kumar, Zhang, Kompella, Potti, Castillo, and Fernandes. Attached to the 2020 10-K were SOX certifications, signed by Defendants Musunuri and Subramanian, that attested to the accuracy of financial reporting, the disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

92.     The 2020 10-K contained the following statement regarding the Company's internal controls:

> ***We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2020***. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, ***our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the

cost-benefit relationship of possible controls and procedures.

93.     The 2020 10-K further stated:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) under the Exchange Act as a process designed by, or under the supervision of, our principal executive officer and principal financial officer and effected by our Board of Directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our financial statements for external reporting purposes in conformity with GAAP….

Under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2020 based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework of 2013. ***Based on this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2020.***

94.     The 2020 10-K contained purported financial results of the Company, reporting, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $3,613,551, accumulated deficit of $73,301,777, and total stockholder's equity of $21,550,441 in the Company's unaudited; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $42,620, R&D expenses of $6,353,287, loss from operations of $21,284,717, other income (expense), net of ($537,236), net loss of $21,821,953, and loss per share of $0.31.

95.     Further, the 2020 10-K also states:

***Collaboration Arrangements***

The Company assesses whether collaboration agreements are subject to Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 808, *Collaborative Arrangements* ("ASC 808"), based on whether they involve joint operating activities and whether both parties have active participation in the arrangement and are exposed to significant risks and rewards. To the extent that the arrangement falls within the scope of ASC 808, the Company assesses whether the payments between the Company and the collaboration partner are subject to other accounting literature. If payments from the collaboration partner

represent consideration from a customer, the Company accounts for those payments within the scope of FASB ASC Topic 606, *Revenue from Contracts with Customers* ("ASC 606"). However, if the Company concludes that its collaboration partner is not a customer, the Company will record royalty payments received as collaboration revenue in the period in which the underlying sale occurs and record expenses and expense reimbursements as either research and development expense or general and administrative expense, or a reduction thereof, based on the underlying nature of the expense or expense reimbursement.

**The Company has two agreements accounted for as collaborative agreements within the scope of ASC 808.** See Note 4 for additional information.

96.    Note 4 explains that the two collaborative agreements accounted for as within the scope of ASC 808 were with Advaite, Inc., a company co-founded and managed by Musunuri's son, and the Shepens Eye Research Institute. Ocugen failed to account for its agreement with CanSinoBIO as a collaborative agreement. With respect to the CanSinoBIO agreement, Note 4 stated only:

4. License and Development Agreements.

***

***Co-Development and Commercialization Agreement with CanSino Biologics Inc.***

In September 2019, Ocugen entered into a co-development and commercialization agreement (the "CanSinoBIO Agreement") with CanSino Biologics Inc. ("CanSinoBIO") with respect to the development and commercialization of the gene therapy product candidate, OCU400.

***CanSinoBIO will be responsible for all the costs for chemistry, manufacturing and control development and manufacture of clinical supplies of OCU400 for all territories. CanSinoBIO will be solely responsible for all costs and expenses of its development activities in and for China, Hong Kong, Macau, and Taiwan (the "CanSinoBIO Territory") and Ocugen will be responsible for all costs and expenses of its development activities for any global location outside the CanSinoBIO Territory (the "Ocugen OCU400 Territory"). CanSinoBIO will pay to Ocugen an annual royalty between mid-to-high single digits based on net sales of products in the CanSinoBIO Territory, and Ocugen will pay to CanSinoBIO an annual royalty between low-to-mid single digits based on net sales of products in the Ocugen OCU400 Territory.***

97.    On March 18, 2021, Ocugen also filed with the SEC a current report on Form 8-

K signed by Musunuri with an attached press release, which disclosed the financial results reported in the 2020 10-K.

98.     The statements in or referred to in ¶¶ 91-97 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholders' equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

*The 1Q21 10-Q*

99.     On May 7, 2021, Ocugen filed a quarterly report on Form 10-Q with the SEC for the period ending March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q was signed by Defendants Musunuri and Subramanian. Attached to the 1Q21 10-Q were SOX certifications, signed by Defendants Musunuri and Subramanian, that attested to the accuracy of financial reporting, the disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

100.    The 1Q21 10-Q contained the following statement regarding the Company's

internal controls:

> *We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of March 31, 2021.* Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

101.    The 1Q21 contained purported financial results of the Company, reporting, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $4,281,000, accumulated deficit of $80,379,000, and total stockholder's equity of $46,489,000; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $0, R&D expenses of $2,872,000, loss from operations of $7,057,000, other income (expense), net of ($20,000), net loss of $7,077,000, and loss per share of $0.04.

102.    On May 7, 2021, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release which disclosed the financial results reported in the 1Q21 10-Q.

103.    The statements in or referred to in ¶¶ 99-102 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or

misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

### The 2Q21 10-Q

104.    On August 6, 2021, Ocugen filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2021 (the "2Q21 10-Q"). The 2Q21 10-Q was signed by Defendants Musunuri and Subramanian. Attached to the 2Q21 10-Q were SOX certifications, signed by Defendants Musunuri and Subramanian, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

105.    The 2Q21 10-Q contained the following statement regarding the Company's internal controls:

> *We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a- 15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of June 30, 2021.* Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, **our disclosure controls and procedures are effective in ensuring**

*that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

106.    The 2Q21 10-Q contained Ocugen's purported financial results, reporting in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $4,840,000, accumulated deficit of $106,331,000, and total stockholder's equity of $116,409,000; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $0, R&D expenses of $18,853,000, loss from operations of $25,610,000, other income (expense), net of ($342,000), net loss of $25,952,000, and loss per share of $0.13.

107.    On August 6, 2021, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release which disclosed the financial results reported in the 2Q21 10-Q.

108.    The statements in or referred to in ¶¶ 104-107 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and

collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

### The 3Q21 10-Q

109.    On November 9, 2021, Ocugen filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2021 (the "3Q21 10-Q"). The 3Q21 10-Q was signed by Defendants Musunuri and Subramanian. Attached to the 3Q21 10-Q were SOX certifications signed by Defendants Musunuri and Subramanian, attesting to the accuracy of financial reporting, the disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

110.    The 3Q21 10-Q contained the following statement regarding the Company's internal controls:

> *We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a- 15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of June 30, 2021.* Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms,* and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment

in evaluating the cost-benefit relationship of possible controls and procedures.

111.    The 3Q21 10-Q contained Ocugen's purported financial results, reporting, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $6,229,000, accumulated deficit of $117,086,000, and total stockholder's equity of $107,110,000; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $0, R&D expenses of $6,281,000, loss from operations of $10,789,000, other income (expense), net of ($18,000), net loss of $10,755,000, and loss per share of $0.05.

112.    On November 9, 2021, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release which disclosed the financial results reported in the 3Q21 10-Q.

113.    The statements in or referred to in ¶¶ 109-112 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

*The 2021 10-K*

114.    On February 28, 2022, Ocugen filed an Annual Report on Form 10-K with the SEC for the 2021 fiscal year (the "2021 10-K"). The 2021 10-K was signed by Defendants Musunuri, Subramanian, Kumar, Zhang, Kompella, Potti, Castillo, and Fernandes. Attached to the 2021 10-K were SOX certifications signed by Defendants Musunuri and Subramanian, attesting to the accuracy of financial reporting, the disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

115.    The 2021 10-K contained the following statement regarding the Company's internal controls:

> *We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2021.* Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

116.    The 2021 10-K contained Ocugen's purported financial results, reporting, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $7,000,000, accumulated deficit of $131,667,000, and total stockholder's equity of $95,818,000; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue

of $0, R&D expenses of $25,108,000, loss from operations of $58,028,000, other income (expense), net of ($389,000), net loss of $58,365,000, and loss per share of $0.30.

117.    On February 25, 2022, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release which disclosed the financial results reported in the 2021 10-K.

118.    The statements in or referred to in ¶¶ 114-117 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

119.    The accounting policy disclosure for collaborative arrangements in the 2021 10-K was identical to the 2020 10-K.

120.    Ocugen disclosed that it did not record any revenue from collaborative arrangements during 2021:

**Collaboration Arrangements**

The Company assesses whether collaboration agreements are subject to Financial

39

Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 808, *Collaborative Arrangements* ("ASC 808"), based on whether they involve joint operating activities and whether both parties have active participation in the arrangement and are exposed to significant risks and rewards. To the extent that the arrangement falls within the scope of ASC 808, the Company assesses whether the payments between the Company and the collaboration partner are subject to other accounting literature. If payments from the collaboration partner represent consideration from a customer, the Company accounts for those payments within the scope of FASB ASC Topic 606, *Revenue from Contracts with Customers*. However, if the Company concludes that its collaboration partner is not a customer, the Company will record royalty payments received as collaboration revenue in the period in which the underlying sale occurs and record expenses and expense reimbursements as either research and development expense or general and administrative expense, or a reduction thereof, based on the underlying nature of the expense or expense reimbursement. ***During the year ended December 31, 2020, the Company recorded collaboration revenue from an agreement accounted for as a collaborative arrangement within the scope of ASC 808. No collaboration revenue was recorded during the years ended December 31, 2021*** and 2019.

121.    The Company's disclosures regarding the CanSinoBIO arrangement was substantially identical in the 2021 10-K to the 2020 10-K.

122.    The 2021 10-K states that Ocugen entered a new Co-Development, Supply and Commercialization Agreement with Bharat Biotech, which was also accounted for as a collaboration arrangement within the scope of ASC 808.

123.    The statements in or referred to in ¶¶ 129-123 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted

that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

***The 2022 Proxy Statement***

124.    On April 28, 2022, Ocugen filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, Fernandes, and Potti solicited, reviewed, approved, and caused Ocugen to file the 2022 Proxy Statement pursuant to Section 14(a) of the Exchange Act.

125.    The 2022 Proxy Statement solicited shareholders to, *inter alia*: (i) reelect Defendants Kompella and Whittington to the Board; and (ii) ratify the selection of Ernst & Young as the Company's Independent Registered Public Accounting Firm for the 2022 fiscal year.

126.    The 2022 Proxy Statement stated that, as a nominee, Defendant Kompella was qualified to serve on the Board based on his "deep experience with our business as a Co-Founder of OpCo and his academic experience in pharmaceutical sciences and ophthalmology." It similarly stated that Defendant Whittington was qualified to serve on the Board due to her "extensive leadership and public company experience."

127.    The 2022 Proxy Statement provided the following regarding the Company's Code of Conduct, in pertinent part:

> We have a written Code of Conduct that applies to our directors and employees, including our executive officers. The Code of Conduct covers fundamental ethical and compliance-related principles and practices such as accurate accounting records and financial reporting, avoiding conflicts of interest, protection and use of our property, compliance with legal and regulatory requirements, and internal reporting procedures for violations of the Code of Conduct. The Code of Conduct is available on our website at www.ocugen.com and any amendments to the Code of Conduct, or any waivers of its requirements, will be disclosed on our website or in a Current Report on Form 8-K, which we will file with the SEC.

Only the Board may waive any specific provisions of the Code of Conduct for directors and executive officers. The Chief Accounting Officer and Senior Vice President, Finance, has been designated as the Compliance Officer, and may waive any specific provision of this Code of Conduct for employees other than a director and executive officer. In the event of an approved waiver involving the conduct of a director or executive officer, appropriate and prompt disclosure, including disclosure of the reasons for the waiver, must be made to our stockholders as required by applicable laws and stock exchange rules. The Audit Committee shall be responsible for monitoring compliance with the Code of Conduct and shall assess the adequacy of the Code of Conduct periodically and recommend any changes to the Code of Conduct to the Board for approval.

128.     The 2022 Proxy Statement provided the following explanation of the Board's role

in "Risk Oversight", in pertinent part:

Our Board's role in risk oversight is consistent with our leadership structure, with management having day-to-day responsibility for assessing and managing our risk exposure and our Board actively overseeing management of our risks — both at the Board and Committee level. The risk oversight process includes receiving regular reports from each of the Committees and our executive officers to enable our Board to understand our risk identification, risk management, and risk mitigation strategies with respect to areas of potential material risk, including operations (including cyber-security), finance, legal, regulatory, strategic, and reputational risk.

Our Board focuses on the overall risks affecting us. Each Committee has been delegated the responsibility for the oversight of specific risks that fall within its area of responsibility. For example:

• The Audit Committee of our Board ("Audit Committee") oversees management of financial reporting, compliance, and litigation risks, including risks related to our insurance, information technology, cybersecurity, human resources, and regulatory matters, as well as the steps management has taken to monitor and control such exposures.

• The Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation policies, plans, and arrangements and the extent to which those policies, plans, and arrangements increase or decrease our risk.

• The Nominating and Corporate Governance Committee manages risks associated with the independence of our Board, potential conflicts of interest, and the effectiveness of our Board.

• The Science and Technology Committee is responsible for overseeing and

assessing business development opportunities to further diversify, strengthen, and unify our product portfolio.

While each Committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through Committee reports about such risks. Matters of significant strategic risk are considered by our entire Board.

129.    The 2022 Proxy Statement provided the following regarding the Audit Committee's responsibilities, in pertinent part:

The Audit Committee assists our Board by providing oversight of our financial management, Independent Registered Public Accounting Firm, and accounting and financial reporting processes, as well as other matters as directed by the Board or the Audit Committee Charter.

Among other things, the Audit Committee's responsibilities include:

• having sole discretion and direct responsibility for appointing, evaluating, retaining, compensating, overseeing, evaluating, and, when necessary, terminating our engagement with our Independent Registered Public Accounting Firm;

• discussing with management and the Independent Registered Public Accounting Firm our annual and quarterly financial statements and related disclosures and pre-approving all audit services;

• establishing and overseeing compliance with our procedures governing treatment of complaints concerning our accounting, internal accounting controls, or auditing matters, and submissions of confidential and anonymous employee concerns regarding accounting or auditing matters;

• reviewing our Code of Conduct, including assessing the adequacy of the Code of Conduct and recommending any proposed changes to the Board, and our compliance with applicable legal requirements, as well as any litigation or material government investigations, and making corresponding reports to the Board;

• overseeing our risk assessment and risk management processes and the guidelines and procedures to implement such processes;

• reviewing and ratifying all related person transactions, based on the standards set forth in our Related Party Transactions Policy; and

• preparing the Audit Committee Report required to be included in our annual proxy statement.

The members of our Audit Committee are Dr. Kumar (Chair), Dr. Fernandes, and Mr. Potti. All members of our Audit Committee are deemed "independent" and financially literate under the applicable rules and regulations of the SEC and Nasdaq. Dr. Kumar and Mr. Potti also qualify as an "audit committee financial expert" within the meaning of SEC regulations.

130.    Despite the above-referenced statements, the Board failed to adequately carry out its risk oversight obligations and failed to adhere to the Code of Conduct. Specifically, the Individual Defendants: (a) made and/or caused the Company to make the false and misleading statements and omissions alleged herein; and (b) failed to report violations of the Code of Conduct.

131.    Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, Fernandes, and Potti caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

132.    As a result of Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, Fernandes, and Potti causing the 2022 Proxy Statement to be false and misleading, on June 7, 2022, the Company's shareholders voted to approve the proposals set forth in the 2022

Proxy Statement.

133.    The 2022 Proxy Statement harmed Ocugen by interfering with its shareholders'

right to cast a fully informed vote regarding critical governance issues affecting the Company.

***The 1Q22 10-Q***

134.    On May 6, 2022, Ocugen filed a quarterly report on Form 10-Q with the SEC for

the first quarter of 2022 (the "1Q22 10-Q"). The 1Q22 10-Q was signed by Defendants Musunuri

and Crespo. Attached to the 1Q22 10-Q were SOX certifications signed by Defendants Musunuri

and Crespo attesting to the accuracy of financial reporting, the disclosure of any material changes

to the Company's internal control over financial reporting and the disclosure of all fraud.

135.    The 1Q22 10-Q contained the following statement regarding the Company's

internal controls:

> ***We have carried out an evaluation, under the supervision and with the
> participation of our management, including our principal executive officer and
> principal financial officer, of the effectiveness of the design and operation of our
> disclosure controls and procedures (as defined in Rules 13a- 15(e) and 15d-15(e)
> under the Securities Exchange Act of 1934, as amended (the "Exchange Act"),
> as of June 30, 2021.*** Based upon that evaluation, our principal executive officer
> and principal financial officer concluded that, as of the end of the period covered
> by this report, ***our disclosure controls and procedures are effective in ensuring
> that (a) the information required to be disclosed by us in the reports that we file
> or submit under the Exchange Act is recorded, processed, summarized, and
> reported within the time periods specified in the SEC's rules and forms***, and (b)
> such information is accumulated and communicated to our management, including
> our principal executive officer and principal financial officer, as appropriate to
> allow timely decisions regarding required disclosure. In designing and evaluating
> our disclosure controls and procedures, our management recognized that any
> controls and procedures, no matter how well designed and operated, can provide
> only reasonable assurance of achieving the desired control objectives, and our
> management necessarily was required to apply its judgment in evaluating the cost-
> benefit relationship of possible controls and procedures.

136.    The 1Q22 10-Q contained Ocugen's purported financial results, reporting, in the

Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities

of $7,687,000, accumulated deficit of $149,686,000, and total stockholder's equity of $131,129,000; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $0, R&D expenses of $7,915,000, loss from operations of $18,034,000, other income (expense), net of ($15,000), net loss of $18,019,000, and loss per share of $0.09.

137.    On May 6, 2022, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release which disclosed the financial results reported in the 1Q22 10-Q.

138.    The statements in or referred to in ¶¶ 134-137 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

### The 2Q22 10-Q

139.    On August 5, 2022, Ocugen filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2022 (the "2Q22 10-Q"). The 2Q22 10-Q was signed by Defendants

Musunuri and Crespo. Attached to the 2Q22 10-Q were SOX certifications signed by Defendants Musunuri and Crespo, attesting to the accuracy of financial reporting, the disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

140.    The 2Q22 10-Q contained the following statement regarding the Company's internal controls:

> ***We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of June 30, 2022.*** Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, ***our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms***, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

141.    The 2Q22 10-Q contained Ocugen's purported financial results, reporting, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $10,338,000, accumulated deficit of $169,157,000, and total stockholder's equity of $114,108,000; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $0, R&D expenses of $9,007,000, loss from operations of $19,565,000, other income (expense), net of ($94,000), net loss of $19,471,000, and loss per share of $0.09.

142.    On August 5, 2022, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release which disclosed the financial results reported

in the 2Q22 10-Q.

143. The statements in or referred to in ¶¶ 139-142 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

### The 3Q22 10-Q

144. On November 8, 2022, Ocugen filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2022 (the "3Q22 10-Q"). The 3Q22 10-Q was signed by Defendants Musunuri and Crespo. Attached to the 3Q22 10-Q were SOX certifications signed by Defendants Musunuri and Crespo, attesting to the accuracy of financial reporting, the disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

145. The 3Q22 10-Q contained the following statement regarding the Company's internal controls:

*We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of September 30, 2022*. Based upon this evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

146.    The 3Q22 10-Q contained Ocugen's purported financial results, reporting, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $14,907,000, accumulated deficit of $191,079,000, and total stockholder's equity of $95,303,000; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $0, R&D expenses of $15,622,000, loss from operations of $23,119,000, other income (expense), net of ($1,197,000), net loss of $21,922,000, and loss per share of $0.10.

147.    On November 8, 2022, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release which disclosed the financial results reported in the 2Q22 10-Q.

148.    The statements in or referred to in ¶¶ 144-147 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in

its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**The 2022 10-K**

149.    On February 28, 2023, Ocugen filed an Annual Report on Form 10-K for the 2022 fiscal year (the "2022 10-K"). The 2022 10-K was signed by Defendants Musunuri, Crespo, Kumar, Zhang, Kompella, Castillo, Fernandes, and Whittington. Attached to the 2022 10-K were SOX certifications signed by Defendants Musunuri and Crespo, attesting to the accuracy of financial reporting, the disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

150.    The 2022 10-K contained the following statement regarding the Company's internal controls:

> *We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2022*. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this Annual Report on Form 10-K, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is*

***recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms***, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

151.    The 2022 10-K states for the first time that it accounted for the CanSinoBIO agreement as a collaborative agreement within the scope of ASC 808.

152.    The 2022 10-K contained Ocugen's purported financial results and reported, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $18,460,000, accumulated deficit of $213,018,000, and total stockholder's equity of $84,052,000; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $0, R&D expenses of $49,757,000, loss from operations of $84,868,000, other income (expense), net of ($3,517,000), net loss of $81,351,000, and loss per share of $0.38.

153.    On February 28, 2023, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release which disclosed the financial results reported in the 2022 10-K.

154.    The statements in or referred to in ¶¶ 149-153 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total

shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

***The 2023 Proxy Statement***

155.    On April 20, 2023, Ocugen filed the 2023 Proxy Statement. Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, Fernandes, and Potti solicited, reviewed, approved, and caused Ocugen to file the 2023 Proxy Statement pursuant to Section 14(a) of the Exchange Act.

156.    The 2023 Proxy Statement solicited shareholders to, *inter alia*: (i) reelect Defendants Castillo and Fernandes to the Board; and (ii) ratify the selection of Ernst & Young as the Company's Independent Registered Public Accounting Firm for the 2023 fiscal year.

157.    The 2023 Proxy Statement stated that, as a nominee, Defendant Castillo was qualified to serve on the Board based on her "expertise in business operations and logistics and her leadership experience." It similarly stated that Defendant Fernandes was qualified to serve on the Board due to her "extensive experience in the pharmaceutical and biotechnology space."

158.    The 2023 Proxy Statement provided the following regarding the Company's Code of Conduct, in pertinent part:

> We have a written Code of Conduct that applies to our directors and employees, including our executive officers. The Code of Conduct covers fundamental ethical and compliance-related principles and practices such as accurate accounting records and financial reporting, avoiding conflicts of interest, protection and use of our property, compliance with legal and regulatory requirements, and internal reporting procedures for violations of the Code of Conduct. The Code of Conduct

is available on our website at www.ocugen.com and any amendments to the Code of Conduct, or any waivers of its requirements, will be disclosed on our website or in a Current Report on Form 8-K, which we will file with the SEC.

Only the Board may waive any specific provisions of the Code of Conduct for directors and executive officers. The Chief Accounting Officer and Senior Vice President, Finance, has been designated as the Compliance Officer, and may waive any specific provision of this Code of Conduct for employees other than a director and executive officer. In the event of an approved waiver involving the conduct of a director or executive officer, appropriate and prompt disclosure, including disclosure of the reasons for the waiver, must be made to our stockholders as required by applicable laws and stock exchange rules. The Audit Committee shall be responsible for monitoring compliance with the Code of Conduct and shall assess the adequacy of the Code of Conduct periodically and recommend any changes to the Code of Conduct to the Board for approval.

159.    The 2023 Proxy Statement provided the following regarding the Board's role in "Risk Oversight," in pertinent part:

Our Board's role in risk oversight is consistent with our leadership structure, with management having day-to-day responsibility for assessing and managing our risk exposure and our Board actively overseeing management of our risks — both at the Board and Committee level. The risk oversight process includes receiving regular reports from each of the Committees and our executive officers to enable our Board to understand our risk identification, risk management, and risk mitigation strategies with respect to areas of potential material risk, including operations (including cyber-security), finance, legal, regulatory, strategic, and reputational risk.

Our Board focuses on the overall risks affecting us. Each Committee has been delegated the responsibility for the oversight of specific risks that fall within its area of responsibility. For example:

• The Audit Committee of our Board ("Audit Committee") oversees management of financial reporting, compliance, and litigation risks, including risks related to our insurance, information technology, cybersecurity, human resources, and regulatory matters, as well as the steps management has taken to monitor and control such exposures.

• The Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation policies, plans, and arrangements and the extent to which those policies, plans, and arrangements increase or decrease our risk.

• The Nominating and Corporate Governance Committee manages risks

associated with the independence of our Board, potential conflicts of interest, and the effectiveness of our Board.

• The Science and Technology Committee is responsible for overseeing and assessing business development opportunities to further diversify, strengthen, and unify our product portfolio.

While each Committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through Committee reports about such risks. Matters of significant strategic risk are considered by our entire Board.

160.    The 2023 Proxy Statement provided the following regarding the Audit Committee's

responsibilities, in pertinent part:

The Audit Committee assists our Board by providing oversight of our financial management, Independent Registered Public Accounting Firm, and accounting and financial reporting processes, as well as other matters as directed by the Board or the Audit Committee Charter.

Among other things, the Audit Committee's responsibilities include:

• Having sole discretion and direct responsibility for appointing, evaluating, retaining, compensating, overseeing, evaluating, and, when necessary, terminating our engagement with our Independent Registered Public Accounting Firm;

• Discussing with management and the Independent Registered Public Accounting Firm our annual and quarterly financial statements and related disclosures and pre- approving all audit services;

• Establishing and overseeing compliance with our procedures governing treatment of complaints concerning our accounting, internal accounting controls, or auditing matters, and submissions of confidential and anonymous employee concerns regarding accounting or auditing matters;

• Reviewing our Code of Conduct, including assessing the adequacy of the Code of Conduct and recommending any proposed changes to the Board, and our compliance with applicable legal requirements, as well as any litigation or material government investigations, and making corresponding reports to the Board;

• Overseeing our risk assessment and risk management processes and the guidelines and procedures to implement such processes;

• Reviewing and ratifying all related person transactions, based on the standards set forth in our Related Party Transactions Policy; and

• Preparing the Audit Committee Report required to be included in our annual proxy statement.

The members of our Audit Committee are Dr. Kumar (Chair), Dr. Fernandes, and Dr. Whittington. Dr. Whittington became a member of the Audit Committee in June 2022. Manish Potti, former director who did not stand for re-election at our 2022 Annual Meeting of Shareholders, served as a member of our Audit Committee until June 2022. All members of our Audit Committee are deemed "independent" and financially literate under the applicable rules and regulations of the SEC and Nasdaq. Dr. Kumar and Dr. Whittington also qualify as an "audit committee financial expert" within the meaning of SEC regulations.

161.    Despite the above-referenced statements, the Board failed to adequately carry out its risk oversight obligations and failed to adhere to the Code of Conduct. Specifically, the Individual Defendants: (a) made and/or caused the Company to make the false and misleading statements and omissions alleged herein; and (b) failed to report violations of the Code of Conduct. Further, the Board was not adequately performing its risk oversight functions.

162.    Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, and Fernandes caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively

impact Ocugen's reputation and business.

163.    As a result of Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, and Fernandes false and misleading statements, on June 9, 2023, Ocugen's shareholders voted to approval the proposals set forth in the 2023 Proxy Statement.

164.    The 2023 Proxy Statement harmed Ocugen by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting the Company.

*The 1Q23 10-Q*

165.    On May 5, 2023, Ocugen filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2023 (the "1Q23 10-Q"). The 1Q23 10-Q was signed by Defendants Musunuri and Vu. Attached to the 1Q23 10-Q were certifications pursuant to SOX, signed by Defendants Musunuri and Vu, attesting to the accuracy of financial reporting, the disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

166.    The 1Q23 10-Q contained the following statement regarding the Company's internal controls:

> *We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of March 31, 2023*. Based upon this evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and

procedures.

167.    The 1Q23 10-Q contained Ocugen's purported financial results, reporting, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $15,683,000, accumulated deficit of $229,516,000, and total stockholder's equity of $75,800,000; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $0, R&D expenses of $9,558,000, loss from operations of $17,751,000, other income (expense), net of ($1,253,000), net loss of $16,498,000, and loss per share of $0.07

168.    On May 5, 2023, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release which disclosed the financial results reported in the 1Q23 10-Q.

169.    The statements in or referred to in ¶¶ 165-168 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

*The 2Q23 10-Q*

170.    On August 15, 2023, after the market closed, Ocugen filed a Form 8-K with the SEC signed by Defendant Musunuri that stated that CFO Vu was no longer with the Company and that the separation from employment was "being treated as a severance qualifying event under Mr. Vu's employment agreement."[4] It further stated that Defendant Musunuri would act as interim principal financial officer, effective immediately, in light of Vu's departure.

171.    That same day, Ocugen also filed a Notification of Late Filing on Form 12b-25 with the SEC with respect to the 2Q23 10-Q. The filing states that the "Company required additional time primarily as a result of recent transition in the Company's management, including its principal financial officer [Vu] and principal accounting officer. Despite working diligently in an effort to timely file the Form 10-Q, the Company has been unable to complete all work necessary to timely file the Form 10-Q."

172.    In combination with the disclosure of Crespo's resignation just five months early on March 10, 2023, announcement of Vu's departure signaled to investors that there were undisclosed problems at the Company related to its financials.

173.    On this news, Ocugen's stock fell $0.04 per share, or 8.3%, to close to $0.44 per share on August 16, 2023.

174.    The statements referred to in ¶¶ 170-172 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclosed material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that Vu had refused to sign the 2Q23 10-Q due to fraud, that he was subsequently terminated, and that at least two other finance executives refused

---

[4] On April 29, 2024, the Company falsely disclosed in its Form 10-K/A filed with the SEC that Vu resigned effective August 14, 2023.

to sign as well.

175.    On August 21, 2023, Ocugen filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2023 (the "2Q23 10-Q"). The 2Q23 10-Q was signed by Defendant Musunuri only. Attached to the 2Q23 10-Q were SOX certifications signed by Defendant Musunuri in the capacity of CEO as well as interim principal financial officer, attesting to the accuracy of financial reporting, the disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

176.    The 2Q23 10-Q contained the following statement regarding the Company's internal controls:

> ***We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of March 31, 2023***. Based upon this evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, ***our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms***, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

177.    The 2Q23 10-Q contained Ocugen's purported financial results and reported, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $3,460,000, accumulated deficit of $252,441,000, and total stockholder's equity of $70,281,000; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue

of $0, R&D expenses of $14,169,000, loss from operations of $23,733,000, other income (expense), net of ($808,000), net loss of $22,925,000, and loss per share of $0.10.

178.    On August 21, 2023, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release which disclosed the financial results reported in the 2Q23 10-Q.

179.    The statements in or referred to in ¶¶ 175-178 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

**The 3Q23 10-Q**

180.    On November 9, 2023, Ocugen filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2023 (the "3Q23 10-Q"). The 3Q23 10-Q was signed by Defendants Musunuri and Breininger. Attached to the 3Q23 10-Q were SOX certifications signed by Defendants Musunuri and Breininger, attesting to the accuracy of financial reporting, the

disclosure of any material changes to Ocugen's internal control over financial reporting, and the disclosure of all fraud.

181.    The 3Q23 10-Q contained the following statement regarding the Company's internal controls:

> *We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of September 30, 2023.* Based upon this evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

182.    The 3Q23 10-Q contained Ocugen's purported financial results and reported, in the Company's unaudited Condensed Consolidated Balance Sheets, *inter alia,* total current liabilities of $11,136,000, accumulated deficit of $266,603,000, and total stockholder's equity of $58,395,000; and in the Company's unaudited Income Statement, *inter alia,* collaboration revenue of $0, R&D expenses of $6,342,000, loss from operations of $15,424,000, other income (expense), net of ($1,262,000), net loss of $14,162,000, and loss per share of $0.06.

183.    On November 9, 2023, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri with an attached press release which disclosed the financial results reported in the 3Q23 10-Q.

184.     The statements in or referred to in ¶¶ 180-183 were materially false and misleading because Defendants made false and/or misleading statements and failed to disclose material adverse facts about Ocugen's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

## **THE TRUTH BEGINS TO MATERIALIZE AND EMERGE**

185.     On April 1, 2024, after the market closed, Ocugen filed a current report on Form 8-K with the SEC (the "Restatement Announcement"). The Restatement Announcement read:

> In connection with the preparation of the financial statements of Ocugen, Inc. (the "Company") for the year ended December 31, 2023, the Company, in consultation with its independent registered public accounting firm, Ernst & Young LLP ("EY"), identified certain accounting errors related to the application of U.S. GAAP to certain agreements with one of its business partners related to a collaboration agreement.
>
> On April 1, 2024, the Audit Committee of the Board of Directors (the "Audit Committee"), based on the recommendation of management and after consultation with EY, ***concluded that the Company's previously-issued audited consolidated financial statements for each fiscal year beginning January 1, 2020 and its previously-issued unaudited interim condensed consolidated financial statements for each of the first three quarters in such years, as well as the associated earnings releases and investor presentations or other communications describing***

*such financial statements, were materially misstated and, accordingly, should no longer be relied upon.*

*The Company intends to restate its consolidated financial statements as of and for the year ended December 31, 2022, in connection with the filing of its 2023 Form 10-K. Similarly, the Company will include restated unaudited financial information for each of the first three quarters of 2023 and 2022 in its 2023 Form 10-K* (each such annual and quarterly period to be restated, a "Restated Period").

*The identified errors in each of the Restated Periods relate to the Company's accounting for the estimated costs in one of its collaboration arrangements. These identified errors will result in a restatement of the following financial statement line item captions: Collaborative arrangement revenue, Research and development expenses, Other income (expense), net and Accrued expenses and other current liabilities.*

The Company is currently not in a position to provide a reasonable estimate of the anticipated changes in its results of operations for the year ended December 31, 2023, for any Restated Period. However, the Company does not expect the errors to result in any impact on its cash position, cash runway, or financial projections.

*Additionally, the Company has determined that the errors resulted from the existence of a material weakness in its internal control over financial reporting that also existed during the Restated Periods and that its internal control over financial reporting was not effective as of December 31, 2023. As a result, the Company's Chief Executive Officer and Chief Accounting Officer have concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2023.*

On April 1, 2024, the Company filed a notification of inability to timely file Form 10-K on Form 12b-25 due to additional time required for the Company to correct the errors described above and prepare restated financial statements. At this time, the Company expects to file the 2023 Form 10-K no later than April 16, 2024. However, there can be no assurance that the Company will be able to prepare restated financial statements and file the 2023 Form 10-K on the timeline anticipated, or that no additional errors will be identified.

186.    As mentioned in the Restatement Announcement, on April 1, 2024, during after market hours, Ocugen filed with the SEC a Notification of Late Filing on Form 12b-25. It stated, in pertinent part:

In connection with the preparation of the financial statements of the Company for the year ended December 31, 2023, the Company identified certain accounting errors relating to the application of U.S. GAAP to certain agreements with one of

its business partners related to a collaboration agreement. As a result, the Company intends to restate its financial statements for the year ended December 31, 2022 and for each of the first three quarters of 2022 and 2023 in the 2023 Form 10-K, the review and preparation of which is currently ongoing. Given the scope of the process to prepare the restatements and related disclosures, the Company requires additional time to prepare and review its financial statements and other disclosures in its 2023 Form 10-K. Therefore, the Company is unable to complete and file the 2023 Form 10-K by the required due date of April 1, 2024.

187.    On this news, Ocugen's stock fell $0.16 per share, or 10.38%, to close at $1.38 per share on April 2, 2024.

188.    On April 16, 2024, Ocugen filed an Annual Report on Form 10-K with the SEC for the 2023 fiscal year (the "2023 10-K") wherein the Company issued its restated financial statements.

189.    The 2023 10-K stated the following, in relevant part:

In connection with the preparation of the Company's Consolidated Financial Statements as of and for the fiscal year ended December 31, 2023, the Company discovered that in the current fiscal year and prior years it had not appropriately accounted for its collaboration arrangements, including the determination of the transaction price, calculating the progress towards the satisfaction of the performance obligations under the collaborative arrangements, and determining the value of the non-cash consideration received and recognized as research and development expense. The Company also corrected the presentation of the revenue previously recognized within Other income (expense), net to Collaborative arrangement revenue in its Consolidated Statements of Operations and Comprehensive Loss.

The misstatements were material to the Company's previously issued financial statements and as a result, the Company has restated its Consolidated Balance Sheets, Consolidated Statements of Operations and Comprehensive Loss, Consolidated Statements of Stockholders' Equity, and Consolidated Statements of Cash Flows as of and for the fiscal year ended December 31, 2022. The restatement includes adjustments to Collaborative arrangement revenue, Research and development expenses, Other income (expense), net and Accrued expenses and other current liabilities during the impacted periods. The Company has also corrected certain other identified immaterial errors that were identified during the impacted periods impacting Research and development expenses, General and administrative expenses, and Accrued expenses and other current liabilities.

190.    The 2023 10-K acknowledges that Ocugen's disclosure controls and procedures

and internal control over financial reporting were not effective as of December 31, 2023:

**Evaluation of Disclosure Controls and Procedures**

*… Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this Annual Report on Form 10-K and as of the end of the prior year, our disclosure controls and procedures are not effective because of a material weakness related to the design and operating effectiveness of controls over the accounting for collaborative arrangements….*

\*\*\*

**Management's Annual Report on Internal Control Over Financial Reporting**

\*\*\*

*… Based on this assessment, management concluded that our internal control over financial reporting was not effective as of December 31, 2023 and December 31, 2022 as a result of a material weakness related to the design and operating effectiveness of controls over the accounting for collaborative arrangements. Specifically, we did not effectively design and operate controls over the technical accounting analysis, the determination of the transaction price, calculating the progress towards the satisfaction of the performance obligations under the collaborative arrangements, and determining the value of the non-cash consideration received.*

\*\*\*

**Remediation**

In order to remediate the material weakness, the Company's management plans to improve the design and operation of their controls over the technical accounting analysis, the determination of the transaction price, calculating the progress towards the satisfaction of the performance obligations under the collaborative arrangements, and determining the value of the non-cash consideration received under collaborative arrangements. Specifically, the Company plans to implement the following: dedicating personnel resources with the appropriate level of proficiency to review any new arrangements on a timely basis; obtaining relevant information from third parties on a timely basis, including actual costs incurred, actual noncash consideration received, and estimates to complete; and increasing the level of review activities over the accounting for collaborative arrangements during the financial statement close process….

191.    The 2023 10-K revised its "License and Development Agreements" disclosure to only include one agreement (containing several amendments) with CanSinoBIO, which Ocugen identified as the only one within the scope of ASC 808:

***Co-Development and Commercialization Agreement with CanSino Biologics, Inc.***

The Company entered into a co-development and commercialization agreement with CanSino Biologics, Inc. ("CanSinoBIO") with respect to the development and commercialization of the Company's modifier gene therapy product candidates, OCU400, OCU410, and OCU410ST. The co-development and commercialization agreement was originally entered into in September 2019 ("the Original CanSinoBIO Agreement") with regards to OCU400, and was subsequently amended in September 2021 and November 2022 ("the Amendments"), to include OCU410 and OCU410ST, respectively. The Company concluded that the Original CanSinoBIO Agreement and the Amendments are separate contracts (collectively referred to as the "CanSinoBio Agreements"). Pursuant to the CanSinoBIO Agreements, the Company and CanSinoBIO are collaborating on the development of the Company's modifier gene therapy platform. CanSinoBIO is responsible for the chemistry, manufacturing, and controls development and manufacture of clinical supplies of such products and is responsible for the costs associated with such activities. CanSinoBIO has an exclusive license to develop, manufacture, and commercialize the Company's modifier gene therapy platform in and for China, Hong Kong, Macau, and Taiwan (the " CanSinoBIO Territory"), and the Company maintains exclusive development, manufacturing, and commercialization rights with respect to the Company's modifier gene therapy platform outside the CanSinoBIO Territory (the " Company Territory").

***

*Accounting analysis and revenue recognition*

***The Company determined the collaboration arrangements with CanSinoBIO, are within the scope of ASC 808 and has analogized to ASC 606 to account for CanSinoBIO's access to its IP as well as data generated in connection with the co-development activities to be undertaken by Ocugen.*** These elements of the arrangements are not distinct and are accounted for as a single performance obligation.

The non-cash consideration to be received related to the Company's satisfaction of the performance obligations includes but is not limited to services relate to chemistry, manufacturing, and controls development and manufacture of clinical supplies of such products through completion of pre-clinical, clinical, regulatory, and other commercialization readiness services. The estimated market value of the co-development services to be performed by CanSinoBIO, represents variable consideration that is included in the transaction price. The Company recognizes collaborative arrangement revenue over time using an input method using ratio of costs incurred to date compared to total estimated costs required to satisfy the performance obligations under the CanSinoBIO Agreements.

The Company constrained the transaction price related to certain future co-development services and future royalties, as it assessed that it is probable that the inclusion of such variable consideration could result in a significant reversal of

cumulative revenue in future periods. The variable consideration is reevaluated at each reporting period and as changes in circumstances occur.

The services provided by CanSinoBIO are recorded as incurred and the difference between the revenue and expense recognized is recorded on the Company's balance sheet as a contract liability within Accrued expenses and other current liabilities. ***The related revenue recognized was recorded in the consolidated statements of operations and comprehensive loss as collaborative arrangement revenue and was approximately $6.0 million and $2.5 million for the year ended December 31, 2023 and the year ended December 31, 2022, respectively. The related expense incurred for services provided by CanSinoBIO was recorded in the consolidated statements of operations and comprehensive loss as research and development expense and was approximately $5.3 million and $9.1 million for the year ended December 31, 2023 and the year ended December 31, 2022, respectively.***

The contract liability was $10.5 million and $11.2 million as of December 31, 2023 and December 31, 2022, respectively. Revenue recognized for the year ended December 31, 2023, that was included in the contract liabilities balances as of January 1, 2023 was approximately $6.0 million. Revenue recognized for the year ended December 31, 2022, that was included in the contract liabilities balances as of January 1, 2022, was approximately $2.5 million.

192.    On this news, Ocugen's share price declined 9.43% from a closing price of $1.59 per share on April 16, 2024, to a closing price of $1.44 per share on April 17, 2024.

193.    On June 6, 2024, Ocugen filed a Form 8-K with the SEC disclosing that Ernst & Young, Ocugen's current independent registered public accounting firm, notified Ocugen of its decision to decline to participate in the request-for-proposal process soliciting proposals from accounting firms to provide audit services to Ocugen as its independent registered public accounting firm for the fiscal year ending December 31, 2024, and declined to stand for re-election as Ocugen's independent registered public accounting firm for fiscal year 2024.

194.    On this news, the Company's share price declined 4.42% from a closing price of $1.81 per share on June 5, 2024 to a closing price of $1.73 per share on June 6, 2024. The Company's share price continued to decline by an additional 7.5% to a closing price of $1.60 per share on June 7, 2024.

195.     As a result of the Individual Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, the Company has suffered significant losses and damages.

## ADDITIONAL ALLEGATIONS REGARDING THE EXTENT OF FRAUD AND IMPROPER REPORTING

196.     As alleged in the Securities Class Action, Defendant Musunuri lied to investors with respect to forecasting. *See* Securities Class Action Amended Complaint ("Amended Complaint") (ECF No. 36), Section C.1. When Musunuri and Arun Upadhyay, the Company's Chief Scientist, were provided with forecasts from the finance department that did not match their goals, they fabricated numbers and estimates to extend the Company's cash runway. The revised forecasts, put together by Musunuri and Upadhyay, were then used as the actual numbers provided in some of the quarterly earnings conference calls that took place and in corporate decks being used by investor relations and filed with the SEC. There were times the forecasts contradicted the forecasts that were put together by the finance department. *Id.*

197.     As alleged in the Amended Complaint, Defendants Crespo and Musunuri had "showdowns" about the proper reporting of forecasts. Then, on March 10, 2023, the Company announced in a Form 8-K filed with the SEC that Crespo resigned on March 7, 2023. She was replaced by Defendant Vu. *See* Section C.1.

198.     As alleged in the Amended Complaint, in July or August 2023, Defendant Vu informed Defendant Musunuri that he refused to sign the 2Q23 10-Q due to misrepresentations in the Company's financials. *See* Section C.2. In August 2023, Vu was fired because of his refusal to sign the 2Q23 10-Q. *Id.*

199.     As alleged in the Amended Complaint, following Vu's termination, Defendant Musunuri and other senior executives approached others in the finance department demanding that

they sign the 2Q23 10-Q. Andrew Walsh, VP of Finance, was asked to sign but refused to do so and was fired a few weeks later. *See* Section C.2. Next, Jaiby Abraham, who was then Manager, Financial Reporting, was approached to sign the 2Q23 10-Q by Defendant Musunuri. *Id.* When she refused, Defendant Musunuri attempted to convince her to sign the 2Q23 10-Q based on their shared Indian heritage. *Id.* Still, Abraham refused to sign. *Id.* At the time of his requests to Abraham, Defendant Musunuri knew about the misrepresentations in the Company's 2Q23 10-Q because of his earlier discussions with Vu. *Id.* Defendant Musunuri signed the 2Q23 10-Q alone after these failed attempts. *Id.*

## THE INDIVIDUAL DEFENDANTS SOLD STOCK WHILE OCUGEN'S STOCK PRICE WAS ARTIFICIALLY INFLATED

200.    As a result of the above false and misleading statements, the Company's share price was artificially inflated. Certain of the Individual Defendants, while in possession of material, non-public information, capitalized on the artificially inflated stock price by selling significant portions of their holdings of Ocugen common stock. According to the Company's public filings with the SEC, Defendants Musunuri, Castillo, Fernandes, Kompella, Kumar, Potti, and Zhang collectively sold more than 3.2 million shares of their personally held stock for collective gross proceeds in excess of $38 million, and in doing so avoided more than $24 million in losses.

201.    Defendant Musunuri sold a total of 1,664,366 shares while the price of the Company's stock was artificially inflated, earning approximately $10,186,318 in proceeds, substantially more than what he would have earned had investors known the truth about Ocugen's business operations.

| Date of Transaction | Shares | Average Share Price | Gross Proceeds[5] | Losses Avoided[6] |
|---|---|---|---|---|
| 05/03/2021 | 195,809 | $14.24 | $2,788,320 | $2,518,104 |
| 06/07/2021 | 7,758 | $10.94 | $84,873 | $74,166 |
| 06/08/2021 | 22,800 | $10.98 | $250,344 | $218,880 |
| 09/15/2021 | 125,000 | $7.52 | $940,000 | $767,500 |
| 10/15/2021 | 125,000 | $9.80 | $1,225,000 | $1,052,500 |
| 11/01/2021 | 115,367 | $14.15 | $1,632,443 | $1,473,237 |
| 11/16/2021 | 115,000 | $8.04 | $924,600 | $765,900 |
| 12/16/2021 | 115,000 | $5.22 | $600,300 | $441,600 |
| 02/14/2022 | 90,000 | $3.74 | $336,600 | $212,400 |
| 03/16/2022 | 81,823 | $2.65 | $216,831 | $103,915 |
| 05/13/2022 | 125,000 | $1.92 | $240,000 | $67,500 |
| 07/14/2022 | 150,000 | $2.72 | $408,000 | $201,000 |
| 10/14/2022 | 100,000 | $1.66 | $166,000 | $28,000 |
| 12/16/2022 | 95,809 | $1.43 | $137,007 | $4,790 |
| 1/17/2023 | 100,000 | $1.28 | $128,000 | -$10,000 |
| 02/16/2023 | 100,000 | $1.08 | $108,000 | -$30,000 |
| 1/03/2024 | 180,204 | $0.65 | $117,133 | -$131,549 |
| **Total** | **1,664,366** | | **$10,186,318** | **$7,757,944** |

202.    Defendant Castillo sold a total of 67,000 shares while the price of the Company's stock was artificially inflated, earning approximately $447,220 in proceeds, substantially more than she would have earned had investors known the truth about Ocugen's business operations.

| Date of Transaction | Shares | Average Share Price | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 06/07/2021 | 10,000 | $10.00 | $100,000 | $86,200 |
| 11/02/2021 | 15,000 | $15.00 | $225,000 | $204,300 |
| 08/11/2022 | 42,000 | $2.91 | $122,220 | $64,260 |
| **Total** | **67,000** | | **$447,220** | **$354,760** |

203.    Defendant Fernandes sold a total of 33,500 shares while the price of the Company's stock was artificially inflated, earning approximately $247,700 in proceeds, substantially more than she would have earned had investors known the truth about Ocugen's business operations.

---

[5] Rounded to the nearest whole dollar.

[6] Calculated using the $1.38 closing price on April 2, 2024, the day the truth was revealed.

| Date of Transaction | Shares | Average Share Price | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 05/25/2021 | 33,500 | $8.20 | $274,700 | $228,470 |
| **Total** | **33,500** | | **$274,700** | **$228,470** |

204.    Defendant Kompella sold a total of 772,191 shares while the price of the Company's stock was artificially inflated, earning approximately $8,478,138 in proceeds, substantially more than he would have earned had investors known the truth about Ocugen's business operations.

| Date of Transaction | Shares | Average Share Price | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 04/26/2021 | 350,000 | $11.70 | $4,095,000 | $3,612,000 |
| 04/30/2021 | 20,000 | $11.56 | $231,200 | $203,600 |
| 05/03/2021 | 25,000 | $14.00 | $350,000 | $315,500 |
| 05/03/2021 | 25,000 | $16.02 | $400,500 | $366,000 |
| 05/28/2021 | 7,191 | $8.82 | $63,425 | $53,501 |
| 06/25/2021 | 10,000 | $8.14 | $81,400 | $67,500 |
| 07/30/2021 | 10,000 | $6.81 | $68,100 | $54,300 |
| 10/18/2021 | 200,000 | $8.41 | $1,682,000 | $1,406,000 |
| 10/20/2021 | 1,731 | $9.02 | $15,614 | $13,225 |
| 10/21/2021 | 1,898 | $9.01 | $17,101 | $14,482 |
| 10/25/2021 | 46,371 | $9.08 | $421,049 | $357,057 |
| 10/26/2021 | 25,000 | $12.05 | $301,250 | $266,750 |
| 11/01/2021 | 25,000 | $14.05 | $351,250 | $316,750 |
| 11/02/2021 | 25,000 | $16.01 | $400,250 | $365,750 |
| **Total** | **772,191** | | **$8,478,138** | **$7,412,514** |

205.    Defendant Kumar sold a total of 49,500 shares while the price of the Company's stock was artificially inflated, earning approximately $228,210 in proceeds, substantially more than he would have earned had investors known the truth about Ocugen's business operations.

| Date of Transaction | Shares | Average Share Price | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 04/19/2021 | 7,500 | $5.33 | $39,975 | $29,625 |
| 07/19/2021 | 7,500 | $6.40 | $48,000 | $37,650 |
| 10/18/2021 | 7,500 | $8.13 | $60,975 | $50,625 |
| 01/18/2022 | 7,500 | $4.07 | $30,525 | $20,175 |

| 04/18/2022 | 7,500 | $2.83 | $21,225 | $10,875 |
| 07/18/2022 | 7,500 | $2.57 | $19,275 | $8,925 |
| 10/06/2022 | 4,500 | $1.83 | $8,235 | $2,025 |
| **Total** | **49,500** | | **$228,210** | **$159,900** |

206. Defendant Zhang sold a total of 300,000 shares while the price of the Company's stock was artificially inflated, earning approximately $4,960,971 in proceeds, substantially more than he would have earned had investors known the truth about Ocugen's business operations.

| Date of Transaction | Shares | Average Share Price | Gross Proceeds | Losses Avoided |
| --- | --- | --- | --- | --- |
| 11/02/2021 | 149,700 | $15.75 | $2,357,775 | $2,151,189 |
| 11/03/2021 | 150,300 | $17.32 | $2,603,196 | $2,395,782 |
| **Total** | **300,000** | | **$4,960,971** | **$4,546,971** |

207. Defendant Subramanian sold a total of 149,066 shares while the price of the Company's stock was artificially inflated, earning approximately $1,173,467 in proceeds, substantially more than he would have earned had investors known the truth about Ocugen's business operations.

| Date of Transaction | Shares | Average Share Price | Gross Proceeds | Losses Avoided |
| --- | --- | --- | --- | --- |
| 04/29/2021 | 7,990 | $10.98 | $87,730 | $76,704 |
| 05/14/2021 | 31,000 | $8.18 | $253,580 | $210,800 |
| 06/15/2021 | 31,000 | $7.00 | $217,000 | $174,220 |
| 07/15/2021 | 31,086 | $6.70 | $208,276 | $165,378 |
| 08/16/2021 | 30,000 | $7.22 | $216,600 | $175,200 |
| 10/15/2021 | 7,990 | $9.96 | $79,580 | $68,554 |
| 10/26/2021 | 10,000 | $11.07 | $110,700 | $96,900 |
| **Total** | **149,066** | | **$1,173,467** | **$967,756** |

208. Defendant Potti sold a total of 219,614 shares while the price of the Company's stock was artificially inflated, earning approximately $2,881,474 in proceeds, substantially more than he would have earned had investors known the truth about Ocugen's business operations.

| Date of Transaction | Shares | Average Share Price | Gross Proceeds | Losses Avoided |
|---|---|---|---|---|
| 05/03/2021 | 28,000 | $15.01 | $420,280 | $381,640 |
| 05/03/2021 | 60,000 | $15.02 | $901,200 | $818,400 |
| 06/15/2021 | 68,185 | $8.86 | $604,119 | $510,024 |
| 11/02/2021 | 63,429 | $15.07 | $955,875 | $868,343 |
| **Total** | **219,614** | | **$2,881,474** | **$2,578,407** |

## DAMAGES TO OCUGEN

209.    As a direct and proximate result of the Individual Defendants' misconduct, Ocugen has expended and will continue to expend significant sums of money.

210.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

211.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

212.    Such expenditures also include the unjust compensation paid to each of the Individual Defendants. Because the Individual Defendants failed to carry out their respective duties as officers and/or directors of the Company, the compensation they received during the Relevant Period was excessive and undeserved and as such, the Individual Defendants were unjustly enriched to the detriment of the Company.

213.    Such expenditures also include losses related to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

214.    Ocugen has also suffered, and will continue to suffer, a loss of reputation and

goodwill as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward due to their misrepresentations.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

215.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216.    Plaintiff brings this action derivatively in the right and for the benefit of Ocugen to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, unjust enrichment, violations of Section 14(a) and 21D of the Exchange Act, and other wrongful conduct as alleged herein.

217.    Plaintiff has owned Ocugen common stock since prior to the beginning of the Relevant Period and has continuously owned Company stock during all relevant times.

218.    Plaintiff will adequately and fairly represent the interests of Ocugen and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

219.    A pre-suit demand on the Board is futile and therefore excused. At the time this action commenced, the Board consisted of six directors – Defendants Castillo, Fernandes, Kompella, Musunuri, Zhang, and Whittington (the "Director Defendants"). Plaintiff is required to show that a majority of the Director Defendants, *i.e.* three, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

220.    All six members of the Board are incapable of exercising independent objective judgment and/or making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

221.    The Director Defendants all face a substantial likelihood of liability for their

individual misconduct, as they were directors during the time of the false and misleading statements and as such had a fiduciary duty to ensure that Ocugen's SEC filings, press releases, and other public statements and presentations on behalf of Ocugen concerning its business, operations, prospects, internal controls, and financial statements were accurate.

222.    The Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that Ocugen was acting legally and its internal controls were sufficiently robust and effective, and to ensure that the Board's duties were being discharged in good faith and with the required diligence. Instead, they reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused Ocugen's stock to trade at artificially inflated prices.

223.    The Director Defendants knowingly and consciously allowed the authorization of false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that Ocugen's internal controls were sufficiently robust and effective, and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These knowing and conscious failures breached the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

224.    The Director Defendants will not bring a suit on behalf of Ocugen to recover damages sustained because of this misconduct because they would expose themselves to significant liability. As such, demand is futile as to the Director Defendants.

### *Defendant Musunuri*

225.    Demand on Defendant Musunuri is futile for the additional reasons that follow. Defendant Musunuri, Ocugen's Chairman of the Board, CEO, and co-founder is not an

independent director for purposes of demand futility, as Ocugen admits in its SEC filings. As CEO, Defendant Musunuri fails the NASDAQ's bright-line independence test. In addition, the Company provides Defendant Musunuri with his principal occupation, for which he receives significant compensation as detailed above.

226.    As a trusted Company director, Defendant Musunuri conducted little, if any, oversight of the scheme to cause Ocugen to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Musunuri was required to, *inter alia,* (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure that the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Musunuri failed to fulfill these duties by permitting the false and misleading statements to be made and not correcting those statements.

227.    Defendant Musunuri had a duty to ensure that statements concerning the Company's business, operations, prospects, and internal controls were accurate. Despite this, Defendant Musunuri reviewed, authorized, and signed the 2020, 2021, 2022, and 2023 Quarterly Reports filed on Form 10-Q and the 2020, 2021, and 2022 Annual Reports on Form 10-K, each of which contained false and misleading statements. Further, he solicited the 2022 and 2023 Proxy Statements, which were likewise false and misleading and allowed him to continue to breach his fiduciary duties.

228.    Further, in violation of the Company's Code of Conduct, Defendant Musunuri

engaged in insider trading as detailed above, and thus personally benefitted from the false and misleading statements.

229.    Defendant Musunuri has a longstanding business relationship with Defendant Kompella as they co-founded Ocugen in 2013. As a result, Defendant Musunuri is inherently interested in the Company and indebted to Defendant Kompella. As such, Defendant Musunuri cannot consider a demand to sue Defendant Kompella as he would not sue the individual who helped him build his Company.

230.    Defendant Musunuri is not independent from Defendants Castillo, Fernandes, and Whittington, as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Musunuri. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by Ocugen to its CEO and Executive Officers. Defendant Musunuri could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

231.    Defendant Musunuri lacks independence due to the following related party transaction as detailed in the 2024 Proxy Statement:

> In December 2021, we entered into an agreement with Advaite, Inc. ("Advaite") to purchase 2,000 COVID-19 SalivaDirect™ Collection Test Kits (the "test kit") for use in our Phase 2/3 immuno-bridging and broadening safety trial for COVAXIN. Pursuant to the agreement, we agreed to pay $320,000 to Advaite for such COVID-19 test kits and the processing of such test kit samples. Additionally, in October 2022, we placed an order for an additional 500 test kits and the processing of such test kit samples in the amount of $80,000. In March 2022, we entered into a services agreement with Advaite to engage them to develop and validate bioanalytical methods for SARS-CoV-2 Spike S1 ELISA, in support of our trials and ongoing research. Pursuant to the services agreement, we agreed to pay approximately $295,000 to Advaite for such services. In December 2023, we terminated the services agreement.
>
> ***Advaite was co-founded and is being managed by Mr. Karthik Musunuri, the son***

*of our Chairman of the Board and CEO, Dr. Shankar Musunuri.*

232.    Lastly, Defendant Musunuri is a defendant in the Securities Class Action and thus faces potential liability.

233.    For the above reasons, Defendant Musunuri faces a substantial likelihood of liability for his breach of fiduciary duties, is neither independent nor disinterested, and any demand upon him is futile and thus, excused.

***Defendant Castillo***

234.    Demand on Defendant Castillo is futile for the additional reasons that follow. Defendant Castillo has served as a director of Ocugen since April 2020 and, as detailed above, derives substantial income from this employment. Accordingly, Defendant Castillo cannot reasonably and objectively consider a demand to sue the Board who controls her continued compensation, including herself.

235.    As a trusted Company director, Defendant Castillo conducted little, if any, oversight of the scheme to cause Ocugen to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Castillo was required to, *inter alia,* (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure that the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Castillo failed to fulfill these duties by permitting the false and misleading statements to be made and not correcting those statements.

236.    Defendant Castillo had a duty to ensure that statements concerning the Company's business, operations, prospects, and internal controls were accurate. Despite this, Defendant Castillo reviewed, authorized, and signed the 2021 and 2022 Form 10-Ks, each of which contained false and misleading statements. Further, she solicited the 2022 and 2023 Proxy Statements, which were likewise false and misleading and allowed her to continue to breach her fiduciary duties.

237.    Defendant Castillo also serves as a member of the Audit Committee and holds additional responsibilities as a result. Defendant Castillo is required to oversee, *inter alia,* the accounting and financial reporting processes of the company and the audits of the financial statements of the Company and otherwise meet the responsibilities set forth in the Audit Committee Charter and described herein. Defendant Castillo failed to adequately review and discuss the Company's Forms 10-K and Forms 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. By allowing the false and misleading statements to be made and by not correcting them, Defendant Castillo breached the fiduciary duties owed.

238.    Further, in violation of the Company's Code of Conduct, Defendant Castillo engaged in insider trading as detailed above, and thus personally benefitted from the false and misleading statements.

239.    For the above reasons, Defendant Castillo faces a substantial likelihood of liability for her breach of fiduciary duties, is neither independent nor disinterested, and any demand upon her is futile and thus, excused.

***Defendant Fernandes***

240.    Demand is futile on Defendant Fernandes for the additional reasons that follow.

Defendant Fernandes has served as a director of Ocugen since 2020 and, as detailed above, derives substantial income from this employment. Accordingly, Defendant Fernandes cannot reasonably and objectively consider a demand to sue the Board who controls her continued compensation, including herself.

241.    As a trusted Company director, Defendant Fernandes conducted little, if any, oversight of the scheme to cause Ocugen to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Fernandes was required to, *inter alia,* (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure that the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Fernandes failed to fulfill these duties by permitting the false and misleading statements to be made and not correcting those statements.

242.    Defendant Fernandes had a duty to ensure that statements concerning the Company's business, operations, prospects, and internal controls were accurate. Despite this, Defendant Fernandes reviewed, authorized, and signed the 2021 and 2022 Form 10-Ks, each of which contained false and misleading statements. Further, she solicited the 2022 and 2023 Proxy Statements, which were likewise false and misleading and allowed her to continue to breach her fiduciary duties.

243.    Further, in violation of the Company's Code of Conduct, Defendant Fernandes engaged in insider trading as detailed above, and thus personally benefitted from the false and

misleading statements.

244.    Defendant Fernandes also serves as a member of the Audit Committee and holds additional responsibilities as a result. Defendant Fernandes is required to oversee, *inter alia,* the accounting and financial reporting processes of the company and the audits of the financial statements of the Company and otherwise meet the responsibilities set forth in the Audit Committee Charter and described herein. Defendant Fernandes failed to adequately review and discuss the Company's Forms 10-K and Forms 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. By allowing the false and misleading statements to be made and by not correcting them, Defendant Fernandes breached the fiduciary duties owed.

245.    Defendants Fernandes and Kumar have a long-standing professional relationship dating back to at least 1988. Defendant Fernandes served in various executive roles at Bristol-Myers Squibb from 1987 to 1998. Defendant Kumar served as a Scientist at Bristol-Myers Squibb from 1988 to 1990. As a result, Defendant Fernandes is indebted to Defendant Kumar and is incapable of impartially considering a demand to sue Defendant Kumar for the wrongdoing alleged herein.

246.    For the above reasons, Defendant Fernandes faces a substantial likelihood of liability for her breach of fiduciary duties, is neither independent nor disinterested, and any demand upon her is futile and thus, excused.

### *Defendant Kompella*

247.    Additional reasons that demand upon Defendant Kompella is futile follow. Defendant Kompella has served as a director of Ocugen since 2019, is a co-founder of the

Company, and derives substantial income from this employment, as detailed above. Accordingly, Defendant Kompella cannot reasonably and objectively consider a demand to sue the Board who helps him run his company or who controls his continued compensation, including himself.

248.    As a trusted Company director, Defendant Kompella conducted little, if any, oversight of the scheme to cause Ocugen to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Kompella was required to, *inter alia*, (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure that the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Kompella failed to fulfill these duties by permitting the false and misleading statements to be made and not correcting those statements.

249.    Defendant Kompella had a duty to ensure that statements concerning the Company's business, operations, prospects, and internal controls were accurate. Despite this, Defendant Kompella reviewed, authorized, and signed the 2020, 2021, and 2022 Form 10-Ks, each of which contained false and misleading statements. Further, he solicited the 2022 and 2023 Proxy Statements, which were likewise false and misleading and allowed him to continue to breach his fiduciary duties.

250.    Further, in violation of the Company's Code of Conduct, Defendant Kompella engaged in insider trading as detailed above, and thus personally benefitted from the false and misleading statements.

251.    Defendant Kompella has a longstanding business relationship with Defendant Musunuri as they co-founded Ocugen in 2013. As a result, Defendant Kompella is inherently interested in the Company and indebted to the people who helped create it, including Defendant Musunuri. As such, Defendant Kompella cannot consider a demand to sue Defendant Musunuri as he would not sue the individual who helped him build his Company.

252.    For the above reasons, Defendant Kompella faces a substantial likelihood of liability for his breach of fiduciary duties, is neither independent nor disinterested, and any demand upon him is futile and thus, excused.

### *Defendant Zhang*

253.    Demand is futile on Defendant Zhang for the additional reasons that follow. Defendant Zhang has served as a director of Ocugen since 2019 and derives substantial income from this employment, as detailed above. Accordingly, Defendant Zhang cannot reasonably and objectively consider a demand to sue the Board who controls his continued compensation, including himself.

254.    As a trusted Company director, Defendant Zhang conducted little, if any, oversight of the scheme to cause Ocugen to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Zhang was required to, *inter alia,* (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure that the Company was operated in a diligent, honest, and prudent manner. Despite this,

Defendant Zhang failed to fulfill these duties by permitting the false and misleading statements to be made and not correcting those statements.

255.    Defendant Zhang had a duty to ensure that statements concerning the Company's business, operations, prospects, and internal controls were accurate. Despite this, Defendant Zhang reviewed, authorized, and signed the 2020, 2021, and 2022 Form 10-Ks, each of which contained false and misleading statements. Further, he solicited the 2022 and 2023 Proxy Statements, which were likewise false and misleading and allowed him to continue to breach his fiduciary duties.

256.    Further, in violation of the Company's Code of Conduct, Defendant Zhang engaged in insider trading as detailed above, and thus personally benefitted from the false and misleading statements.

257.    For the above reasons, Defendant Zhang faces a substantial likelihood of liability for his breach of fiduciary duties, is neither independent nor disinterested, and any demand upon him is futile and thus, excused.

### Defendant Whittington

258.    Demand on Defendant Whittington is futile for the additional reasons that follow. Defendant Whittington has served as a director of Ocugen since 2022 and has derived substantial income from this employment, as detailed above. Accordingly, Defendant Whittington cannot reasonably and objectively consider a demand to sue the Board who controls her continued compensation, including herself.

259.    As a trusted Company director, Defendant Whittington conducted little, if any, oversight of the scheme to cause Ocugen to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Whittington was required

to, *inter alia,* (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure that the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Whittington failed to fulfill these duties by permitting the false and misleading statements to be made and not correcting those statements.

260.    Defendant Whittington had a duty to ensure that statements concerning the Company's business, operations, prospects, and internal controls were accurate. Despite this, Defendant Whittington reviewed, authorized, and signed the 2022 Form 10-K, which contained false and misleading statements. Further, she solicited the 2022 and 2023 Proxy Statements, which were likewise false and misleading and allowed her to continue to breach her fiduciary duties.

261.    Defendant Whittington also serves as a member of the Audit Committee and holds additional responsibilities as a result. Defendant Whittington is required to oversee, *inter alia,* the accounting and financial reporting processes of the company and the audits of the financial statements of the Company and otherwise meet the responsibilities set forth in the Audit Committee Charter and described herein. Defendant Whittington failed to adequately review and discuss the Company's Forms 10-K and Forms 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. By allowing the false and misleading statements to be made and by not correcting them, Defendant Whittington breached the fiduciary duties owed.

262.    For the above reasons, Defendant Whittington faces a substantial likelihood of

liability for her breach of fiduciary duties, is neither independent nor disinterested, and any demand upon her is futile and thus, excused.

### *Additional Reasons Demand is Futile*

263.    Ocugen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused Ocugen to take action to recover the damages that Ocugen has suffered and will continue to suffer thereby.

264.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause Ocugen to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

265.    In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

266.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

267.    The Director Defendants' conduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a

majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of Ocugen. Accordingly, demand is excused as being futile.

268. Publicly traded companies, such as Ocugen, typically carry director and officer liability insurance from which Ocugen could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Ocugen's damages. If no such insurance is carried, then the Director Defendants will not cause Ocugen to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

269. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIM I

**Against Defendants Musunuri, Castillo, Fernandes, Kompella, Zhang, Whittington, Kumar, and Potti for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

270. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

271. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

272.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

273.    Under the direction and watch of the Director Defendants, the 2022 Proxy Statement and the 2023 Proxy Statement failed to disclose that the Individual Defendants had violated the Code of Conduct and that the Board's risk oversight mechanisms were evidently inadequate given the aforementioned misconduct.

274.    The 2022 and 2023 Proxy Statements also failed to disclose that: (i) Ocugen had a material weakness resulting in its internal control over financial reporting and disclosure controls and procedures being ineffective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total shareholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statements (Ocugen has since admitted that these financial statements could not be relied on); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all of the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

275.    In the exercise of reasonable care, Defendants Musunuri, Castillo, Fernandes,

Kompella, Zhang, Whittington, Kumar, and Potti should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement and the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement and the 2023 Proxy Statement, including, but not limited to, the reelection of Defendants Kompella, Whittington, Castillo, and Fernandes to the Board, thus allowing them to continue breaching their fiduciary duties to Ocugen.

276.    Ocugen was damaged because of the Director Defendants' material misrepresentations and omissions in the 2022 and 2023 Proxy Statements.

277.    Plaintiff, on behalf of Ocugen, has no adequate remedy at law.

## CLAIM II

### Against Defendant Musunuri for Contribution Under
### Section 21D of the Exchange Act

278.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

279.    Ocugen and Defendant Musunuri are named as defendants in the related Securities Class Action that alleges and asserts claims arising under the federal securities laws. Ocugen is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. The conduct of Defendants Musunuri as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

280.    If Ocugen is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendants Musunuri, who has caused the Company to suffer substantial harm through his misconduct. Ocugen is entitled to contribution and indemnification from the Individual Defendants

in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

281.    As a trusted Company director, Defendant Musunuri had the power or ability to, and did, control or influence, either directly or indirectly, Ocugen's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

282.    Defendant Musunuri is liable under Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

283.    Ocugen is entitled to receive all appropriate contribution or indemnification from Defendant Musunuri.

## CLAIM III

### Against the Individual Defendants for Breach of Fiduciary Duties

284.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

285.    By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

286.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

287.    The Individual Defendants knowingly issued false financial statements and made false and misleading statements regarding Ocugen's business operations, practices, and international controls in connection therewith, as alleged herein. These actions could not have been a loyal and good faith exercise of prudent business judgment to protect and promote Ocugen's corporate

interests.

288.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Ocugen has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

289.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

290.    Plaintiff, on behalf of Ocugen, has no adequate remedy at law.

## CLAIM IV

### Against the Individual Defendants for Gross Mismanagement

291.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

292.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

293.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ocugen has sustained significant damages in excess of hundreds of millions of dollars and will continue to sustain significant damages.

294.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

295.    Plaintiff, on behalf of Ocugen, has no remedy at law.

## CLAIM V

### Against the Individual Defendants for Waste of Corporate Assets

296.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

297.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

298.    As a result of the misconduct described above, and by failing to properly consider the interests of Ocugen and its public shareholders, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to investigate and defend Defendants' unlawful actions; and (iv) causing the loss of financing from investors and business from future customers who no longer trust Ocugen and its products.

299.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

300.    Plaintiff, on behalf of Ocugen, has no adequate remedy at law.

## CLAIM VI

### Against the Individual Defendants for Unjust Enrichment

301.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

302.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual

Defendants were unjustly enriched at the expense of, and to the detriment of, Ocugen.

303.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

304.    Additionally, at the time of their stock sales set forth herein, Defendants Musunuri, Subramanian, Kumar, Zhang, Kompella, Potti, Castillo, and Fernandes knew of the information described above, and sold Ocugen common stock on the basis of such information. Their sales of Ocugen common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

305.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## CLAIM VII

### Against the Director Defendants for Aiding and Abetting

306.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

307.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Individual Defendants.

308.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially

false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law as alleged herein, and failing to report the same.

309.    As a result, the Director Defendants substantially assisted the Individual Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

310.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

311.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## **CLAIM VIII**

**Against Defendants Castillo, Kompella, Musunuri, Subramanian, Fernandes, Kumar, Potti, and Zhang for Insider Selling**

312.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

313.    By reason of their fiduciary roles as officers, directors, and/or controlling persons of Ocugen, Defendants Castillo, Kompella, Musunuri, Subramanian, Fernandes, Kumar, Potti, and Zhang (the "Insider Selling Defendants") specifically owed Ocugen the highest obligation of due care, good faith, and loyalty.

314.    As officers, directors, and/or controlling persons of the Company, the Insider Selling Defendants were given access, directly or indirectly, to material information about the Company, as described above, which was not generally available to the public.

315.    When the Insider Selling Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information, and sold Company stock on the basis

of such information; information which they each knew had a significant effect on the market price of the Company's stock.

316.    The information described above was proprietary, non-public information concerning the Company's business operations and financial condition. It was a proprietary asset belonging to Ocugen, which the Insider Selling Defendants misappropriated to their own benefit when they sold holdings in Company stock. The Insider Selling Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

317.    As the use of Ocugen's proprietary information for their own personal gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, Ocugen is entitled to disgorge any illegal profits obtained thereby.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys'

fees, accountants' and experts' fees, costs, and expenses; and

     E.     Granting such other and further relief as the Court deems just and proper.

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury.


Dated: May 6, 2025               Respectfully submitted,

                           **THE ROSEN LAW FIRM, P.A.**

                           <u>/s/ Olivia D. Simkins</u>
                           Olivia D. Simkins (PA ID: 336339)
                           Jacob A. Goldberg
                           101 Greenwood Avenue, Suite 440
                           Jenkintown, PA 19046
                           Telephone: (215) 600-2817
                           Email: osimkins@rosenlegal.com
                           Email: jgoldberg@rosenlegal.com

                           Phillip Kim (pro hac vice)
                           275 Madison Avenue, 40th Floor
                           New York, NY 10016
                           Telephone: (212) 686-1060
                           Facsimile: (212) 202-3827
                           Email: philkim@rosenlegal.com

                           *Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Ratna Kammuluri am a plaintiff in the within action. I have reviewed the allegations made in this shareholder amended derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Signed by:

*Ratna Kammuluri*                    5/6/2025
813A4D52288D40E...

Ratna Kammuluri