# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY WATTS, derivatively on behalf of OCUGEN, INC., <br><br> Plaintiff, <br><br> vs. <br><br> SHANKAR MUSUNURI, SANJAY SUBRAMANIAN, MICHAEL BREININGER, ARUN UPADHYAY, RAMESH KUMAR, JUNGE ZHANG, UDAY KOMPELLA, MARNA C. WHITTINGTON, KIRSTEN CASTILLO, PRABHAVATHI FERNANDES, and MANISH POTTI, <br><br> Defendants, <br><br> and <br><br> OCUGEN, INC., <br><br> Nominal Defendant. | Lead Case No.: 2:24-cv-02234 <br><br><br> **DEMAND FOR JURY TRIAL** |

## AMENDED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiffs Jeffrey Watts ("Watts") and Priyank Garg ("Garg") (together, "Plaintiffs"), by and through their undersigned attorneys, hereby submit this Amended Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Ocugen, Inc. ("Ocugen" or the "Company") against the Individual Defendants (as defined below) seeking to remedy their breaches of fiduciary duties and other violations of law from May 8, 2020 through April 1, 2024 (the "Relevant

Period"). Plaintiffs make these allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by Ocugen with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Ocugen; (c) review of news articles, stockholder communications, and postings on Ocugen's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from a consolidated securities fraud class action pending in this Court captioned, *Patterson v. Ocugen, Inc.*, et al., Case No. 2:24-cv-01500 (the "Securities Class Action"); and (e) review of other publicly available information concerning Ocugen and the Individual Defendants.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action asserting claims for breach of fiduciary duty and other violations of law against certain current and former officers and members of the Company's Board of Directors (the "Board").

2.      Headquartered in Malvern, Pennsylvania, Ocugen is a clinical-stage biopharmaceutical company that focuses on discovering, developing, and commercializing novel gene and cell therapies and vaccines. Currently, Ocugen has three modifier gene therapy programs in clinic trials for retinal diseases: OCU400, OCU410, and OCU410ST.

3.      During the Relevant Period, Ocugen faced a myriad of financial challenges. Indeed, since its inception, Ocugen has faced significant losses from operations and negative cash flow

from operations causing concern that the Company may never be profitable.

4.      Despite this gloomy outlook, analysts and stockholders were optimistic regarding the Company's business condition and future based on misrepresentations made by the Individual Defendants. To keep the Company afloat, the Individual Defendants used these misstatements to obtain financing through the issuance of common stock. Without this capital, the Company had no future.

5.      Throughout the Relevant Period, the Individual Defendants failed to disclose that Ocugen's financial statements were materially misstated and that Ocugen did not have adequate internal controls. As a result, the Company failed to properly account for its co-development and commercialization agreement with CanSino Biologics Inc. ("CanSinoBIO") with respect to the development and commercialization of OCU400, OCU410, and OCU410ST.

6.      On September 27, 2019, Ocugen entered into a co-development and commercialization agreement with CanSinoBIO (the "Agreement") with respect to the development and commercialization of Ocugen's gene therapy products. In breach of their fiduciary duties, the Individual Defendants knowingly, or recklessly, allowed Ocugen to apply improper accounting guidance to the Agreement, which caused Ocugen to provide false revenue recognition guidance and disclosures in Ocugen's financial statements. Through the Individual Defendants' misconduct, they painted a rosy picture of a purportedly positive future for the Company, which provided the Company with the opportunity to raise substantial capital through a securities offering.

7.    Indeed, the Individual Defendants knew of the discrepancies with respect to Ocugen's financial reporting but allowed the misreporting to continue unabated.  Specifically, the Individual Defendants knowingly turned a blind eye to Defendant Shankar Musunuri ("Musunuri"), the Company's Chief Executive Officer ("CEO"), firing executives who questioned the false numbers given during quarterly earnings call and contained in the Company's filings with the SEC.

8.    Indeed, both former Chief Accounting Officer ("CAO") Jessica Crespo ("Crespo") and former Chief Financial Officer ("CFO") Quan Vu ("Vu") confronted Defendant Musunuri regarding improper forecasting of the Company's financials and were subsequently fired from their positions.

9.    Crespo's altercation with Musunuri regarding the Company's wrongful forecasting led to the Company announcing her resignation on March 7, 2023. The day prior, on March 6, 2023, Ocugen announced the appointment of Vu to CFO & Chief Business Officer.

10.    Vu's appointment was short lived. Indeed, Vu refused to sign the Company's  Q2 2023 10-Q due to misrepresentations in the Company's financials and on August 14, 2023, the Company announced that  Vu was no longer serving as the CFO/Chief Business Officer, and as principal financial officer and principal accounting officer of Ocugen.   The Company also announced that Vu's separation from employment was being treated as a severance qualifying event under Vu's employment agreement.

11.    The next day, on August 15, 2023, the Board appointed Musunuri  as the interim

principal financial officer, effective immediately, due to Vu's departure.  That same day, after the

market closed, the Company also filed a Notification of Late Filing on Form 12b-25 with the SEC

with respect to the Q2 2023 10-Q.

      12.     On this news, Ocugen's stock fell $0.04 per share, or 8.3%, to close at $0.44 per

share on August 16, 2023.

      13.     On April 1, 2024, Ocugen filed with the SEC a current report on Form 8-K (the

"Restatement Announcement"), stating:

> [T]he Audit Committee of the Board of Directors (the "Audit Committee"), based
> on the recommendation of management and after consultation with EY, concluded
> that the Company's previously-issued audited consolidated financial statements for
> each fiscal year beginning January 1, 2020 and its previously-issued unaudited
> interim condensed consolidated financial statements for each of the first three
> quarters in such years, as well as the associated earnings releases and investor
> presentations or other communications describing such financial statements, were
> materially misstated and, accordingly, should no longer be relied upon. The
> Company intends to restate its consolidated financial statements as of and for the
> year ended December 31, 2022, in connection with the filing of its 2023 Form 10-
> K. Similarly, the Company will include restated unaudited financial information for
> each of the first three quarters of 2023 and 2022 in its 2023 Form 10-K (each such
> annual and quarterly period to be restated, a "Restated Period").

      14.     The Restatement Announcement revealed that "[t]he identified errors in each of the

Restated Periods relate to the Company's accounting for the estimated costs in one of its

collaboration arrangements. These identified errors will result in a restatement of the following

financial statement line-item captions: Collaborative arrangement revenue, Research and

development expenses, Other income (expense), net and Accrued expenses and other current

liabilities." The collaboration was the agreement with CanSinoBIO.

15.     Furthermore, the Company identified a material weakness in its internal control over financial reporting and acknowledged that its internal control and disclosure controls and procedures were not effective as of December 31, 2023.

16.     In connection with the foregoing, and on the same day, Ocugen filed with the SEC a Notification of Late Filing on Form 12b-25 (the "Late Filing Notification"). The Late Filing Notification stated that "[g]iven the scope of the process to prepare the restatements and related disclosures, the Company requires additional time to prepare and review its financial statements and other disclosures in its 2023 Form 10-K. Therefore, the Company is unable to complete and file the 2023 Form 10-K by the required due date of April 1, 2024."

17.     On this news, the Company's stock price declined $0.16 per share, or 10.38%, from a closing price of $1.54 per share on April 1, 2024, to close at $1.38 per share at the close of trading on April 2, 2024.

18.     Ocugen filed its restated Annual Report on Form 10-K for the year ended December 31, 2023 with the SEC on April 16, 2024. The restatement "includes adjustments to Collaborative arrangement revenue, Research and development expenses, Other income (expense), net and Accrued expenses and other current liabilities during the impacted periods. The Company has also corrected certain other identified immaterial errors that were identified during the impacted periods impacting Research and development expenses, General and administrative expenses, and Accrued expenses and other current liabilities." Ocugen's restatement of financial statements included adjustments that increased current liabilities and decreased stockholder equity.

19.    The restatement due to accounting errors also impacted several key financial metrics, including the current ratio. The current ratio is a liquidity ratio that measures whether a firm has enough resources to meet its short-term obligations(i.e., it is the ratio of a firm's current assets to its current liabilities). A current ratio is used to indicate the financial condition of a company. The restatement revealed that ***Ocugen's current ratio was overstated*** by as much as **54.6%-82.0%** during the affected period.

20.    On May 31, 2024, Ernst & Young LLP ("EY") notified the Company of its decision to decline to participate in the request-for-proposal process and to decline to stand for reelection as the Company's independent registered public accounting firm for fiscal year 2024. As discussed herein, EY's decision to not be the Company's independent auditor and not stand for re-election is suspicious.

21.    Additionally, Defendants Musunuri, Subramanian, Kumar, Zhang, Kompella, Potti, Castillo, and Fernandes (each defined below) breached their fiduciary duties by engaging in lucrative insider sales of Company common stock while the share price was artificially inflated because of their breaches of their fiduciary duties.

22.    The Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by knowingly engaging in the deceptions alleged herein.

23.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Ocugen has sustained damages as described below.

## JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

25.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

26.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

28.     Plaintiff Jeffrey Watts is a current shareholder of Ocugen and holds 644.92133 shares of Ocugen common stock.  Plaintiff has continuously held Ocugen common stock since purchasing the stock on January 11, 2021.

29.     Plaintiff Priyank Garg is a current shareholder of Ocugen and holds 20,746  shares of Ocugen common stock.  Plaintiff has continuously held Ocugen common stock since purchasing

the stock on August 11, 2020.

30.     Nominal Defendant Ocugen is a biotechnology company. It is incorporated in Delaware and its headquarters is located at 11 Great Valley Parkway, Malvern, Pennsylvania 19355. Ocugen's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "OCGN."

31.     Defendant Musunuri has served as Chairman of Ocugen since he co-founded the Company in September 2013 and has additionally served as Ocugen's CEO since May 2015. For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year") and the fiscal year ended December 31, 2024 (the "2024 Fiscal Year"), Defendant Musunuri received $4,535,231 and $1,941,538, respectively, in total compensation from the Company.

32.     As demonstrated by the chart below, Defendant Musunuri sold shares of Ocugen at great profit while in possession of material non-public information during the Relevant Period.

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 2021-05-03 | 195,809 | $14.24 | $2,788,320 |
| 2021-06-07 | 7,758 | $10.94 | $84,872 |
| 2021-06-08 | 22,800 | $10.98 | $250,344 |
| 2021-09-15 | 125,000 | $7.52 | $940,000 |
| 2021-10-15 | 125,000 | $49.80 | $1,225,000 |
| 2021-11-01 | 115,367 | $14.15 | $1,632,4431 |
| 2021-11-16 | 115,000 | $8.04 | $324,559 |
| 2021-12-16 | 115,000 | $5.22 | $600,300 |
| 2022-02-14 | 90,000 | $3.74 | $336,600 |
| 2022-03-16 | 81,823 | $2.65 | $216,830 |
| 2022-05-13 | 125,000 | $1.92 | $240,000 |

| | | | |
|---|---|---|---|
| 2022-07-14 | 150,000 | $2.72 | $408,000 |
| 2022-10-14 | 100,000 | $1.66 | $166,000 |
| 2022-12-16 | 95,809 | $1.43 | $137,006 |
| 2023-01-17 | 100,000 | $1.28 | $128,000 |
| 2023-02-16 | 100,000 | $1.08 | $108,000 |
| **Total:** | **1,664,366** | | **$24,278,262.00** |

33.    Defendant Sanjay Subramanian ("Subramanian") served as Ocugen's CFO from the start of the Relevant Period until March 18, 2022.

34.    As demonstrated by the chart below, Defendant Subramanian sold shares of Ocugen at great profit while in possession of material non-public information during the Relevant Period.

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 2021-04-29 | 7,990 | $10.98 | $87,730 |
| 2021-05-14 | 31,000 | $8.18 | $253,673 |
| 2021-06-15 | 31,000 | $7.00 | $217,000 |
| 2021-07-15 | 31,086 | $6.70 | $217,000 |
| 2021-08-16 | 30,000 | $7.22 | $216,600 |
| 2021-10-15 | 7,990 | $9.96 | $79,580 |
| 2021-10-26 | 10,000 | $11.07 | $110,700 |
| **Total:** | **149,066** | | **$1,182,283.00** |

35.    Defendant Michael Breininger ("Breininger") served as the Company's Controller from August 2023 and as CAO from September 2023 until November 2024. For the 2023 Fiscal Year, Defendant Breininger received $226,935 in total compensation from the Company.

36.    Defendant Arun Upadhyay ("Upadhyay") has served as the Company's Chief

Scientific Officer since September 2022. He previously served as Ocugen's Senior Vice Preisdent and Head of R&D from December 2021 to September 2022.

37.     Defendant Ramesh Kumar ("Kumar") served as a Company director from September 2019 through June 28, 2024. As a member of the Board, Defendant Kumar also served as Chair of the Audit Committee. For the 2023 Fiscal Year, Defendant Kumar received $144,013 in total compensation from the Company. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Kumar received $347,279 in total compensation from the Company;  for the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Kumar received $316,981 in total compensation from the Company; and for the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Kumar received $88,578 in total compensation from the Company.

38.     As demonstrated by the chart below, Defendant Kumar sold shares of Ocugen at great profit while in possession of material non-public information during the Relevant Period.

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 2021-04-19 | 7,500 | $5.33 | $39,975 |
| 2021-07-19 | 7,500 | $6.40 | $48,000 |
| 2021-10-18 | 7,500 | $8.13 | $60,975 |
| 2022-01-18 | 7,500 | $4.07 | $30,525 |
| 2022-04-18 | 7,500 | $2.83 | $21,225 |
| 2022-07-18 | 7,500 | $2.57 | $19,275 |
| 2022-10-06 | 4,500 | $1.83 | $8,235 |
| **Total:** | **49,500** | | **$228,210.00** |

39.    Defendant Junge Zhang ("Zhang") has served as a Company director since 2019. As a member of the Board, Defendant Zhang also serves as a member of the Nominating and Corporate Governance Committee. For the 2023 Fiscal Year, Defendant Zhang received $87,125 in total compensation from the Company; for the 2022 Fiscal Year, Defendant Zhang received $335,555 in total compensation from the Company; for the 2021 Fiscal Year, Defendant Zhang received $310,233 in total compensation from the Company; and for the 2020 Fiscal Year, Defendant Zhang received $81,830 in total compensation from the Company.

40.    As demonstrated by the chart below, Defendant Zhang sold shares of Ocugen at great profit while in possession of material non-public information during the Relevant Period.

| Date | Number of Shares | Price | Proceeds |
|------|-----------------|-------|----------|
| 2021-11-02 | 149,700 | $15.75 | $2,357,775 |
| 2021-11-03 | 150,300 | $17.32 | $2,603,196 |
| **Total:** | **300,000** | | **$4,960,971.00** |

41.    Defendant Uday B. Kompella ("Kompella") co-founded the Company in September 2013 and has served as a Company director since 2019. As a member of the Board, Defendant Kompella also serves as a member of the Nominating and Corporate Governance Committee. For the 2023 Fiscal Year, Defendant Kompella received $102,125 in total compensation from the Company; for the 2022 Fiscal Year, Defendant Kompella received $341,819 in total compensation from the Company; For the 2021 Fiscal Year, Defendant Kompella received $299,981 in total compensation from the Company; and for the 2020 Fiscal Year, Defendant Kompella received $72,343 in total compensation from the Company.

42.    As demonstrated by the chart below, Defendant Kompella sold shares of Ocugen at great profit while in possession of material non-public information during the Relevant Period.

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 2021-04-26 | 350,000 | $11.70 | $4,095,000 |
| 2021-04-30 | 20,000 | $11.56 | $231,200 |
| 2021-05-03 | 50,000 | $15.01 | $750,500 |
| 2021-05-28 | 7,191 | $8.82 | $63,424.62 |
| 2021-06-25 | 10,000 | $8.13 | $81,350 |
| 2021-07-30 | 10,000 | $6.81 | $68,070 |
| 2021-10-18 | 200,000 | $8.41 | $1,682,000 |
| 2021-10-20 | 1,731 | $9.02 | $15,613 |
| 2021-10-21 | 1,898 | $9.01 | $17,100 |
| 2021-10-25 | 46,371 | $9.08 | $421,048 |
| 2021-10-26 | 25,000 | $12.05 | $301,205 |
| 2021-11-01 | 25,000 | $14.05 | $351,250 |
| 2021-11-02 | 25,000 | $16.01 | $400,250 |
| **Total:** | **772,191** | | **$8,478,010.62** |

43.    Defendant Marna Whittington ("Whittington") has served as a Company director since 2022. As a member of the Board, she also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. For the 2023 Fiscal Year, Defendant Whittington received $103,321 in total compensation from the Company.

44.    Defendant Kirsten Castillo ("Castillo") has served as a Company director since 2020. As a member of the Board, she also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee, Compensation Committee, and Science and Technology Committee. For the 2023 Fiscal Year, Defendant Castillo received

$110,821 in total compensation from the Company; for the 2022 Fiscal Year, Defendant Castillo received $348,182 in total compensation from the Company; for the 2021 Fiscal Year, Defendant Castillo received $308,731 in total compensation from the Company; and for the 2020 Fiscal Year, Defendant Castillo received $54,495 in total compensation from the Company.

45.    As demonstrated by the chart below, Defendant Castillo sold shares of Ocugen at great profit while in possession of material non-public information during the Relevant Period.

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 2021-06-07 | 10,000 | $10.000 | $100,000 |
| 2021-11-02 | 15,000 | $15.00 | $225,000 |
| 2022-08-11 | 42,000 | $2.91 | $122,220 |
| **Total:** | **67,000** | | **$447,220.00** |

46.    Defendant Prabhavathi Fernandes ("Fernandes") has served as a Company director since 2020. As a member of the Board, Defendant Fernandes also serves as the Chair of the Compensation Committee and as a member of the Audit Committee and Science and Technology Committee. For the 2023 Fiscal Year, Defendant Fernandes received $124,625 in total compensation from the Company; for the 2022 Fiscal Year, Defendant Fernandes received $357,595 in total compensation from the Company; for the 2021 Fiscal Year, Defendant Fernandes received $302,602 in total compensation from the Company; and for the 2020 Fiscal Year, Defendant Fernandes received $49,809 in total compensation from the Company.

47.    As demonstrated by the chart below, Defendant Fernandes sold shares of Ocugen at great profit while in possession of material non-public information during the Relevant Period.

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 2021-05-25 | 33,500 | $8.20 | $274,700 |
| **Total:** | **33,500** | | **$274,700.00** |

48.    Defendant Manish Potti ("Potti") served as a Company director from 2017 until his resignation in June 2022. As a previous member of the Board, Defendant Potti served as a member of the Audit Committee. For the 2022 Fiscal Year, Defendant Potti received $167,970 in total compensation from the Company; for the 2021 Fiscal Year, Defendant Potti received $304,481 in total compensation from the Company; and for the 2020 Fiscal Year, Defendant Potti received $77,641 in total compensation from the Company.

49.    As demonstrated by the chart below, Defendant Potti sold shares of Ocugen at great profit while in possession of material non-public information during the Relevant Period.

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 2021-05-03 | 88,000 | $15.02 | 1,321,320 |
| 2021-06-15 | 68,185 | $8.86 | $604,119 |
| 2021-11-02 | 63,429 | $15.07 | $955,875 |
| **Total:** | **219,614** | | **$2,881,314.00** |

50.    Defendants Musunuri, Subramanian, Breininger, Kumar, Zhang, Kompella, Whittington, Castillo, Fernandes, and Potti are sometimes referred to herein as the "Individual Defendants."

### THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS SHAREHOLDERS

51.    By reason of their positions as officers and/or directors of the Company and

because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

52.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Ocugen were required to, among other things:

- ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- conduct the affairs of the Company in a lawful, efficient, business-like manner

so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

- ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

54. Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing

and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

55.    In addition, the Company has also adopted a Code of Business Conduct and Ethics (the "Code") which applies to all employees, executive officers and directors of the Company. The purpose of the Code is:

> to demonstrate our firm commitment to compliance and to reflect our belief in the highest standards of ethics and integrity. The Code is designed to promote (i) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, (ii) full, fair, accurate, timely, and understandable disclosure in reports and documents the Company files with, or submit to, the Securities and Exchange Commission (the "SEC") and in our other public communications, (iii) compliance with applicable governmental laws, rules and regulations, (iv) prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code and (v) to ensure accountability for adherence to the Code. It also serves as a guide to help us achieve our goals and set expectations by highlighting many of the laws, rules and regulations that affect our industry. But, more importantly, it helps protect our reputation by ensuring to our business partners, investors and patients that together we are committed to a culture of compliance.

56.    The Code goes on to state:

Insider Trading

You are prohibited from buying, selling or engaging in any other transaction with respect to securities of Ocugen or any other company, including the Company's suppliers and customers, while in possession of material, non-public information. Material information is any information that a reasonable investor would consider important in making an investment decision. You must also refrain from sharing, tipping or disclosing material, non-public information with others.

You should be aware that stock market surveillance techniques are becoming increasingly sophisticated, and the probability that U.S. federal or other regulatory authorities will detect and prosecute even small level trading is significant. Insider trading rules are strictly enforced, even in instances where the financial transactions seem small. Violations of the U.S. securities laws may result in civil and criminal penalties, including disgorgement of profits, civil judgments, fines and jail sentences.

All directors, executive officers and employees are also subject to our Insider Trading Policy, which is available on our intranet site. You should review and be familiar with the Insider Trading Policy. If you are uncertain about the constraints on your purchase or sale of any securities by virtue of your relationship with Ocugen, you should consult with our Chief Financial Officer or our Compliance Officer before making any such purchases or sale.

***

Accuracy of Books and Records and Public Reports

The Company has an obligation to make and keep books, records and accounts that, in reasonable detail, accurately and fairly reflect the Company's transactions and to maintain tax records and prepare tax returns that comply with applicable laws, rules and regulations. The Company must also maintain a system of internal accounting controls that meet generally accepted accounting principles and applicable laws, rules and regulations. All employees who are responsible for any aspect of the Company's internal accounting controls and financial and tax reporting systems (including, but not limited to, the Chief Executive Officer, Chief Financial Officer, the principal accounting officers and persons performing similar functions) must conduct themselves using the highest ethical standards of integrity and honesty, in a manner that allows the Company to meet accounting and legal requirements and to prepare financial reports and financial statements that are not false or misleading, and that present full, fair, accurate, timely and understandable disclosure in the Company's periodic reports and other public communications.

You must honestly and accurately report all business transactions. You are responsible for the accuracy of your records and reports. Accurate information is essential to our ability to meet legal and regulatory requirements.

All Company books, records and accounts will be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the

transactions they record. No employee, executive officer or director may override, or direct others to override, the Company's established system of internal controls over financial reporting and disclosure. The financial statements of the Company must conform to generally accepted accounting rules and the Company's finance policies. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries should be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property should be made without adequate supporting documentation. Transactions of the Company are to be executed only in accordance with management's general or specific authorizations.

It is our policy to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the SEC and in other public communications.

Concerns Regarding Accounting or Auditing Matters

It is your responsibility to report any concerns regarding questionable or fraudulent accounting or auditing matters or complaints regarding accounting, internal accounting controls or auditing matters.

57.    The Company's Audit Committee Charter goes on to explain the purpose of the Audit Committee (comprised of Whittington, Kumar, Fernandes, and Castillo during the Relevant Period) which is "to assist the Board's oversight of the Company's accounting and financial reporting processes and the audits of the Company's financial statements."

58.    The Audit Committee Charter enumerates a number of functions and processes the Audit Committee is tasked with, including:

Audited Financial Statements

1. Review and Discussion. The Audit Committee shall review and discuss with the Company's management and independent auditor the Company's audited financial statements, including the matters required to be discussed by AS 16.

2. Recommendation to Board Regarding Financial Statements. The Audit

Committee shall review and discuss the Company's annual audited financial statements, interim financial statements and any certification, report, opinion or review rendered by the independent auditor with the Company's management and the independent auditor. The Audit Committee shall recommend to the Board whether the annual audited financial statements and related notes should be included in the Company's annual report on Form 10-K.

3. Audit Committee Report. The Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.

Review of Other Financial Disclosures

1. Independent Auditor Review of Interim Financial Statements. The Audit Committee shall direct the independent auditor to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Audit Committee and Chief Financial Officer any matters identified in connection with the auditor's review of interim financial information which are required to be discussed by applicable auditing standards. The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent auditor's review of interim financial information.

**Controls and Procedures**

1. Oversight. The Audit Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and Code of Business Conduct and Ethics. The Audit Committee shall periodically assess the adequacy of the Code of Business Conduct and Ethics and recommend any proposed changes to the Board for approval. The Audit Committee shall receive and review the reports of the Chief Executive Officer and the Chief Financial Officer required by Rule 13a-14 under the Exchange Act.

2. Risk Management. The Audit Committee shall assess and discuss the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled.

3. Legal Compliance. The Audit Committee shall review with the Company's

counsel and report to the Board on litigation, material government investigations and compliance with applicable legal requirements and the Company's Code of Business Conduct and Ethics.

4. Procedures for Complaints. The Audit Committee shall establish, and oversee the Company's compliance with, procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

5. Oversight of Related Person Transactions. The Audit Committee shall review the Company's policies and procedures for reviewing and approving or ratifying "related person transactions" (defined as transactions required to be disclosed pursuant to Item 404 of Regulation S-K), including the Company's Related Party Transactions Policy, and recommend any changes to the Board. In accordance with the Company's Related Party Transactions Policy and Nasdaq rules, the Audit Committee shall conduct appropriate review and oversight of all related person transactions for potential conflict of interest situations on an ongoing basis.

6. Review the Company Investment Policy. The Audit Committee shall review the Company's Investment Policy on an annual basis and approve any changes. The Audit Committee shall review any requests for a waiver to the Investment Policy.

7. Cybersecurity and Additional Risks. In connection with the Audit Committee's discussion of the Company's financial, accounting and financial risk assessment and management guidelines, it may consider the Company's major risk exposures, including financial, operational, privacy, security, cybersecurity, competition, legal, regulatory, hedging and accounting risk exposures and the steps that the Company's management has taken to monitor and control such exposures.

8. Additional Duties. The Audit Committee shall have such other duties as may be delegated from time to time by the Board.

59.     The Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in the breaches of their fiduciary duties.

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

60.    Ocugen, a clinical-stage biopharmaceutical company, focuses on discovering, developing, and commercializing novel gene and cell therapies and vaccines. The Company was founded in 2013 by Defendants Musunuri and Kompella and is headquartered in Malvern, Pennsylvania.

### DESPITE THE COMPANY ALWAYS HAVING BEEN IN A RISKY FINANCIAL POSITION, ANALYSTS WERE POSITIVE ABOUT THE COMPANY'S FUTURE

61.    Ocugen has always been in a risky financial position. Ocugen's ability to become and remain profitable depends on its ability to generate revenue. Ocugen is not able to generate revenue that is sufficient to achieve profitability unless and until it obtains marketing approval for and commercializes one of its product candidates. However, to date, Ocugen has not successfully developed or commercialized a single pharmaceutical product. To pay for its expenses, Ocugen has had to obtain financing through the issuance of common stock, among other avenues. This funding can only be achieved if the public is led to believe that the Company has a profitable future.

62.    Ocugen has incurred significant losses from operations and negative cash flows from operations since its inception. Indeed, Ocugen's recurring operating losses have raised substantial doubt regarding its ability to continue as a going concern.

63.    At all relevant times, the Individual Defendants knew the perception of Ocugen's inability to continue as a going concern would make it more difficult for it to obtain financing for

the continuation of its operations.

64.    Before the start of the Relevant Period, Ocugen was extremely low in cash. As of December 31, 2019, the Company had cash, cash equivalents, and restricted cash totaling just $7.6 million. Ocugen needed to raise capital to continue to execute its business plan, and for the Individual Defendants to cash in on the shares of Ocugen they held.

65.    The Company was able to raise capital through numerous stock issuances through the fiscal years of 2020 through 2022. Through these multiple subsequent stock issuances, Ocugen was able to fund its operations and increase the balance of its cash on hand, and the Individual Defendants were able to sell large quantities of their Ocugen shares. However, by the end of the 2023 Fiscal Year, the Company was once again short on cash necessary to continue operations.

66.    Yet, despite the Company's precarious financial position, during the Relevant Period, analysts were optimistic about the Company's future. The Company is covered by the analysts Chardan Capital Markets and H.C. Wainwright & Co., among others. During the Relevant Period, both of these analysts issued optimistic reports regarding the Company, rating Ocugen stock as a "buy" and issuing positive broadcasts regarding the trajectory of the OCU400 development.

### THE COMPANY'S IMPROPER ACCOUNTING WAS WELL-KNOWN AMONG MANAGEMENT

67.    According to the Amended Securities Complaint, Confidential Witness ("CW") No. 1[1] ("CW-1") worked at Ocugen's headquarters in Malvern, Pennsylvania from February 2022

---

[1] The misconduct at issue here led to the filing of the Securities Class Action, which names Ocugen

through September 2023 as Financial Planning and Analysis Manager. CW-1 reported to Frank Clifford ("Clifford"), the head of Financial Planning and Analysis.

68.     CW-1's responsibilities primarily related to Ocugen's clinical teams and research and development group ("R&D"). CW-1 prepared forecasts on expected costs for drug development that were sent to Musunuri. Clifford and Crespo, the Chief Accounting Officer, saw CW-1's forecasts as well. The forecasts were based on information such as the costs per patient in the clinical studies, numbers provided to CW-1 from R&D, and calculations of costs based on research timelines. CW-1's forecasts were usually used to establish the Company's cash runway.

69.     The date for the initiation of trials often changed which required changes in the Company's financial estimates. For example, CW-1 stated that "[i]f you told me that a trial is going to start tomorrow and that the FDA requires it to last a year, then that is the timeline."; "Whatever estimates or forecasts are put together show the financial results for a year from tomorrow."; and "But if the trial has issues that lead it to be rescheduled to start three months later, you have to shift the timeline to 15 months from now." But Musunuri and Chief Scientific Officer, Defendant Upadhyay, "pushed back on that and insisted we forecast estimates based on the original study timeline. So rather than a year required by the FDA, [Musunuri and Upadhyay] wanted to make calculations based on the study lasting nine months."

---

and certain of the Individual Defendants as defendants. On October 4, 2024, plaintiffs in the Securities Class Action filed an Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Amended Securities Complaint" or "ASC"). The Amended Securities Complaint includes the accounts of several former employees ("CWs") that assist in substantiating Plaintiffs' allegations of the misconduct of the Individual Defendants in this action.

70.     According to the ASC, when CW-1 provided forecasts to Musunuri and Upadhyay, the two men became furious because the information did not match with their goals.  Rather than sending the forecasts back to the finance department, Musunuri and Upadhyay came up with their own numbers and estimates without any basis for doing so.  CW-1 stated: "They pulled the timelines and other figures out of their a\*\*es."

71.     Per the ASC, the revised forecasts, put together by Musunuri and Upadhyay, were then used as the actual numbers provided in some of the quarterly investor calls that took place during CW-1's tenure.  Indeed, CW-1 stated: "There were times the forecasts they used in the investor calls contradicted the forecasts we put together in the finance department."

72.     "For the going concern numbers, they wanted to show that they had 12 months [worth of available cash], but I don't believe it was feasible without a major injection of cash," CW-1 said.  "They were getting their cash runway to extend further than it was."

73.     Per the ASC, CW-1's forecast also included information about OCU400, which is the Company's modifier gene therapy product candidate for retinal diseases.

74.     According to the Amended Securities Complaint, CW-1 stated that Musunuri and Upadhyay used numbers in the projection of time for completion of the OCU400 study that ignored actual recruitment results.  Phases 1 and 2 of the Phase 1/2 trial for OCU400 required 18 patients, but enrollment in 2022 and 2023 was extremely slow (as there are not a lot of subjects in the United States with the targeted diseases).

75.     The real forecast incorporated those delays in enrollment, but Musunuri and

Upadhyay overruled those numbers and instead maintained the original timeline for completion of the trial even though it was impossible to reach. CW-1 noted that "Musunuri and Upadhyay said that the estimated time to reach full enrollment was not to be moved." "They kept their timelines with extremely tight enrollment deadlines which, of course, never came true," CW-1 stated. "They kept it condensed even though it wasn't." And despite the troubles they had meeting the timeline for enrolling 18 subjects in Phases 1/2 of the trial, they kept the same timeline for Phase 3, which required recruiting 150 patients. Indeed, Defendants continued to represent that they could reach their target in a month, but that would be impossible. CW- 1 stated: "They kept constricting timelines that could not be hit and if you look at the results, they knew they couldn't be hit."

76.     As detailed in the Amended Securities Complaint, CW-1's forecasts led to either Musunuri or Upadhyay or both shutting down CW- 1's access to R&D, the division where CW-1 needed to get the information to prepare the assessments. In the ASC, CW-1 stated that when they "found out that I had a forecast that didn't match their goals, I wasn't allowed to speak to that division anymore." Soon after, all of CW-1's meetings with the clinical trials division were taken off the calendar, and Clifford (instead of CW-1) had to gather the information from R&D and clinical trials so that financial forecasts could continue.

77.     When Musunuri stated numbers in a quarterly earnings conference call that contradicted the finance department's projections, according the Amended Securities Complaint, CW-1 and Clifford, the head of Financial Planning and Analysis, wrote a 20-page report shortly before March 2023 spelling out in detail what was wrong with the forecasts being provided to the

public and the risks of using those manipulated numbers.[2]  CW-1 stated that the report was sent by email to Crespo, the Company's Chief Accounting Officer, to ensure it could not be destroyed without leaving some sort of digital evidence. The report "showed an enormous amount of risk in what they were presenting."  "We also wanted to give Jess [Crespo] a heads up on what was going on."

78.    Per the ASC, CW-1 does not know the full extent to which fabricated numbers were being reported; however, CW-1 was certain they were appearing in corporate decks being used by investor relations and filed with the SEC. All of this led to a meeting in Musunuri's office in or about early March 2023 with Musunuri and Upadhyay on one side and Clifford, Crespo, and a few other finance executives on the other side.  When the finance executives returned, they met with CW-1 in one of their offices. "Jess and Frank came back furious," according to CW-1. "It was really a bad moment for them. They were both berated by [Musunuri and Upadhyay] for not towing the company line." Crespo was particularly angered.  "She believed the numbers we approved; she believed the forecasts we were putting out."  CW-1 stated: "She resented being put on the spot to get reprimanded."

79.    According to the Amended Securities Complaint, for  CW-1, the key problem for the Company in changing the forecast was adjustments in the projected cash runway.  CW-1 stated that Clifford, Crespo and CW-1 reexamined the projected cash runway to see how much further

---

[2] It appears that the quarterly earnings conference call in question was likely the Company's earnings conference call held on February 27, 2023.

out it could be stretched in an attempt to appease Musunuri and Upadhyay but that the best they could do was stretch out the time just a little bit, which once again infuriated Musunuri and Upadhyay.

80.    Per the Amended Securities Complaint, it was after the meeting with Crespo and. Musunuri and Upadhyay regarding the reporting of the forecasts, that the Company announced in a Form 8-K filed with the SEC on March 10, 2023, that Crespo resigned on March 7, 2023, purportedly to pursue new opportunities. While the Company stated that Crespo's resignation was not due to any disagreement or dispute with the Company or the Board, on May 17, 2024, Ocugen disclosed in a preliminary proxy statement filed with the SEC that Crespo's resignation was treated as a resignation for "good reason" pursuant to her employment agreement.

81.    Once Crespo was gone from the Company, the signing of the Company's financials fell to Vu, who the Company hired to replace Crespo. As detailed in the Amended Securities Complaint, Vu, Ocugen's CFO during the Relevant Period, refused to sign certain misleading Company financials and was subsequently fired.

82.    According to the Amended Securities Complaint, in July or August 2023, Vu stopped by CW-1's desk to inform CW-1 that he had had a run-in with Musunuri because he had informed the CEO he would not sign the Q2 2023 10-Q.  After that, no more than a few weeks passed before CW-1 saw members of security come into the finance department and walk in Vu's office; Vu was fired because of his refusal to sign the Q2 2023 10-Q, and security walked him out.

83.    On August 14, 2023, the Company announced that Vu was no longer serving as the

CFO/Chief Business Officer or as principal financial officer and principal accounting officer of Ocugen. The Company also announced that Vu's separation from employment was being treated as a severance qualifying event under Vu's employment agreement.

84.    The ASC also details statements from an employee who worked at Ocugen as Executive Liaison/Assistant to Chief Accounting Officer Crespo from May 2022 through March 2023, and then to CFO Vu from March 2023 through August 2023 ("CW-2"). CW-2 worked at the Company headquarters in Malvern, Pennsylvania and reported to Megan Kelly (formerly Megan Rodriguez) who was the full-time Executive Assistant to Musunuri.

85.    According to the ASC, CW-2 was in a unique position as Vu's Executive Assistant because CW-2 was a confidante of Vu, and multiple people in the finance department spoke to CW-2 about events taking place. CW-2 also periodically worked for Musunuri and was able to see and frequently hear him because CW-2's desk was near Musunuri's office and Musunuri had glass walls.

86.    CW-2 stated in the Amended Securities Complaint that Vu discovered something deeply disturbing involving what CW-2 understood to be misrepresentations to the public. Indeed, CW-2 revealed that, in late May/early June 2023, Vu met with CW-2 in Vu's office and stated that, after speaking with members of the R&D team and reviewing the Company's financials, there were multiple errors that had been identified, indicating that the Company was actively misleading the public with respect to its financial results. Vu told CW-2 that something did not add up. CW-2 quoted Vu as saying, "*I went to a lawyer, there is going to be an investigation of finance and*

***R&D because I learned something that isn't right, and I can't live with myself if I allow it to continue without saying something.*** (Emphasis added.)

87.     According to the Amended Securities Complaint, and relevant to this derivative complaint, Vu also told CW-2 at the late May/early June 2023 meeting, or subsequent thereto, that ***Vu alerted the Board to his discovery and CW-2 believed the Board contacted EY to conduct an investigation.*** At the time, the Board was comprised of Defendants Musunuri, Zhang, Kompella, Whittington, Castillo, Fernandes, and Kumar. Despite the Board's knowledge, the financial improprieties continued, as the truth was not revealed until April 1, 2024.

88.     Indeed, on May 31, 2024, the Company announced that EY had notified the Company of its decision to decline to participate in the request-for-proposal process and to decline to stand for reelection as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

89.     Per the ASC, since Vu knew how Musunuri reacted when facing opposition, he refused to tell CW-2 or anyone else what misrepresentations he had discovered and why it was so serious. According to CW-2 in the ASC, "[h]e wouldn't talk about the details of why he was so upset so that no one else was in the line of fire." "[Vu] knew that that as soon as he launched this investigation that anyone connected to him was in the line of fire, so he wanted to give them deniability…. [H]e had a sense of responsibility for his staff."

90.     Per the ASC, in mid-June 2023, Musunuri cut off all communication with Vu and CW-2. Musunuri's behavior made clear that both Vu and CW-2 had "targets on our backs."

According to CW-2, Musunuri "likes to retaliate against anyone who he perceives has done him wrong." ***"[Because] Shankar [Musunuri] knew that Vu had alerted the Board, he shut down and cut us off."*** Thus, per the Amended Securities Complaint, the Board, comprised of Defendants Musunuri, Zhang, Kompella, Whittington, Castillo, Fernandes, and Kumar, knew of the Company's false financial reporting and did nothing about it.

91.    Moreover, as stated in the ASC, CW-1 noted that after Vu's termination in August 2023, senior executives approached others in the finance department demanding they sign the Q2 2023 10-Q. Andrew Walsh ("Walsh"), VP of Finance, was asked to sign but refused to do so and was also fired a few weeks later. After Walsh, the senior executives approached a second person who CW-1 declined to identify. Per the ASC, CW-1 stated that she too refused to sign.

92.    Further, as stated in the Amended Securities Complaint, CW-3 worked at Ocugen from September 2021 to November 2023 as Accounting Manager (from September 2021 to April 2022) and Associate Director of Accounting (from April 2022 to November 2023). CW-3 worked at the Company headquarters in Malvern, Pennsylvania, and from September 2021 through March 2022, reported to Subramanian, the CFO; from March 2022 through March 2023, reported to Crespo, Chief Accounting Officer and Vice President of Finance; and from March 2023 through October 2023, reported to Walsh, Senior Director of Finance and Treasury.

93.    CW-3 confirms CW-1's statements that, in August 2023, after Vu left the Company, Walsh was asked to sign the Q2 2023 10-Q but refused to do so.

94.    CW-3 also stated in the Amended Securities Complaint that in August 2023, the

second person approached to sign the Q2 2023 10-Q was Jaiby Abraham ("Abraham"), who was then Manager, Financial Reporting. The appeal to sign the Q2 2023 10- Q came from Musunuri. Musunuri met with Abraham in her office in mid-to-late August 2023. When his initial request for her to sign failed, Musunuri appealed to her again based on their shared Indian heritage, CW-3 stated. Based on that shared heritage, Musunuri stated we have to help each other succeed, according to CW-3. However, Abraham still refused to sign the Q2 2023 10- Q. According to the ASC, because of the refusals to sign the Q2 2023 10-Q, Ocugen was unable to file its quarterly report for the quarter ended June 30, 2023 with the SEC by the deadline.

95.    CW-1 further stated in the ASC that, by August 2023, he and his colleagues recognized that the Company was likely preparing for a complete shakeup of the finance division given that top executives could find no one there to sign the Q2 2023 10-Q. CW-1 stated, in relevant part: "Our impression was that they didn't want a finance department that exercised independent thought" and that "We knew it was only a matter of time before they fired everyone and brought in consultants who would do what they were told and act as stenographers. Everyone was looking for work." According to CW-3, there were 11 or 12 people in the finance division in January 2023. Between September and December 2023, all or most of the professional staff in the finance division were fired or resigned, as per CW-1 in the Amended Securities Complaint.

**THE AGREEMENT**

96.    Ocugen entered into the Agreement with CanSinoBIO with respect to the development and commercialization of its modifier gene therapy product candidates, OCU400,

OCU410, and OCU410ST.

97. The Agreement was originally entered into in September 2019 with regards to OCU400 and was subsequently amended in September 2021 and November 2022 to include OCU410 and OCU410ST, respectively. Pursuant to the Agreement, Ocugen is collaborating with CanSinoBIO on the development of its modifier gene therapy platform.

98. CanSinoBIO is responsible for the chemistry, manufacturing, and controls of clinical supplies of such product candidates and is responsible for the costs associated with such activities. CanSinoBIO has an exclusive license to develop, manufacture, and commercialize Ocugen's modifier gene therapy platform in and for China, Hong Kong, Macau, and Taiwan (the "CanSinoBIO Territory"). Ocugen maintains exclusive development, manufacturing, and commercialization rights with respect to its modifier gene therapy platform outside the CanSinoBIO Territory ("Company Territory").

99. Per its SEC filings, Ocugen shared how it accounted for the Agreement. For instance, in its Form 10-Q filed with the SEC on November 6, 2020, in a Section titled "Recently Adopted Accounting Standards," Ocugen stated the following:

> In November 2018, the FASB issued ASU No. 2018-18, *Collaborative Arrangements (Topic 808): Clarifying the Interaction between Topic 808 and Topic 606*. This standard clarifies that certain transactions between collaborative arrangement participants should be accounted for as revenue under ASC 606 when the collaborative arrangement participant is a customer in the context of a unit of account. In those situations, ASC 606 guidance should be applied, including recognition, measurement, presentation, and disclosure requirements. The standard adds unit-of-account guidance to ASC 808 to align with the guidance in ASC 606 when an entity is assessing whether the collaborative arrangement or a part of the collaborative arrangement is within the scope of ASC 606. The standard also

precludes a company from presenting transactions with collaborative arrangement participants that are not directly related to sales to third parties with revenue from contracts with customers recognized under ASC 606 if the collaborative arrangement participant is not a customer. ***This standard was effective for the Company on January 1, 2020***. Consistent with the guidance in this standard, the Company assesses whether collaboration arrangements are within the scope of ASC 606. For collaboration arrangements that are not within the scope of ASC 606, applicable transactions with collaborative arrangement participants are presented as collaboration revenue rather than revenue from contracts with customers. See above and Note 5 for additional information.[3]

## APPLICABLE ACCOUNTING STANDARDS OCUGEN WAS REQUIRED TO FOLLOW

100.    During the Relevant Period, Ocugen was required to evaluate its CanSinoBIO Agreement at inception and throughout the life of the arrangement to determine whether it was a collaborative arrangement within the scope of ASC 808.  However, Ocugen failed to recognize the Agreement as a collaborative agreement in its accounting.

101.    The Company admitted as much in its restatement. In its restatement, Ocugen stated:

> In connection with the preparation of the Company's Consolidated Financial Statements as of and for the fiscal year ended December 31, 2023, the Company discovered that in the current fiscal year and prior years it had not appropriately accounted for its collaboration arrangements, including the determination of the transaction price, calculating the progress towards the satisfaction of the performance obligations under the collaborative arrangements, and determining the value of the non-cash consideration received and recognized as research and development expense. The Company also corrected the presentation of the revenue previously recognized within Other income (expense), net to Collaborative arrangement revenue in its Consolidated Statements of Operations and Comprehensive Loss.

> The misstatements were material to the Company's previously issued financial statements and as a result, the Company has restated its Consolidated Balance Sheets, Consolidated

---

[3] All emphasis has been added unless otherwise noted herein.

Statements of Operations and Comprehensive Loss, Consolidated Statements of Stockholders' Equity, and Consolidated Statements of Cash Flows as of and for the fiscal year ended December 31, 2022. The restatement includes adjustments to Collaborative arrangement revenue, Research and development expenses, Other income (expense), net and Accrued expenses and other current liabilities during the impacted periods. The Company has also corrected certain other identified immaterial errors that were identified during the impacted periods impacting Research and development expenses, General and administrative expenses, and Accrued expenses and other current liabilities.

### *Revenue Recognition*

102.    An entity is required to recognize revenue pursuant to the following five steps:

a. Step 1: Identify the contract(s) with a customer….

b. Step 2: Identify the performance obligations in the contract….

c. Step 3: Determine the transaction price—The transaction price is the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. The transaction price can be a fixed amount of customer consideration, but it may sometimes include variable consideration or consideration in a form other than cash. The transaction price also is adjusted for the effects of the time value of money if the contract includes a significant financing component and for any consideration payable to the customer. *If the consideration is variable, an entity estimates the amount of consideration to which it will be entitled in exchange for the promised goods or services. The estimated amount of variable consideration will be included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved.* (See paragraphs 606-10-32-2 through 32-27.

d. Step 4: Allocate the transaction price to the performance obligations in the contract….

e. Step 5: *Recognize revenue when (or as) the entity satisfies a performance obligation*—An entity recognizes revenue when (or as) it satisfies a performance obligation by transferring a promised good or service to a customer (*which is when the customer obtains control of that good or service*). The amount of revenue recognized is the amount allocated to the satisfied performance obligation. A

performance obligation may be satisfied at a point in time (typically for promises to transfer goods to a customer) or over time (typically for promises to transfer services to a customer). ***For performance obligations satisfied over time, an entity recognizes revenue over time by selecting an appropriate method for measuring the entity's progress toward complete satisfaction of that performance obligation.*** (See paragraphs 606-10- 25-23 through 25-30.) ASC 606-10-05-4.

103.    With regard to performance obligations satisfied over time, Accounting Standards Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers* (Accounting Standards Codification "ASC" Topic 606) provides that companies must "recognize revenue over time by measuring the progress toward complete satisfaction of that performance obligation. The objective when measuring progress is to depict an entity's performance in transferring control of goods or services promised to a customer (that is, the satisfaction of an entity's performance obligation)." ASC 606-10-25-31. "An entity shall apply a single method of measuring progress for each performance obligation satisfied over time, and the entity shall apply that method consistently to similar performance obligations and in similar circumstances. At the end of each reporting period, an entity shall remeasure its progress toward complete satisfaction of a performance obligation satisfied over time." ASC 606-10-25-32.

104.    "Appropriate methods of measuring progress include output methods and input methods." ASC 606-10-25-33. "Input methods recognize revenue on the basis of the entity's efforts or inputs to the satisfaction of a performance obligation (for example, resources consumed, labor hours expended, costs incurred, time elapsed, or machine hours used) relative to the total expected inputs to the satisfaction of that performance obligation. If the entity's efforts or inputs are expended evenly throughout the performance period, it may be appropriate for the entity to

recognize revenue on a straight-line basis." ASC 606-10-55-20.

105.    Among other disclosures, ASC 606 requires the following:

a. Revenue recognized from contracts with customers, to be disclosed separately from other sources of revenue. ASC 606-10-50-4.

b. Recognized revenue from contracts with customers to be disaggregated into categories that depict how the nature, amount, timing, and uncertainty of revenue and cash flows are affected by economic factors. ASC 606-10-50-5.

c. The opening and closing balances of receivables, contract assets, and contract liabilities from contracts with customers.7 ASC 606-10-50-8a.

### *How Collaborative Arrangements Are Accounted For*

106.    A collaborative arrangement is characterized as an arrangement under which two or more parties actively participate in a joint operating activity and are exposed to significant risks and rewards that depend on the commercial success of the activity. ASC 808-10-20, ASC 808-10-15-7. ASC 808 relates to disclosures under collaborative arrangements. In particular, ASC 808 requires the following disclosures:

In the period in which a collaborative arrangement is entered into … and all annual periods thereafter, a participant to a collaborative arrangement shall disclose all of the following:

a. Information about the nature and purpose of its collaborative arrangements
b. Its rights and obligations under the collaborative arrangements
c. The accounting policy for collaborative arrangements in accordance with Topic 235
d. The income statement classification and amounts attributable to transactions arising from the collaborative arrangement between participants for each period an income statement is presented.

Information related to individually significant collaborative arrangements shall be disclosed separately. ASC 808-10-50-1.

107.     Pursuant to new guidance adopted by the ASC in 2020, transactions between collaborative arrangement participants fall under the purview of ASC 606 when the collaborative arrangement participant is a customer in the context of a unit of account (i.e., distinct good or service). When this occurs, all guidance under ASC 606 should be applied, including recognition, measurement, presentation, and disclosure requirements. ASC 808-10-15-5B.

108.     The new guidance (under ASC 808-10-45-3) also made it improper for entities to present consideration from transactions with a collaborator that is not a customer together with revenue recognized from contracts with customers. Thus, revenue from collaborative arrangements was not allowed to be presented together with regular revenue, but revenue from collaborative arrangements could still be presented separately from revenue from contracts with customers on the entity's income statement.

109.     At all relevant times, the Company was required to assess its CanSinoBIO agreement at its inception and throughout the life of the agreement to determine whether it was a collaborative arrangement within the scope of ASC 808. ASC 808-10-15-6. During the Relevant Period, Ocugen failed to recognize the CanSinoBIO agreement as a collaborative arrangement in its financial statements in violation of ASC 808. In addition, even after the Company later acknowledged that the agreement was a collaborative arrangement, Ocugen failed to follow ASC 808's guidance, instead continuing to improperly account for the arrangement in its financial statements. Moreover, the Company failed to analogize its accounting for the arrangement to ASC 606 and thus failed to correctly apply ASC 606's relevant accounting and disclosure provisions.

**IT WAS WELL-KNOWN AT THE COMPANY THAT THE AGREEMENT WAS IMPROPERLY ACCOUNTED FOR**

110.    Per the Amended Securities Complaint, CW-3 worked at Ocugen from September 2021 to November 2023 as Accounting Manager (from September 2021 to April 2022) and Associate Director of Accounting (from April 2022 to November 2023).  Accounting was part of the finance division.

111.    CW-3 worked at the Company's headquarters in Malvern, Pennsylvania and, from September 2021 through March 2022, reported to CFO Subramanian; from March 2022 through March 2023, reported to Crespo, Chief Accounting Officer and Vice President of Finance; and from March 2023 through October 2023, reported to Walsh, Senior Director of Finance and Treasury.

112.    CW-3 handled day-to-day accounting functions in both of his positions at the Company.  His responsibility included reviewing financial information provided by the various divisions within the Company, contractors and vendors.

113.    Per the ASC, CW-3 did the accounting for the CanSinoBIO agreement and  CW-3 stated that "[e]veryone in the department touched it at one point or another but no one else [apart from himself] really dug deeply into it."  CW-3 stated in the Amended Securities Complaint that it was more of a math role than a more detailed accounting effort, relying on estimates from the science division.

114.    CW-3 also stated in the ASC that the CanSinoBIO relationship was the largest contractual relationship with an outside company; the contract contained a set value regarding

what work was being completed to come up with an estimate of deferred expenses and revenue.

115.    Per the ASC, the accounting department had very limited access to anything related to the CanSinoBIO agreement.  Indeed,  CW-3 stated in the ASC that CW-3 and other Company accountants were allowed to contact every company in a business relationship with Ocugen except CanSinoBIO and that it was CW-3's understanding that that had been the rule since the agreement was signed.  According to CW-3, Upadhyay, Ocugen's Chief Scientific Officer, made clear that the rule came down from the top. As a result, the accountants had little information about CanSinoBIO when preparing the Company's financial results for public disclosure. Indeed, CW-3 stated that the lack of contact with CanSinoBIO "made it hard when we were doing financials and were not allowed to reach out to guide the work."

116.    According to the ASC, the financial metrics provided to accounting with respect to the Agreement were estimates made by Upadhyay based on *his* assessments of the amount of work completed under the agreement and estimated costs.  CW-3 stated in the ASC that he depended totally on the estimates from the science department based on its representation of the value of the contract and its estimates of the total amount of work completed.  Per the ASC, CW-3, stated it was just math. Those numbers were then used to determine the publicly reported deferred expenses and revenue.

117.    Per the ASC, CW-3 did not hear and saw no evidence of the estimates for the CanSinoBIO agreement being subjected to internal and disclosure controls.  Whenever the team had questions regarding the underlying facts regarding CanSinoBIO that were the basis for

Ocugen's financial estimates, according to the ASC, they were forced to ask Musunuri, Upadhyay, or Michael Shine, head of the Commercial Division, and in the ASC, CW-3 stated that the Agreement "was a black hole for accounting and finance."

### THE COMPANY ANNOUNCES A RESTATEMENT OF ITS FINANCIALS

118.    On April 1, 2024, after the market closed, Ocugen filed with the SEC the Restatement Announcement, which stated:

> In connection with the preparation of the financial statements of Ocugen, Inc. (the "Company") for the year ended December 31, 2023, the Company, in consultation with its independent registered public accounting firm, Ernst & Young LLP ("EY"), identified certain accounting errors related to the application of U.S. GAAP to certain agreements with one of its business partners related to a collaboration agreement.
>
> On April 1, 2024, the Audit Committee of the Board of Directors (the "Audit Committee"), based on the recommendation of management and after consultation with EY, concluded that the Company's previously-issued audited consolidated financial statements for each fiscal year beginning January 1, 2020 and its previously-issued unaudited interim condensed consolidated financial statements for each of the first three quarters in such years, as well as the associated earnings releases and investor presentations or other communications describing such financial statements, were materially misstated and, accordingly, should no longer be relied upon.
> The Company intends to restate its consolidated financial statements as of and for the year ended December 31, 2022, in connection with the filing of its 2023 Form 10-K. Similarly, the Company will include restated unaudited financial information for each of the first three quarters of 2023 and 2022 in its 2023 Form 10-K (each such annual and quarterly period to be restated, a "Restated Period").
>
> The identified errors in each of the Restated Periods relate to the Company's accounting for the estimated costs in one of its collaboration arrangements. These identified errors will result in a restatement of the following financial statement line item captions: Collaborative arrangement revenue, Research and development expenses, Other income (expense), net and Accrued expenses and other current liabilities.
>
> The Company is currently not in a position to provide a reasonable estimate of the

anticipated changes in its results of operations for the year ended December 31, 2023, for any Restated Period. However, the Company does not expect the errors to result in any impact on its cash position, cash runway, or financial projections.

Additionally, the Company has determined that the errors resulted from the existence of a material weakness in its internal control over financial reporting that also existed during the Restated Periods and that its internal control over financial reporting was not effective as of December 31, 2023. As a result, the Company's Chief Executive Officer and Chief Accounting Officer have concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2023.

119.    On April 1, 2024, the Company filed a notification of inability to timely file Form 10-K on Form 12b-25 due to additional time required for the Company to correct the errors described above and prepare restated financial statements.

120.    That same day, the Company filed the Late Filing Notification which stated:

In connection with the preparation of the financial statements of the Company for the year ended December 31, 2023, the Company identified certain accounting errors relating to the application of U.S. GAAP to certain agreements with one of its business partners related to a collaboration agreement. As a result, the Company intends to restate its financial statements for the year ended December 31, 2022 and for each of the first three quarters of 2022 and 2023 in the 2023 Form 10-K, the review and preparation of which is currently ongoing. Given the scope of the process to prepare the restatements and related disclosures, the Company requires additional time to prepare and review its financial statements and other disclosures in its 2023 Form 10-K. Therefore, the Company is unable to complete and file the 2023 Form 10-K by the required due date of April 1, 2024.

121.    On June 6, 2024, the Company filed a Form 8-K with the SEC disclosing that on May 31, 2024, EY, the Company's current independent registered public accounting firm, had notified the Company of its decision to decline to participate in the request-for-proposal process soliciting proposals from accounting firms to provide audit services to the Company as its independent registered public accounting firm for the 2024 Fiscal Year, and to decline to stand for re-election as the

Company's independent registered public accounting firm for the 2024 Fiscal Year.

THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS

### *May 8, 2020 Form 10-Q and Form 8-K*

122.    On May 8, 2020, Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending March 31, 2020 (the "Q1 2020 10-Q") signed by Defendants Musunuri and Subramanian. The Q1 2020 10-Q contained purported financial results of the Company, recording, *inter alia*, (i) total current liabilities of $3,314,998, accumulated deficit of $55,423,643, and total stockholder's equity of $7,297,105 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0,[4] R&D expenses of $1,652,318, loss from operations of $3,929,102, other income (expense), net[5] of ($14,717), net loss of $3,943,819, and loss per share of $0.07 in the Company's unaudited Income Statement.

123.    The Q1 2020 10-Q stated the following regarding the Company's disclosure controls (emphasis added):

> We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) (the "Exchange Act"), as of March 31, 2020. Based upon that evaluation, our principal executive officer and principal

---

[4] The "collaborative revenue" line item did not appear on the Company's Income Statements except for in the Q2 2020 10-Q (defined below), Q3 2020 10-Q (defined below), and the 2020 10-K (defined below).

[5] With respect to the Company's Income Statements, the terms "Other income (expense), net" and "Total other income (expense)" are interchangeable.

financial officer concluded that, as of the end of the period covered by this report, ***our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms***, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure….

124.     Attached to the Q1 2020 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Musunuri and Subramanian attesting to the accuracy of financial reporting, the disclosure of all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, and the disclosure of all fraud.

125.     On May 8, 2020, Ocugen also filed with the SEC a Form 8-K signed by Musunuri regarding the Q1 2020 financial results (the "May 8, 2020 Press Release"). The May 8, 2020 Press Release disclosed, *inter alia*, total current liabilities of $3,314,998, accumulated deficit of $55,423,643, and total stockholder's equity of $7,297,105 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $1,652,318, loss from operations of $3,929,102, other income (expense), net of ($14,717), net loss of $3,943,819, and loss per share of $0.07 in the Company's unaudited Income Statement.

126.     The statements in (or referred to in) ¶¶ 122-25 were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, the Individual Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently,

its internal control over financial reporting and disclosure controls and procedures were not effective; (2) as a result, Ocugen failed to properly account for the Agreement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q1 2020 10-Q and May 8, 2020 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (3) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (4) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

### *June 30, 2020 Form 10-Q and Form 8-K*

127.    On August 14, 2020, Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending June 30, 2020 (the "Q2 2020 10-Q") signed by Defendants Musunuri and Subramanian. The Q2 2020 10-Q contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $7,041,353, accumulated deficit of $59,037,618, and total stockholder's equity of $14,623,027 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $42,620, R&D expenses of $1,629,869, loss from operations of $3,366,265, other income (expense), net of ($247,710), net loss of $3,613,975, and loss per share of $0.19 in the Company's unaudited Income Statement.

128.    The Q2 2020 10-Q contained nearly identical statements regarding the Company's

disclosure controls as set forth in ¶ 123.

129.    Attached to the Q2 2020 10-Q were SOX certifications signed by Defendants Musunuri and Subramanian as described in ¶ 124.

130.    On August 14, 2020, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri the Q2 2020 financial results (the "August 14, 2020 Press Release"). The August 14, 2020 Press Release disclosed, *inter alia*, total current liabilities of $7,041,353, accumulated deficit of $59,037,618, and total stockholder's equity of $14,623,027 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $42,620, R&D expenses of $1,629,869, loss from operations of $3,366,265, other income (expense), net of ($247,710), net loss of $3,613,975, and loss per share of $0.19 in the Company's unaudited Income Statement.

131.    The statements in (or referred to in) ¶¶ 127-30 were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, the Individual Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for the Agreement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue,

R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q2 2020 10-Q and August 14, 2020 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

### *November 6, 2020 Form 10-Q and Form 8-K*

132.    On November 6, 2020, Ocugen filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2020 (the "Q3 2020 10-Q") signed by Defendants Musunuri and Subramanian. The 3Q 2020 10-Q contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $4,130,787, accumulated deficit of $69,511,465, and total stockholder's equity of $14,421,645 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $1,477,382, loss from operations of $10,181,980, other income (expense), net of ($291,867), net loss of $10,473,847, and loss per share of $0.07 in the Company's unaudited Income Statement.

133.    The Q3 2020 10-Q contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 123.

134.    Attached to the Q3 2020 10-Q were SOX certifications signed by Defendants Musunuri and Subramanian as described in ¶ 124.

135.    On November 6, 2020, Ocugen also filed with the SEC a current report on Form 8-

K signed by Musunuri regarding Q3 2020 financial results (the "November 6, 2020 Press Release"). The November 6, 2020 Press Release disclosed, *inter alia*, total current liabilities of $4,130,787, accumulated deficit of $69,511,465, and total stockholder's equity of $14,421,645 in the Company's unaudited Condensed Consolidated Balance Sheets; and (ii) collaboration revenue of $0, R&D expenses of $1,477,382, loss from operations of $10,181,980, other income (expense), net of ($291,867), net loss of $10,473,847, and loss per share of $0.07 in the Company's unaudited Income Statement.

136.    The statements in (or referred to in) ¶¶ 132-35 were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, the Individual Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for its CanSinoBIO arrangement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's unaudited Income Statement set forth in the Company's Q3 2020 10-Q and the November 6, 2020 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly,

Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

### 2020 10-K

137. On March 19, 2021, Ocugen filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the fiscal year ended December 31, 2020 ("2020 10-K"), signed by Defendants Musunuri, Subramanian, Kumar, Zhang, Kompella, Potti, Castillo, and Fernandes. The 2020 10-K contained purported financial results of the Company, recording, *inter alia*, total current liabilities of $3,613,551, accumulated deficit of $73,301,777, and total stockholder's equity of $21,550,441 in the Company's Consolidated Balance Sheets; and (ii) collaboration revenue of $42,620, R&D expenses of $6,353,287, loss from operations of $21,284,717, other income (expense), net of ($537,236), net loss of $21,821,953, and loss per share of $0.31 in the Company's audited Income Statement.

138. The 2020 10-K contained nearly identical statements regarding the Company's disclosure controls as set forth in ¶ 123.

139. The 2020 10-K stated:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) under the Exchange Act as a process designed by, or under the supervision of, our principal executive officer and principal financial officer and effected by our Board of Directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our financial statements for external reporting purposes in conformity with GAAP….

> Under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2020 based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework of 2013. Based on this assessment, *management concluded that our internal control over financial reporting was effective as of December 31, 2020*.

140. Attached to the 2020 10-K were SOX certifications signed by Defendants Musunuri and Subramanian as described in ¶ 124.

141. On March 18, 2021, Ocugen also filed with the SEC a current report on Form 8-K signed by Musunuri regarding full year 2020 financial results (the "March 18, 2021 Press Release"). The March 18, 2021 Press Release disclosed, *inter alia*, total current liabilities of $3,613,551, accumulated deficit of $73,301,777, and total stockholder's equity of $21,550,441 in the Company's unaudited Consolidated Balance Sheets; and (ii) collaboration revenue of $42,620, R&D expenses of $6,353,287, loss from operations of $21,284,717, other income (expense), net of ($537,236), net loss of $21,821,953, and loss per share of $0.31 in the Company's unaudited Income Statement.

142. The statements in (or referred to in) ¶¶ 137-41 were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, the Individual Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not

effective; (ii) as a result, Ocugen failed to properly account for the Agreement resulting in material misstatements regarding total current liabilities, accumulated deficit, and total stockholder's equity in the Company's Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in the Company's Income Statement set forth in the Company's 2020 10-K and March 18, 2021 Press Release (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

143.    The 2020 10-K also states (emphasis added):

**Collaboration Arrangements**

The Company assesses whether collaboration agreements are subject to Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 808, *Collaborative Arrangements* ("ASC 808"), based on whether they involve joint operating activities and whether both parties have active participation in the arrangement and are exposed to significant risks and rewards. To the extent that the arrangement falls within the scope of ASC 808, the Company assesses whether the payments between the Company and the collaboration partner are subject to other accounting literature. If payments from the collaboration partner represent consideration from a customer, the Company accounts for those payments within the scope of FASB ASC Topic 606, *Revenue from Contracts with Customers* ("ASC 606"). However, if the Company concludes that its collaboration partner is not a customer, the Company will record royalty payments received as collaboration revenue in the period in which the underlying sale occurs and record expenses and expense reimbursements as either research and development expense or general and administrative expense, or a reduction thereof, based on the underlying nature of the expense or expense reimbursement.
***The Company has two agreements accounted for as collaborative agreements within the scope of ASC 808.*** See Note 4 for additional information.

144.    Note 4 explains that the two collaborative agreements accounted for as collaborative agreements within the scope of ASC 808 were with Advaite, Inc., a company co-founded and managed by Musunuri's son, and The Shepens Eye Research Institute.  Ocugen failed to properly account for its agreement with CanSinoBIO as a collaborative agreement.

4. License and Development Agreements

**Collaboration Agreement with Advaite, Inc.**

In April 2020, the Company entered into a collaboration agreement (the "Advaite Agreement") with Advaite, Inc. ("Advaite") with respect to the development of Advaite's RapCov COVID-19 Testing Kit (the "COVID-19 Test"). Advaite was co-founded and is being managed by Mr. Karthik Musunuri, the son of the Company's Chief Executive Officer, Chairman of the Board and co-founder, Dr. Shankar Musunuri. Pursuant to the Advaite Agreement, the Company has provided, and will continue to provide as required in the future, certain production, research and development, technical, regulatory, and quality support services to Advaite in connection with the development and commercialization of the COVID-19 Test (the "Ocugen Services"). Advaite is responsible for the research, development, and seeking to obtain regulatory approval of the COVID-19 Test, and where regulatory approval is obtained, commercialize the COVID-19 Test. In January 2021, the COVID-19 Test received EUA from the FDA.

\*\*\*

The Advaite Agreement is a collaborative arrangement within the scope of ASC 808. Cost reimbursements are recorded as a reduction in research and development expense in the period incurred. Royalty payments are recorded as collaboration revenue in the period in which the underlying sale occurs. For the year ended December 31, 2020, the Company recorded $0.3 million as a reduction of research and development expense. For the year ended December 31, 2020, the Company recorded $42,620 as collaboration revenue in connection with the Advaite Agreement.

\*\*\*

53

***Co-Development and Commercialization Agreement with CanSino Biologics Inc.***

In September 2019, Ocugen entered into a co-development and commercialization agreement (the "CanSinoBIO Agreement") with CanSino Biologics Inc. ("CanSinoBIO") with respect to the development and commercialization of the gene therapy product candidate, OCU400.

***CanSinoBIO will be responsible for all the costs for chemistry, manufacturing and control development and manufacture of clinical supplies of OCU400 for all territories. CanSinoBIO will be solely responsible for all costs and expenses of its development activities in and for China, Hong Kong, Macau, and Taiwan (the "CanSinoBIO Territory") and Ocugen will be responsible for all costs and expenses of its development activities for any global location outside the CanSinoBIO Territory (the "Ocugen OCU400 Territory"). CanSinoBIO will pay to Ocugen an annual royalty between mid-to-high single digits based on net sales of products in the CanSinoBIO Territory, and Ocugen will pay to CanSinoBIO an annual royalty between low-to-mid single digits based on net sales of products in the Ocugen OCU400 Territory.***

***

***License Agreement with The Schepens Eye Research Institute***

In December 2017, the Company entered into an exclusive license agreement with SERI, which was amended in January 2021 (as so amended the "SERI Agreement"). The SERI Agreement gives the Company an exclusive, worldwide, sublicensable license to patent rights, biological materials and technical information for nuclear hormone receptor genes Nuclear Receptor Subfamily 1 Group D Member 1, *NR2E3* (OCU400), *RORA* (OCU410), Nuclear Protein 1, Transcriptional Regulator, and Nuclear Receptor Subfamily 2 Group C Member 1….

***

The SERI Agreement is a collaborative arrangement within the scope of ASC 808. Payments pursuant to the SERI Agreement are recorded as research and development expense in the period the obligation is incurred. The SERI Agreement requires the Company to pay licensing fees for patent rights granted, an annual license maintenance fee of $25,000 the first two calendar years following the expiration or termination of the Sponsored Research Agreement and an annual license maintenance fee of $0.1 million for each calendar year thereafter, payment

54

> of up to $6.0 million upon the achievement of certain development and regulatory milestones, payment of up to $10.1 million upon the achievement of certain commercial milestones, and royalties in the low-single digits based on net sales. The Company has made no milestone or royalty payments to date pursuant to the SERI Agreement.

(Emphasis added).

145.    The statements in (or referred to in) ¶¶ 143-44 were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations.  Specifically, the Individual Defendants made false and/or misleading statements and or failed to disclose that: (1) Ocugen had a material weakness in its internal control over financial reporting and, consequently, its internal control over financial reporting and disclosure controls and procedures were not effective; (ii) as a result, Ocugen failed to properly account for the Agreement  resulting in material misstatements in its financial statements (and would later admit that the financial statements therein were materially misstated and should no longer be relied upon); (iii) accordingly, Ocugen would likely be forced to restate one or more of its financial statements filed with the SEC; and (iv) all the foregoing, once revealed, was likely to negatively impact Ocugen's reputation and business.

### May 7, 2021 Form 10-Q and Form 8-K

146.    On May 7, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2021 ("1Q21") (the "1Q 2021 10-Q"). The 1Q 2021 10-Q was signed by Defendants Musunuri and Subramanian and attached as exhibits SOX certifications

signed by Defendants Musunuri and Subramanian attesting to the accuracy of the 1Q 2021 10-Q.

147.    The 1Q 2021 10-Q stated the following regarding Ocugen's internal controls:

*We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of March 31, 2021.* Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

148.    The 1Q 2021 10-Q reported the following financial results for Ocugen for 1Q21: (1) in Ocugen's unaudited Condensed Consolidated Balance Sheets: $4,281,000 in total current liabilities, $80,379,000 in accumulated deficit, and $46,489,000 in total stockholder's equity; and (2) in Ocugen's unaudited Income Statement: $0 in collaboration revenue, $2,872,000 in R&D expenses, $7,057,000 in loss from operations; other income (expense) net of ($20,000), $7,077,000 in net loss, and $0.04 in loss per share. The same day, the Company also reported these financials in a Form 8-K it filed with the SEC.

149.    The statements in ¶¶146-48 above were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company was experiencing a material weakness in its internal control over financial reporting and, due to the foregoing, its internal control over financial reporting and disclosure controls and procedures were not effective;

(2) as a result of the foregoing, the Company failed to correctly account for its arrangement with CanSinoBIO, which resulted in material misstatements with respect to the total current liabilities, accumulated deficit, and total stockholder's equity in Ocugen's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in Ocugen's unaudited Income Statement set forth in its 1Q 2021 10-Q and May 7, 2021 press release; (3) due to the foregoing, the Company would likely be required to restate one or more of the financial statements it had filed with the SEC; and (4) all of the foregoing, taken together, was likely to detrimentally impact the Company's reputation and business once revealed. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *August 6, 2021 Form 10-Q and Form 8-K*

150.    On August 6, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2021 ("2Q21") (the "2Q 2021 10-Q"). The 2Q 2021 10-Q was signed by Defendants Musunuri and Subramanian and attached as exhibits SOX certifications signed by Defendants Musunuri and Subramanian attesting to the accuracy of the 2Q 2021 10-Q.

151.    The 2Q 2021 10-Q stated the following regarding Ocugen's internal controls:

*We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of June 30, 2021.* Based upon that evaluation, our principal executive officer

and principal financial officer concluded that, as of the end of the period covered by this report, ***our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms***, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

(Emphasis added)

152.    The 2Q 2021 10-Q reported the following financial results for Ocugen for 2Q21: (1) in Ocugen's unaudited Condensed Consolidated Balance Sheets: $4,840,000 in total current liabilities, $106,331,000 in accumulated deficit, and $116,409,000 in total stockholder's equity; and (2) in Ocugen's unaudited Income Statement: $0 in collaboration revenue, $18,853,000 in R&D expenses, $25,610,000 in loss from operations; other income (expense) net of ($342,000), $25,952,000 in net loss, and $0.13 in loss per share. The same day, the Company also reported these financials in a Form 8-K it filed with the SEC.

153.    The statements in ¶¶150-52 above were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company was experiencing a material weakness in its internal control over financial reporting and, due to the foregoing, its internal control over financial reporting and disclosure controls and procedures were not effective; (2) as a result of the foregoing, the Company failed to correctly account for its arrangement with CanSinoBIO, which resulted in material misstatements with respect to the total current liabilities, accumulated deficit, and total stockholder's equity in Ocugen's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations,

other income (expense), net, net loss, and loss per share in Ocugen's unaudited Income Statement set forth in its 2Q 2021 10-Q and August 6, 2021 press release; (3) due to the foregoing, the Company would likely be required to restate one or more of the financial statements it had filed with the SEC; and (4) all of the foregoing, taken together, was likely to detrimentally impact the Company's reputation and business once revealed. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *November 9, 2021 Form 10-Q and Form 8-K*

154.    On November 9, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2021 ("3Q21") (the "3Q 2021 10-Q"). The 3Q 2021 10-Q was signed by Defendants Musunuri and Subramanian and attached certifications pursuant to SOX signed by Defendants Musunuri and Subramanian attesting to the accuracy of the 3Q 2021 10-Q.

155.    The 3Q 2021 10-Q stated the following regarding Ocugen's internal controls:

> *We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of June 30, 2021.* Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including

our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

(Emphasis added).

156.    The 3Q 2021 10-Q reported the following financial results for Ocugen for 3Q21: (1) in Ocugen's unaudited Condensed Consolidated Balance Sheets: $6,229,000 in total current liabilities, $117,086,000 in accumulated deficit, and $107,110,000 in total stockholder's equity; and (2) in Ocugen's unaudited Income Statement: $0 in collaboration revenue, $6,281,000 in R&D expenses, $10,789,000 in loss from operations; other income (expense) net of ($18,000), $10,755,000 in net loss, and $0.05 in loss per share. The same day, the Company also reported these financials in a Form 8-K it filed with the SEC.

157.    The statements in ¶¶154-56 above were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company was experiencing a material weakness in its internal control over financial reporting and, due to the foregoing, its internal control over financial reporting and disclosure controls and procedures were not effective; (2) as a result of the foregoing, the Company failed to correctly account for its arrangement with CanSinoBIO, which resulted in material misstatements with respect to the total current liabilities, accumulated deficit, and total stockholder's equity in Ocugen's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in Ocugen's unaudited Income Statement set forth in its 3Q 2021 10-Q and November 9, 2021 press release; (3) due to the foregoing, the Company would likely be required to restate one or more of the financial statements it had filed

with the SEC; and (4) all of the foregoing, taken together, was likely to detrimentally impact the Company's reputation and business once revealed. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2021 10-K*

158.    On February 28, 2022, the Company filed its annual report on Form 10-K with the SEC for the fourth quarter ("4Q21") and full 2021 Fiscal Year (the "2021 10-K"). The 2021 10-K was signed by Defendants Musunuri, Subramanian, Kumar, Zhang, Kompella, Potti, Castillo, and Fernandes and contained SOX certifications signed by Defendants Musunuri and Subramanian attesting to the accuracy of the 2021 10-K.

159.    The 2021 10-K stated the following regarding Ocugen's internal controls:

> *We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2021.* Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

(Emphasis added).

160.    The 2021 10-K reported the following financial results for Ocugen for the 2021

61

Fiscal Year: (1) in Ocugen's unaudited Condensed Consolidated Balance Sheets: $7,000,000 in total current liabilities, $131,667,000 in accumulated deficit, and $95,818,000 in total stockholder's equity; and (2) in Ocugen's unaudited Income Statement: $0 in collaboration revenue, $35,108,000 in R&D expenses, $58,028,000 in loss from operations; other income (expense) net of ($389,000), $58,365,000 in net loss, and $0.30 in loss per share. Three days earlier, on February 22, 2022, the Company also reported these financials in a Form 8-K it filed with the SEC.

161.    In addition, the 2021 10-K represented that: "Under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2021 … and [b]ased on this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2021."

162.    The statements in ¶¶158-61 above were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company was experiencing a material weakness in its internal control over financial reporting and, due to the foregoing, its internal control over financial reporting and disclosure controls and procedures were not effective; (2) as a result of the foregoing, the Company failed to correctly account for its arrangement with CanSinoBIO, which resulted in material misstatements with respect to the total current liabilities, accumulated deficit, and total stockholder's equity in Ocugen's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations,

other income (expense), net, net loss, and loss per share in Ocugen's unaudited Income Statement

set forth in its 2021 10-K and February 25, 2022 press release; (3) due to the foregoing, the

Company would likely be required to restate one or more of the financial statements it had filed

with the SEC; and (4) all of the foregoing, taken together, was likely to detrimentally impact the

Company's reputation and business once revealed. As a result of the foregoing, the Company's

statements about its business, operations, and prospects were materially false and misleading

and/or lacked a reasonable basis at all relevant times.

163.    With respect to the Company's collaborative agreements, the 2021 10-K stated the

following, in relevant part:

> ### *Collaboration Arrangements*
>
> The Company assesses whether collaboration agreements are subject to Financial
> Accounting Standards Board ("FASB") Accounting Standards Codification
> ("ASC") Topic 808, *Collaborative Arrangements* ("ASC 808"), based on whether
> they involve joint operating activities and whether both parties have active
> participation in the arrangement and are exposed to significant risks and rewards.
> To the extent that the arrangement falls within the scope of ASC 808, the Company
> assesses whether the payments between the Company and the collaboration partner
> are subject to other accounting literature. If payments from the collaboration
> partner represent consideration from a customer, the Company accounts for those
> payments within the scope of FASB ASC Topic 606, *Revenue from Contracts with
> Customers*. However, if the Company concludes that its collaboration partner is not
> a customer, the Company will record royalty payments received as collaboration
> revenue in the period in which the underlying sale occurs and record expenses and
> expense reimbursements as either research and development expense or general
> and administrative expense, or a reduction thereof, based on the underlying nature
> of the expense or expense reimbursement. ***During the year ended December 31,
> 2020, the Company recorded collaboration revenue from an agreement
> accounted for as a collaborative arrangement within the scope of ASC 808. No
> collaboration revenue was recorded during the years ended December 31, 2021***
> and 2019.

164.    In addition, the 2021 10-K represented that Ocugen had taken part in a new Co-Development, Supply and Commercialization Agreement with Bharat Biotech. The Company also accounted for the agreement as a collaboration arrangement under the scope of ASC 808. The Company's statements regarding the CanSinoBIO agreements were substantially identical to the statements in the 2020 10-K as set forth in ¶143 above.

165.    The statements in ¶¶163-64 above were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company was experiencing a material weakness in its internal control over financial reporting and, due to the foregoing, its internal control over financial reporting and disclosure controls and procedures were not effective; (2) as a result of the foregoing, the Company failed to correctly account for its arrangement with CanSinoBIO, which resulted in material misstatements in its financial statements; (3) due to the foregoing, the Company would likely be required to restate one or more of the financial statements it had filed with the SEC; and (4) all of the foregoing, taken together, was likely to detrimentally impact the Company's reputation and business once revealed. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2022 Proxy Statement*

166.    On April 28, 2022, the Company filed with the SEC its 2022 Proxy Statement. Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, Fernandes, and Potti solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which

contained material misstatements and omissions.

167.    The 2022 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Kompella and Whittington to the Board; and (2) ratify the selection of Ernst & Young as the Company's Independent Registered Public Accounting Firm for the 2022 Fiscal Year.

168.    Regarding the Company's Code of Ethics, the 2022 Proxy Statement provided, in relevant part:

> We have a written Code of Conduct that applies to our directors and employees, including our executive officers. The Code of Conduct covers fundamental ethical and compliance-related principles and practices such as accurate accounting records and financial reporting, avoiding conflicts of interest, protection and use of our property, compliance with legal and regulatory requirements, and internal reporting procedures for violations of the Code of Conduct. The Code of Conduct is available on our website at www.ocugen.com and any amendments to the Code of Conduct, or any waivers of its requirements, will be disclosed on our website or in a Current Report on Form 8-K, which we will file with the SEC.
>
> Only the Board may waive any specific provisions of the Code of Conduct for directors and executive officers. The Chief Accounting Officer and Senior Vice President, Finance, has been designated as the Compliance Officer, and may waive any specific provision of this Code of Conduct for employees other than a director and executive officer. In the event of an approved waiver involving the conduct of a director or executive officer, appropriate and prompt disclosure, including disclosure of the reasons for the waiver, must be made to our stockholders as required by applicable laws and stock exchange rules. The Audit Committee shall be responsible for monitoring compliance with the Code of Conduct and shall assess the adequacy of the Code of Conduct periodically and recommend any changes to the Code of Conduct to the Board for approval.

169.    Regarding the Board's role in "Risk Oversight," the 2022 Proxy Statement provided, in relevant part:

> Our Board's role in risk oversight is consistent with our leadership structure, with management having day-to-day responsibility for assessing and managing our risk

exposure and our Board actively overseeing management of our risks — both at the Board and Committee level. The risk oversight process includes receiving regular reports from each of the Committees and our executive officers to enable our Board to understand our risk identification, risk management, and risk mitigation strategies with respect to areas of potential material risk, including operations (including cyber-security), finance, legal, regulatory, strategic, and reputational risk.

Our Board focuses on the overall risks affecting us. Each Committee has been delegated the responsibility for the oversight of specific risks that fall within its area of responsibility. For example:

- The Audit Committee of our Board ("Audit Committee") oversees management of financial reporting, compliance, and litigation risks, including risks related to our insurance, information technology, cybersecurity, human resources, and regulatory matters, as well as the steps management has taken to monitor and control such exposures.

- The Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation policies, plans, and arrangements and the extent to which those policies, plans, and arrangements increase or decrease our risk.

- The Nominating and Corporate Governance Committee manages risks associated with the independence of our Board, potential conflicts of interest, and the effectiveness of our Board.

- The Science and Technology Committee is responsible for overseeing and assessing business development opportunities to further diversify, strengthen, and unify our product portfolio.

While each Committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through Committee reports about such risks. Matters of significant strategic risk are considered by our entire Board.

170.    Regarding the Audit Committee's responsibilities, the 2022 Proxy Statement provided, in relevant part:

The Audit Committee assists our Board by providing oversight of our financial

management, Independent Registered Public Accounting Firm, and accounting and financial reporting processes, as well as other matters as directed by the Board or the Audit Committee Charter.

Among other things, the Audit Committee's responsibilities include:

- having sole discretion and direct responsibility for appointing, evaluating, retaining, compensating, overseeing, evaluating, and, when necessary, terminating our engagement with our Independent Registered Public Accounting Firm;

- discussing with management and the Independent Registered Public Accounting Firm our annual and quarterly financial statements and related disclosures and pre-approving all audit services;

- establishing and overseeing compliance with our procedures governing treatment of complaints concerning our accounting, internal accounting controls, or auditing matters, and submissions of confidential and anonymous employee concerns regarding accounting or auditing matters;

- reviewing our Code of Conduct, including assessing the adequacy of the Code of Conduct and recommending any proposed changes to the Board, and our compliance with applicable legal requirements, as well as any litigation or material government investigations, and making corresponding reports to the Board;

- overseeing our risk assessment and risk management processes and the guidelines and procedures to implement such processes;

- reviewing and ratifying all related person transactions, based on the standards set forth in our Related Party Transactions Policy; and

- preparing the Audit Committee Report required to be included in our annual proxy statement.

The members of our Audit Committee are Dr. Kumar (Chair), Dr. Fernandes, and Mr. Potti. All members of our Audit Committee are deemed "independent" and financially literate under the applicable rules and regulations of the SEC and Nasdaq. Dr. Kumar and Mr. Potti also qualify as an "audit committee financial expert" within the meaning of SEC regulations.

171.    Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, Fernandes, and Potti caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's financial statements from May 8, 2020 to April 1, 2024, including important financial metrics such as collaborative arrangement revenue, research and development expenses, other income (expense), net and accrued expenses and other current liabilities, were materially false and misleading; (2) the Company did not have adequate internal controls over financial reporting; (3) as a result, the Company would have to restate its financial statements, at great cost to the Company, for the entire fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), for each of the first three quarters of the 2023 Fiscal Year, and for each of the quarters of the 2022 Fiscal Year. As a result, Ocugen's statements were materially false and misleading at all relevant times.

172.    The 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

173.    As a result of Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, Fernandes, and Potti causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect Defendants Kompella and Whittington to the

Board, allowing them to continue to breach their fiduciary duties to the Company.

### *May 6, 2022 Form 10-Q*

174. On May 6, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2022 (the "1Q 2022 10-Q"). The 1Q 2022 10-Q was signed by Defendant Musunuri and contained SOX certifications signed by Defendant Musunuri attesting to the accuracy of the 1Q 2022 10-Q.

175. The 1Q 2022 10-Q stated the following regarding Ocugen's internal controls:

> *We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of March 31, 2022*. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

(Emphasis added).

176. The 1Q 2022 10-Q reported the following financial results for Ocugen for 1Q22: (1) in Ocugen's unaudited Condensed Consolidated Balance Sheets: $7,687,000 in total current liabilities, $149,686,000 in accumulated deficit, and $131,129,000 in total stockholder's equity; and (2) in Ocugen's unaudited Income Statement: $0 in collaboration revenue, $7,915,000 in R&D expenses, $18,034,000 in loss from operations; other income (expense) net of ($15,000),

$18,019,000 in net loss, and $0.09 in loss per share. The same day, the Company also reported these financials in a Form 8-K it filed with the SEC.

177.    The statements in ¶¶174-76 above were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company was experiencing a material weakness in its internal control over financial reporting and, due to the foregoing, its internal control over financial reporting and disclosure controls and procedures were not effective; (2) as a result of the foregoing, the Company failed to correctly account for its arrangement with CanSinoBIO, which resulted in material misstatements with respect to the total current liabilities, accumulated deficit, and total stockholder's equity in Ocugen's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in Ocugen's unaudited Income Statement set forth in its 1Q 2022 10-Q and May 6, 2022 press release; (3) due to the foregoing, the Company would likely be required to restate one or more of the financial statements it had filed with the SEC; and (4) all of the foregoing, taken together, was likely to detrimentally impact the Company's reputation and business once revealed. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *August 5, 2022 Form 10-Q*

178.    On August 5, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2022 ("2Q22") (the "2Q 2022 10-Q"). The 2Q 2022 10-Q was

signed by Defendant Musunuri and contained SOX certifications signed by Defendant Musunuri

attesting to the accuracy of the 2Q 2022 10-Q.

179.    The 2Q 2022 10-Q stated the following regarding Ocugen's internal controls:

*We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of June 30, 2022*. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

(Emphasis added).

180.    The 2Q 2022 10-Q reported the following financial results for Ocugen for 2Q22:

(1) in Ocugen's unaudited Condensed Consolidated Balance Sheets: $10,338,000 in total current

liabilities, $169,157,000 in accumulated deficit, and $114,108,000 in total stockholder's equity;

and (2) in Ocugen's unaudited Income Statement: $0 in collaboration revenue, $9,007,000 in R&D

expenses, $19,565,000 in loss from operations; other income (expense) net of $94,000,

$19,471,000 in net loss, and $0.09 in loss per share. The same day, the Company also reported

these financials in a Form 8-K it filed with the SEC.

181.    The statements in ¶¶178-80 above were materially false and misleading at the time

they were made because they failed to disclose, *inter alia*, that: (1) the Company was experiencing

a material weakness in its internal control over financial reporting and, due to the foregoing, its internal control over financial reporting and disclosure controls and procedures were not effective; (2) as a result of the foregoing, the Company failed to correctly account for its arrangement with CanSinoBIO, which resulted in material misstatements with respect to the total current liabilities, accumulated deficit, and total stockholder's equity in Ocugen's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in Ocugen's unaudited Income Statement set forth in its 2Q 2022 10-Q and August 5, 2022 press release; (3) due to the foregoing, the Company would likely be required to restate one or more of the financial statements it had filed with the SEC; and (4) all of the foregoing, taken together, was likely to detrimentally impact the Company's reputation and business once revealed. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *November 8, 2022 Form 10-Q*

182.    On November 8, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2022 ("3Q22") (the "3Q 2022 10-Q"). The 3Q 2022 10-Q was signed by Defendant Musunuri and contained SOX certifications signed by Defendant Musunuri attesting to the accuracy of the 3Q 2022 10-Q.

183.    The 3Q 2022 10-Q stated the following regarding Ocugen's internal controls:

*We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and*

> ***principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of September 30, 2022***. Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, ***our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms***, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

(Emphasis added).

184.    The 3Q 2022 10-Q also reported the following financial results for Ocugen for 3Q22: (1) in Ocugen's unaudited Condensed Consolidated Balance Sheets: $14,907,000 in total current liabilities, $191,079,000 in accumulated deficit, and $95,303,000 in total stockholder's equity; and (2) in Ocugen's unaudited Income Statement: $0 in collaboration revenue, $15,622,000 in R&D expenses, $23,119,000 in loss from operations, other income (expense) net of $1,197,000, $21,922,000 in net loss, and $0.10 in loss per share. The same day, the Company also reported these financials in a Form 8-K it filed with the SEC.

185.    The statements in ¶¶182-84 above were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company was experiencing a material weakness in its internal control over financial reporting and, due to the foregoing, its

internal control over financial reporting and disclosure controls and procedures were not effective; (2) as a result of the foregoing, the Company failed to correctly account for its arrangement with CanSinoBIO, which resulted in material misstatements with respect to the total current liabilities, accumulated deficit, and total stockholder's equity in Ocugen's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in Ocugen's unaudited Income Statement set forth in its 3Q 2022 10-Q and November 8, 2022 press release; (3) due to the foregoing, the Company would likely be required to restate one or more of the financial statements it had filed with the SEC; and (4) all of the foregoing, taken together, was likely to detrimentally impact the Company's reputation and business once revealed. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2022 Form 10-K*

186.    On February 28, 2023, the Company filed its Form 10-K with the SEC for the 2022 Fiscal Year (the "2022 10-K"). The 2022 10-K was signed by Defendants Musunuri, Kumar, Zhang, Kompella, Castilllo, Fernandes, and Whittington and contained attached certifications pursuant to SOX signed by Defendant Musunuri attesting to the accuracy of the 2022 10-K.

187.    The 2022 10-K stated the following regarding Ocugen's internal controls:

*We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e)*

**under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of December 31, 2022.** Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this Annual Report on Form 10-K, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

(Emphasis added).

188.    In addition, the 2022 10-K stated: "Under the supervision of and with the participation of our Chief Executive Officer and Chief Accounting Officer, our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2022 . . . and [b]ased on this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2022." The 2022 10-K was also the first instance whereby the Company stated that it accounted for the CanSinoBIO agreement as a collaborative agreement under ASC 808.

189.    The 2022 10-K also reported the following financial results for Ocugen for the 2022 Fiscal Year: (1) in Ocugen's unaudited Condensed Consolidated Balance Sheets: $18,460,000 in total current liabilities, $213,018,000 in accumulated deficit, and $84,052,000 in total stockholder's equity; and (2) in Ocugen's unaudited Income Statement: $0 in collaboration

revenue, $49,757,000 in R&D expenses, $84,868,000 in loss from operations, other income (expense) net of $3,517,000, $81,351,000 in net loss, and $0.38 in loss per share. The same day, the Company also reported these financials in a Form 8-K it filed with the SEC.

190.    The statements in ¶¶186-89 above were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company was experiencing a material weakness in its internal control over financial reporting and, due to the foregoing, its internal control over financial reporting and disclosure controls and procedures were not effective; (2) as a result of the foregoing, the Company failed to correctly account for its arrangement with CanSinoBIO, which resulted in material misstatements with respect to the total current liabilities, accumulated deficit, and total stockholder's equity in Ocugen's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in Ocugen's unaudited Income Statement set forth in its 2022 10-K and February 28, 2023 press release; (3) due to the foregoing, the Company would likely be required to restate one or more of the financial statements it had filed with the SEC; and (4) all of the foregoing, taken together, was likely to detrimentally impact the Company's reputation and business once revealed. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### 2023 Proxy Statement

191.    On April 20, 2023, the Company filed with the SEC its 2023 Proxy Statement.

Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, and Fernandes solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

192.    The 2023 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Castillo and Fernandes to the Board; and (2) ratify the selection of Ernst & Young LLP as the Company's Independent Registered Public Accounting Firm for the 2023 Fiscal Year.

193.    Regarding the Company's Code of Ethics, the 2023 Proxy Statement provided, in relevant part:

> We have a written Code of Conduct that applies to our directors and employees, including our executive officers. The Code of Conduct covers fundamental ethical and compliance-related principles and practices such as accurate accounting records and financial reporting, avoiding conflicts of interest, protection and use of our property, compliance with legal and regulatory requirements, and internal reporting procedures for violations of the Code of Conduct. The Code of Conduct is available on our website at www.ocugen.com and any amendments to the Code of Conduct, or any waivers of its requirements, will be disclosed on our website or in a Current Report on Form 8-K, which we will file with the SEC.

> Only the Board may waive any specific provisions of the Code of Conduct for directors and executive officers. The Chief Accounting Officer and Senior Vice President, Finance, has been designated as the Compliance Officer, and may waive any specific provision of this Code of Conduct for employees other than a director and executive officer. In the event of an approved waiver involving the conduct of a director or executive officer, appropriate and prompt disclosure, including disclosure of the reasons for the waiver, must be made to our stockholders as required by applicable laws and stock exchange rules. The Audit Committee shall be responsible for monitoring compliance with the Code of Conduct and shall assess the adequacy of the Code of Conduct periodically and recommend any changes to the Code of Conduct to the Board for approval.

194.    Regarding the Board's role in "Risk Oversight," the 2023 Proxy Statement

provided, in relevant part:

> Our Board's role in risk oversight is consistent with our leadership structure, with management having day-to-day responsibility for assessing and managing our risk exposure and our Board actively overseeing management of our risks — both at the Board and Committee level. The risk oversight process includes receiving regular reports from each of the Committees and our executive officers to enable our Board to understand our risk identification, risk management, and risk mitigation strategies with respect to areas of potential material risk, including operations (including cyber-security), finance, legal, regulatory, strategic, and reputational risk.
>
> Our Board focuses on the overall risks affecting us. Each Committee has been delegated the responsibility for the oversight of specific risks that fall within its area of responsibility. For example:
>
> - The Audit Committee of our Board ("Audit Committee") oversees management of financial reporting, compliance, and litigation risks, including risks related to our insurance, information technology, cybersecurity, human resources, and regulatory matters, as well as the steps management has taken to monitor and control such exposures.
>
> - The Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation policies, plans, and arrangements and the extent to which those policies, plans, and arrangements increase or decrease our risk.
>
> - The Nominating and Corporate Governance Committee manages risks associated with the independence of our Board, potential conflicts of interest, and the effectiveness of our Board.
>
> - The Science and Technology Committee is responsible for overseeing and assessing business development opportunities to further diversify, strengthen, and unify our product portfolio.
>
> While each Committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through Committee reports about such risks. Matters of significant strategic risk are considered by our entire Board.

195.    Regarding the Audit Committee's responsibilities, the 2023 Proxy Statement

provided, in relevant part:

> The Audit Committee assists our Board by providing oversight of our financial management, Independent Registered Public Accounting Firm, and accounting and financial reporting processes, as well as other matters as directed by the Board or the Audit Committee Charter.
>
> Among other things, the Audit Committee's responsibilities include:
>
> - Having sole discretion and direct responsibility for appointing, evaluating, retaining, compensating, overseeing, evaluating, and, when necessary, terminating our engagement with our Independent Registered Public Accounting Firm;
>
> - Discussing with management and the Independent Registered Public Accounting Firm our annual and quarterly financial statements and related disclosures and pre-approving all audit services;
>
> - Establishing and overseeing compliance with our procedures governing treatment of complaints concerning our accounting, internal accounting controls, or auditing matters, and submissions of confidential and anonymous employee concerns regarding accounting or auditing matters;
>
> - Reviewing our Code of Conduct, including assessing the adequacy of the Code of Conduct and recommending any proposed changes to the Board, and our compliance with applicable legal requirements, as well as any litigation or material government investigations, and making corresponding reports to the Board;
>
> - Overseeing our risk assessment and risk management processes and the guidelines and procedures to implement such processes;
>
> - Reviewing and ratifying all related person transactions, based on the standards set forth in our Related Party Transactions Policy; and
>
> - Preparing the Audit Committee Report required to be included in our annual proxy statement.
>
> The members of our Audit Committee are Dr. Kumar (Chair), Dr. Fernandes, and Dr. Whittington. Dr. Whittington became a member of the Audit Committee in June 2022. Manish Potti, former director who did not stand for re-election at our

2022 Annual Meeting of Shareholders, served as a member of our Audit Committee until June 2022. All members of our Audit Committee are deemed "independent" and financially literate under the applicable rules and regulations of the SEC and Nasdaq. Dr. Kumar and Dr. Whittington also qualify as an "audit committee financial expert" within the meaning of SEC regulations.

196. Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, and Fernandes caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company's financial statements from May 8, 2020 to April 1, 2024, including important financial metrics such as collaborative arrangement revenue, research and development expenses, other income (expense), net and accrued expenses and other current liabilities, were materially false and misleading; (2) the Company did not have adequate internal controls over financial reporting; (3) as a result, the Company would have to restate its financial statements, at great cost to the Company, for the entire fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), for each of the first three quarters of the 2023 Fiscal Year, and for each of the quarters of the 2022 Fiscal Year. As a result, Ocugen's statements were materially false and misleading at all relevant times.

197. The 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

198.   As a result of Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, and Fernandes causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect Defendants Castillo and Fernandes to the Board, allowing them to continue to breach their fiduciary duties to the Company.

### *May 5, 2023 Form 10-Q*

199.   On May 5, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2023 ("1Q23") (the "1Q 2023 10-Q"). The 1Q 2023 10-Q was signed by Defendant Musunuri and non-party Vu and contained attached certifications pursuant to SOX signed by Defendant Musunuri and non-party Vu attesting to the accuracy of the 1Q 2023 10-Q.

200.   The 1Q 2023 10-Q stated the following regarding Ocugen's internal controls:

*We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of March 31, 2023*. Based upon this evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible

controls and procedures.

(Emphasis added).

201.    The 1Q 2023 10-Q also reported the following financial results for Ocugen for 1Q23: (1) in Ocugen's unaudited Condensed Consolidated Balance Sheets: $15,683,000 in total current liabilities, $229,516,000 in accumulated deficit, and $75,800,000 in total stockholder's equity; and (2) in Ocugen's unaudited Income Statement: $0 in collaboration revenue, $9,558,000 in R&D expenses, $17,751,000 in loss from operations, other income (expense) net of $1,253,000, $16,498,000 in net loss, and $0.07 in loss per share. The same day, the Company also reported these financials in a Form 8-K it filed with the SEC.

202.    The statements in ¶¶199-201 above were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company was experiencing a material weakness in its internal control over financial reporting and, due to the foregoing, its internal control over financial reporting and disclosure controls and procedures were not effective; (2) as a result of the foregoing, the Company failed to correctly account for its arrangement with CanSinoBIO, which resulted in material misstatements with respect to the total current liabilities, accumulated deficit, and total stockholder's equity in Ocugen's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations, other income (expense), net, net loss, and loss per share in Ocugen's unaudited Income Statement set forth in its 1Q 2023 10-Q and May 5, 2023 press release; (3) due to the foregoing, the Company would likely be required to restate one or more of the financial statements it had filed with the

SEC; and (4) all of the foregoing, taken together, was likely to detrimentally impact the Company's reputation and business once revealed. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### THE TRUTH BEGINS TO EMERGE AS THE FALSE AND MISLEADING STATEMENTS CONTINUE

#### *August 15, 2023 Form 8-K and Notification of Late Filing on Form 12b-25*

203.    On August 15, 2023, after the close of market, Ocugen filed a current report on Form 8-K with the SEC, which was signed by Defendant Musunuri, announcing that Vu was no longer working at Ocugen. In relevant part, it stated:

> Effective August 14, 2023, Quan Vu is no longer serving as the Chief Financial Officer/Chief Business Officer, and as principal financial officer and principal accounting officer, of Ocugen, Inc. The separation from employment is being treated as a severance qualifying event under Mr. Vu's employment agreement.

204.    In light of Vu's departure, the Board appointed Defendant Musunuri as the Company's interim principal financial officer, effective immediately.

205.    Also on August 15, 2023, after the close of market, Ocugen filed a Notification of Late Filing on Form 12b-25 with the SEC regarding the Company's quarterly report for the period ended June 30, 2023 ("2Q23"). In relevant part, the filing stated that the Company "requires additional time primarily as a result of recent transition in the Company's management, including its principal financial officer [Vu] and principal accounting officer. ***Despite working diligently in an effort to timely file the Form 10-Q, the Company has been unable to complete all work necessary to timely file the Form 10-Q.***"

206.    On this news, the price per share of the Company's stock fell $0.04, or 8.3%, to close at $0.44 per share on August 16, 2023. Still, despite this partial emergence of the truth, the Individual Defendants continued to make a series of materially false and misleading statements to investors.

207.    Indeed, despite this partial emergence of the truth, the statements in ¶¶203-05 above still failed to disclose, *inter alia*, that: Vu had refused to sign the 2Q 2023 10-Q due to fraud, that he was subsequently terminated, and that at least two other finance executives refused to sign as well.

### *August 21, 2023 Form 10-Q*

208.    On August 21, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for 2Q23 (the "2Q 2023 10-Q"). The 2Q 2023 10-Q was signed by Defendant Musunuri, in the capacity of CEO and interim Principal Financial Officer, and attached certifications pursuant to SOX signed by Defendant Musunuri attesting to the accuracy of the 2Q 2023 10-Q.

209.    The 2Q 2023 10-Q stated the following regarding Ocugen's internal controls:

We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer who is also our interim principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of June 30, 2023. ***Based upon this evaluation, our principal executive officer/interim principal financial officer concluded that, as of the end of the period covered by this report,*** our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms***, and (b) such information is accumulated and communicated to our management, including our principal executive***

> *officer/interim principal financial officer, as appropriate to allow timely decisions regarding required disclosures. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.*

(Emphasis added).

210.    The 2Q 2023 10-Q also reported the following financial results for Ocugen for 2Q23: (1) in Ocugen's unaudited Condensed Consolidated Balance Sheets: $13,460,000 in total current liabilities, $252,441,000 in accumulated deficit, and $70,281,000 in total stockholder's equity; and (2) in Ocugen's unaudited Income Statement: $0 in collaboration revenue, $14,169,000 in R&D expenses, $23,733,000 in loss from operations, other income (expense) net of $808,000, $22,925,000 in net loss, and $0.10 in loss per share. The same day, the Company also reported these financials in a Form 8-K it filed with the SEC.

211.    The statements in ¶¶208-10 above were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company was experiencing a material weakness in its internal control over financial reporting and, due to the foregoing, its internal control over financial reporting and disclosure controls and procedures were not effective; (2) as a result of the foregoing, the Company failed to correctly account for its arrangement with CanSinoBIO, which resulted in material misstatements with respect to the total current liabilities, accumulated deficit, and total stockholder's equity in Ocugen's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations,

other income (expense), net, net loss, and loss per share in Ocugen's unaudited Income Statement set forth in its 2Q 2023 10-Q and August 21, 2023 press release; (3) due to the foregoing, the Company would likely be required to restate one or more of the financial statements it had filed with the SEC; and (4) all of the foregoing, taken together, was likely to detrimentally impact the Company's reputation and business once revealed. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *November 9, 2023 Form 10-Q*

212.    On November 9, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2023 ("3Q23") (the "3Q 2023 10-Q"). The 3Q 2023 10-Q was signed by Defendants Musunuri and Breininger and contained attached certifications pursuant to SOX signed by Defendants Musunuri and Breininger attesting to the accuracy of the 3Q 2023 10-Q.

213.    The 3Q 2023 10-Q stated the following regarding Ocugen's internal controls:

*We have carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of September 30, 2023*. Based upon this evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, *our disclosure controls and procedures are effective in ensuring that (a) the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms*, and (b) such information is accumulated and communicated to our management, including our principal executive officer

and principal financial officer, as appropriate to allow timely decisions regarding required disclosures. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and our management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

(Emphasis added).

214. The 3Q 2023 10-Q also reported the following financial results for Ocugen for 3Q23: (1) in Ocugen's unaudited Condensed Consolidated Balance Sheets: $11,136,000 in total current liabilities, $266,603,000 in accumulated deficit, and $58,395,000 in total stockholder's equity; and (2) in Ocugen's unaudited Income Statement: $0 in collaboration revenue, $6,342,000 in R&D expenses, $15,424,000 in loss from operations, other income (expense) net of $1,262,000, $14,162,000 in net loss, and $0.06 in loss per share. The same day, the Company also reported these financials in a Form 8-K it filed with the SEC.

215. The statements in ¶¶212-14 above were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company was experiencing a material weakness in its internal control over financial reporting and, due to the foregoing, its internal control over financial reporting and disclosure controls and procedures were not effective; (2) as a result of the foregoing, the Company failed to correctly account for its arrangement with CanSinoBIO, which resulted in material misstatements with respect to the total current liabilities, accumulated deficit, and total stockholder's equity in Ocugen's unaudited Condensed Consolidated Balance Sheets and collaboration revenue, R&D expenses, loss from operations,

other income (expense), net, net loss, and loss per share in Ocugen's unaudited Income Statement

set forth in its 3Q 2023 10-Q and November 9, 2023 press release; (3) due to the foregoing, the

Company would likely be required to restate one or more of the financial statements it had filed

with the SEC; and (4) all of the foregoing, taken together, was likely to detrimentally impact the

Company's reputation and business once revealed. As a result of the foregoing, the Company's

statements about its business, operations, and prospects were materially false and misleading

and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH FULLY EMERGES**

216.    The truth fully emerged on April 1, 2024 when, after the market closed, the

Company filed a current report on Form 8-K with the SEC announcing that it was restating various

of its previously issued financial reports (the "Restatement Announcement"). The Restatement

Announcement revealed the following, in relevant part:

> In connection with the preparation of the financial statements of Ocugen, Inc. (the "Company") for the year ended December 31, 2023, the Company, in consultation with its independent registered public accounting firm, Ernst & Young LLP ("EY"), identified certain accounting errors related to the application of U.S. GAAP to certain agreements with one of its business partners related to a collaboration agreement.

> On April 1, 2024, the Audit Committee of the Board of Directors (the "Audit Committee"), based on the recommendation of management and after consultation with EY, ***concluded that the Company's previously-issued audited consolidated financial statements for each fiscal year beginning January 1, 2020*** and its previously-issued unaudited interim condensed consolidated financial statements for each of the first three quarters in such years, as well as the associated earnings releases and investor presentations or other communications ***describing such financial statements, were materially misstated and, accordingly, should no longer be relied upon***.

***The Company intends to restate its consolidated financial statements as of and for the year ended December 31, 2022, in connection with the filing of its 2023 Form 10-K. Similarly, the Company will include restated unaudited financial information for each of the first three quarters of 2023 and 2022 in its 2023 Form 10-K*** (each such annual and quarterly period to be restated, a "Restated Period").

The identified errors in each of the Restated Periods relate to the Company's accounting for the estimated costs in one of its collaboration arrangements. ***These identified errors will result in a restatement of the following financial statement line item captions: Collaborative arrangement revenue, Research and development expenses, Other income (expense), net and Accrued expenses and other current liabilities***.

The Company is currently not in a position to provide a reasonable estimate of the anticipated changes in its results of operations for the year ended December 31, 2023, for any Restated Period. However, the Company does not expect the errors to result in any impact on its cash position, cash runway, or financial projections.

***Additionally, the Company has determined that the errors resulted from the existence of a material weakness in its internal control over financial reporting that also existed during the Restated Periods and that its internal control over financial reporting was not effective as of December 31, 2023.*** As a result, the Company's Chief Executive Officer and Chief Accounting Officer have concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2023.

On April 1, 2024, the Company filed a notification of inability to timely file Form 10-K on Form 12b-25 due to additional time required for the Company to correct the errors described above and prepare restated financial statements. At this time, the Company expects to file the 2023 Form 10-K no later than April 16, 2024. However, there can be no assurance that the Company will be able to prepare restated financial statements and file the 20 3 Form 10-K on the timeline anticipated, or that no additional errors will be identified.

(Emphasis added).

217.    Also on April 1, 2024, Ocugen filed with the SEC a Notification of Late Filing on

Form 12b-25. It stated the following, in relevant part:

In connection with the preparation of the financial statements of the Company for

the year ended December 31, 2023, the Company identified certain accounting errors relating to the application of U.S. GAAP to certain agreements with one of its business partners related to a collaboration agreement. As a result, the Company intends to restate its financial statements for the year ended December 31, 2022 and for each of the first three quarters of 2022 and 2023 in the 2023 Form 10-K, the review and preparation of which is currently ongoing. Given the scope of the process to prepare the restatements and related disclosures, the Company requires additional time to prepare and review its financial statements and other disclosures in its 2023 Form 10-K. Therefore, the Company is unable to complete and file the 2023 Form 10-K by the required due date of April 1, 2024.

218.    On this news, the Company's stock price declined by $0.16 per share, or 10.38%, from a closing price of $1.54 per share on April 1, 2024, to close at $1.38 per share on April 2, 2024.

SUBSEQUENT DEVELOPMENTS

219.    On April 16, 2024, Ocugen issued its restated financial statements in the Form 10-K it filed with the SEC for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K failed to disclose the identity of the counterparty to the collaboration agreement that had been incorrectly accounted for in Ocugen's previously issued financial statements but it revised the Company's "License and Development Agreements" disclosure to only name one agreement with CanSinoBIO, which the Company named as the only one within the scope of ASC 808:

> ***Co-Development and Commercialization Agreement with CanSino Biologics, Inc.***
>
> The Company entered into a co-development and commercialization agreement with CanSino Biologics, Inc. ("CanSinoBIO") with respect to the development and commercialization of the Company's modifier gene therapy product candidates, OCU400, OCU410, and OCU410ST. The co-development and commercialization agreement was originally entered into in September 2019 ("the Original CanSinoBIO Agreement") with regards to OCU400, and was subsequently

amended in September 2021 and November 2022 ("the Amendments"), to include OCU410 and OCU410ST, respectively. The Company concluded that the Original CanSinoBIO Agreement and the Amendments are separate contracts (collectively referred to as the "CanSinoBio Agreements"). Pursuant to the CanSinoBIO Agreements, the Company and CanSinoBIO are collaborating on the development of the Company's modifier gene therapy platform. CanSinoBIO is responsible for the chemistry, manufacturing, and controls development and manufacture of clinical supplies of such products and is responsible for the costs associated with such activities. CanSinoBIO has an exclusive license to develop, manufacture, and commercialize the Company's modifier gene therapy platform in and for China, Hong Kong, Macau, and Taiwan (the " CanSinoBIO Territory"), and the Company maintains exclusive development, manufacturing, and commercialization rights with respect to the Company's modifier gene therapy platform outside the CanSinoBIO Territory (the " Company Territory").

***

*Accounting analysis and revenue recognition*

***The Company determined the collaboration arrangements with CanSinoBIO, are within the scope of ASC 808 and has analogized to ASC 606 to account for CanSinoBIO's access to its IP as well as data generated in connection with the co-development activities to be undertaken by Ocugen.*** These elements of the arrangements are not distinct and are accounted for as a single performance obligation.

The non-cash consideration to be received related to the Company's satisfaction of the performance obligations includes but is not limited to services relate to chemistry, manufacturing, and controls development and manufacture of clinical supplies of such products through completion of pre-clinical, clinical, regulatory, and other commercialization readiness services. The estimated market value of the co-development services to be performed by CanSinoBIO, represents variable consideration that is included in the transaction price. The Company recognizes collaborative arrangement revenue over time using an input method using ratio of costs incurred to date compared to total estimated costs required to satisfy the performance obligations under the CanSinoBIO Agreements.

The Company constrained the transaction price related to certain future co-development services and future royalties, as it assessed that it is probable that the inclusion of such variable consideration could result in a significant reversal of

91

cumulative revenue in future periods. The variable consideration is reevaluated at each reporting period and as changes in circumstances occur.

The services provided by CanSinoBIO are recorded as incurred and the difference between the revenue and expense recognized is recorded on the Company's balance sheet as a contract liability within Accrued expenses and other current liabilities. ***The related revenue recognized was recorded in the consolidated statements of operations and comprehensive loss as collaborative arrangement revenue and was approximately $6.0 million and $2.5 million for the year ended December 31, 2023 and the year ended December 31, 2022, respectively. The related expense incurred for services provided by CanSinoBIO was recorded in the consolidated statements of operations and comprehensive loss as research and development expense and was approximately $5.3 million and $9.1 million for the year ended December 31, 2023 and the year ended December 31, 2022, respectively.***

The contract liability was $10.5 million and $11.2 million as of December 31, 2023 and December 31, 2022, respectively. Revenue recognized for the year ended December 31, 2023, that was included in the contract liabilities balances as of January 1, 2023 was approximately $6.0 million. Revenue recognized for the year ended December 31, 2022, that was included in the contract liabilities balances as of January 1, 2022, was approximately $2.5 million.

(Emphasis added).

220.    The impact of the restatement on the Company's financial statements is summarized as follows:

92

Balance Sheet Chart

| (000s, except per share amts.) | Q1 22 | Q2 22 | Q3 22 | 2022 | Q1 23 | Q2 23 | Q3 23 |
|---|---|---|---|---|---|---|---|
| **Current liabilities** | | | | | | | |
| Originally reported | $ 7,687 | $ 10,338 | $ 14,907 | $ 18,460 | $ 15,683 | $ 13,460 | $ 11,136 |
| Restated | $ 13,301 | $ 17,963 | $ 24,523 | $ 28,531 | $ 26,582 | $ 24,499 | $ 19,730 |
| Under/(over) stated $ | $ 5,614 | $ 7,625 | $ 9,616 | $ 10,071 | $ 10,899 | $ 11,039 | $ 8,594 |
| Under/(over) stated % | 42.2% | 42.4% | 39.2% | 35.3% | 41.0% | 45.1% | 43.6% |
| | | | | | | | |
| **Accumulated Deficit** | | | | | | | |
| Originally reported | $ 149,686 | $ 169,157 | $ 191,079 | $ 213,018 | $ 229,516 | $ 252,441 | $ 266,603 |
| Restated | $ 155,300 | $ 176,782 | $ 200,695 | $ 223,089 | $ 240,415 | $ 263,480 | $ 275,197 |
| Under/(over) stated $ | $ 5,614 | $ 7,625 | $ 9,616 | $ 10,071 | $ 10,899 | $ 11,039 | $ 8,594 |
| Under/(over) stated % | 3.6% | 4.3% | 4.8% | 4.5% | 4.5% | 4.2% | 3.1% |
| | | | | | | | |
| **Total Stockholders' Equity** | | | | | | | |
| Originally reported | $ 131,129 | $ 114,108 | $ 95,303 | $ 84,052 | $ 75,800 | $ 70,281 | $ 58,395 |
| Restated | $ 125,515 | $ 106,483 | $ 85,687 | $ 73,981 | $ 64,901 | $ 59,242 | $ 49,801 |
| Under/(over) stated $ | $ (5,614) | $ (7,625) | $ (9,616) | $ (10,071) | $ (10,899) | $ (11,039) | $ (8,594) |
| Under/(over) stated % | (4.5%) | (7.2%) | (11.2%) | (13.6%) | (16.8%) | (18.6%) | (17.3%) |
| | | | | | | | |
| **Current Ratio** | | | | | | | |
| Originally | 17.96 | 11.86 | 7.21 | 5.34 | 5.38 | 5.46 | 5.08 |
| Post restatement | 10.38 | 6.82 | 4.38 | 3.45 | 3.18 | 3.00 | 2.87 |
| Under/(over) % | (73.0%) | (73.8%) | (64.5%) | (54.6%) | (69.5%) | (82.0%) | (77.2%) |

Income Statement Chart

| (000s, except per share amts.) | Q1 22 | Q2 22 | Q3 22 | Q4 22 | 2022 | Q1 23 | Q2 23 | Q3 23 |
|---|---|---|---|---|---|---|---|---|
| **Collaborative arrangement revenue** | | | | | | | | |
| Originally reported | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Restated | $ 500 | $ 643 | $ 466 | $ 879 | $ 2,488 | $ 443 | $ 485 | $ 3,699 |
| Under/(over) stated $ | $ 500 | $ 643 | $ 466 | $ 879 | $ 2,488 | $ 443 | $ 485 | $ 3,699 |
| | | | | | | | | |
| **R&D expenses** | | | | | | | | |
| Originally reported | $ 7,915 | $ 9,007 | $ 15,622 | $ 17,213 | $ 49,757 | $ 9,558 | $ 14,169 | $ 6,342 |
| Restated | $ 9,393 | $ 11,602 | $ 17,937 | $ 17,227 | $ 56,159 | $ 10,172 | $ 14,574 | $ 7,048 |
| Under/(over) stated $ | $ 1,478 | $ 2,595 | $ 2,315 | $ 14 | $ 6,402 | $ 614 | $ 405 | $ 706 |
| Under/(over) stated % | 15.7% | 22.4% | 12.9% | 0.1% | 11.4% | 6.0% | 2.8% | 10.0% |
| | | | | | | | | |
| **Loss from operations** | | | | | | | | |
| Originally reported | $ (18,034) | $ (19,565) | $ (23,119) | $ (24,150) | $ (84,868) | $ (17,751) | $ (23,733) | $ (15,424) |
| Restated | $ (19,030) | $ (21,576) | $ (25,110) | $ (23,355) | $ (89,071) | $ (18,035) | $ (23,540) | $ (12,431) |
| Over/(under) stated $ | $ (996) | $ (2,011) | $ (1,991) | $ 795 | $ (4,203) | $ (284) | $ 193 | $ 2,993 |
| Over/(under) stated % | (5.2%) | (9.3%) | (7.9%) | 3.4% | (4.7%) | (1.6%) | 0.8% | 24.1% |
| | | | | | | | | |
| **Other income (expense), net** | | | | | | | | |
| Originally reported | $ 15 | $ 94 | $ 1,197 | $ 2,211 | $ 3,517 | $ 1,253 | $ 808 | $ 1,262 |
| Restated | $ 15 | $ 94 | $ 1,197 | $ 961 | $ 2,267 | $ 709 | $ 475 | $ 714 |
| Under/(over) stated $ | $ - | $ - | $ - | $ (1,250) | $ (1,250) | $ (544) | $ (333) | $ (548) |
| Under/(over) stated % | 0.0% | 0.0% | 0.0% | (130.1%) | (55.1%) | (76.7%) | (70.1%) | (76.8%) |
| | | | | | | | | |
| **Net loss** | | | | | | | | |
| Originally reported | $ (18,019) | $ (19,471) | $ (21,922) | $ (21,939) | $ (81,351) | $ (16,498) | $ (22,925) | $ (14,162) |
| Restated | $ (19,015) | $ (21,482) | $ (23,913) | $ (22,394) | $ (86,804) | $ (17,326) | $ (23,065) | $ (11,717) |
| Over/(under) stated $ | $ (996) | $ (2,011) | $ (1,991) | $ (455) | $ (5,453) | $ (828) | $ (140) | $ 2,445 |
| Over/(under) stated % | (5.2%) | (9.4%) | (8.3%) | (2.0%) | (6.3%) | (4.8%) | (0.6%) | 20.9% |
| | | | | | | | | |
| **Loss per share** | | | | | | | | |
| Originally reported | $ (0.09) | $ (0.09) | $ (0.10) | $ (0.10) | $ (0.38) | $ (0.07) | $ (0.10) | $ (0.06) |
| Restated | $ (0.09) | $ (0.10) | $ (0.11) | $ (0.10) | $ (0.40) | $ (0.08) | $ (0.10) | $ (0.05) |
| Over/(under) stated $ | $ - | $ (0.01) | $ (0.01) | $ - | $ (0.02) | $ (0.01) | $ - | $ 0.01 |
| Over/(under) stated % | 0.0% | (10.0%) | (9.1%) | 0.0% | (5.0%) | (12.5%) | 0.0% | 20.0% |

221.    The charts set forth above depict that the balance sheet impact for all periods was to increase current liabilities and decrease stockholder's equity by increasing accumulated deficit (i.e. accumulated net losses from previous periods). Indeed, with regard to the restated periods, the Company's current liabilities were understated by *35.3%-45.1%*; stockholder's equity was overstated by *4.5%-18.6%*; and accumulated deficit was understated by *3.1%-4.8%*.

222.     In addition, the Balance Sheet Chart depicts the impact of the misstatements on Ocugen's current ratio (i.e. the ratio of current assets to current liabilities). Current ratio is a liquidity ratio that assesses a company's ability to pay short-term obligations or those due within one year, and it is often used by investors to gauge a company's financial health. The higher a company's current ratio is, the better positioned the company is to pay its debts in the short-term, and the lower risk the company faces for default. Based on the restatement, ***the Company's current ratio was overstated*** by as much as ***54.6%-82.0%*** for all restated periods.

223.     In addition, the restatement evidenced a $4.6 million adjustment, increasing the December 31, 2021 balance of the accumulated deficit, which represents the cumulative misstatement in the previously issued financial statements.

224.     The Income Statement Chart above depicts that the income statement impact was to increase R&D expenses, loss from operations, net loss, loss per share, and collaboration revenue and decrease other income. Indeed, R&D expenses were understated by as much as ***0.1%-22.4%*** for all restated periods; loss from operations was understated by as much as ***5.2%-9.3%*** for 1Q22 through 3Q22 and ***1.6%-4.7%*** for the 2022 Fiscal Year through 1Q23; net loss was understated by as much as ***0.6%-9.4%*** for 1Q22 through 2Q23; loss per share increased by ***9.1%-10%*** for 2Q22 through 3Q22 and ***5.0%-12.5%*** for the 2022 Fiscal Year through 1Q23. Moreover, while collaboration revenue increased by ***100%*** for the restated periods, other income (expense), net was overstated by as much as ***55.1%-130.1%*** for 4Q22 through 3Q23.

225.     The 2023 10-K also recognized that, due to a material weakness which existed as

of December 31, 2022 and December 31, 2023, the Company's disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2023. In relevant part, the 2023 10-K stated:

**Evaluation of Disclosure Controls and Procedures**

… Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this Annual Report on Form 10-K and as of the end of the prior year, our disclosure controls and procedures are not effective because of a material weakness related to the design and operating effectiveness of controls over the accounting for collaborative arrangements….

***

**Management's Annual Report on Internal Control Over Financial Reporting**

***

***… Based on this assessment, management concluded that our internal control over financial reporting was not effective as of December 31, 2023 and December 31, 2022 as a result of a material weakness related to the design and operating effectiveness of controls over the accounting for collaborative arrangements. Specifically, we did not effectively design and operate controls over the technical accounting analysis, the determination of the transaction price, calculating the progress towards the satisfaction of the performance obligations under the collaborative arrangements, and determining the value of the non-cash consideration received.***

***

**Remediation**

In order to remediate the material weakness, the Company's management plans to improve the design and operation of their controls over the technical accounting analysis, the determination of the transaction price, calculating the progress towards the satisfaction of the performance obligations under the collaborative arrangements, and determining the value of the non-cash consideration received under collaborative arrangements. Specifically, the Company plans to implement the following: dedicating personnel resources with the appropriate level of proficiency to review any new arrangements on a timely basis; obtaining relevant information from third parties on a timely basis, including actual costs incurred, actual noncash consideration received, and estimates to complete; and increasing the level of review activities over the accounting for collaborative arrangements

during the financial statement close process….

(Emphasis added).

## DAMAGES TO OCUGEN

226.    As a direct and proximate result of the Individual Defendants' conduct, Ocugen will lose and expend many millions of dollars.

227.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

228.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

229.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

230.    Such expenditures also include, but are not limited to, the cost to the Company for restating the false and misleading financial statements contained herein and the cost to remedy the Company's deficient internal controls as alleged herein.

231.    Additionally, these expenditures include, but are not limited to, unjust

compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

232.    As a direct and proximate result of the Individual Defendants' conduct, Ocugen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

233.    Plaintiffs bring this action derivatively and for the benefit of Ocugen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ocugen, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

234.    Ocugen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

235.    Plaintiffs are, and have been at all relevant times, shareholders of Ocugen. Plaintiffs will adequately and fairly represent the interests of Ocugen in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

236.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

237.    A pre-suit demand on the Board of Ocugen is futile and, therefore, excused. At the time of filing of this amended consolidated complaint, the Board consists of the following six individuals: Defendants Musunuri, Zhang, Kompella, Whittington, Castillo, and Fernandes (the "Current Director Defendants"). Plaintiffs needs only to allege demand futility as to three of the six Current Director Defendants that were on the Board at the time of the filing of this amended consolidated complaint.

238.    Demand is excused as to all of the Current Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Current Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

239.    In complete abdication of their fiduciary duties, the Current Director Defendants either knowingly or recklessly caused or permitted the Company to issue materially false and misleading statements. Specifically, the Current Director Defendants caused Ocugen to issue false and misleading statements which were intended to make Ocugen appear more profitable and attractive to investors. Moreover, the Current Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Current Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus, excused.

240.    Additional reasons that demand on Defendant Musunuri is futile follow. Defendant Musunuri is the co-founder of the Company. He also serves as the Company's CEO and as Chairman of the Board. Defendant Musunuri has served as the Company's CEO and as a Company director since September 2019. The Company provides Defendant Musunuri with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. Moreover, Defendant Musunuri solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Current Director Defendants to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Musunuri signed the 2020, 2021 and the 2022 10-Ks, as well as the certifications contained therein pursuant to SOX, all of which contained false and misleading elements, and attested to their accuracy. Furthermore, Defendant Musunuri engaged in lucrative insider trading during the Relevant Period, reaping personal profits exceeding $24,042,262. As the Company's CEO and Chairman of the Board, Defendant Musunuri was ultimately responsible for all the false and misleading statements and omissions that were made, including those contained in the relevant Forms 10-K and 10-Q which he personally signed. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Musunuri is a defendant in the Securities Class Action. For these reasons, too, Defendant Musunuri

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

241.    Additional reasons that demand on Defendant Zhang is futile follow. Defendant Zhang has served as a Company director since September 2019. Defendant Zhang also serves as a member of the Nominating and Corporate Governance Committee and the Science and Technology Committee. In addition, the Company provides him with handsome compensation for his role as a director. Moreover, Defendant Zhang solicited the 2022 Proxy Statement and the 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Current Director Defendants to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Zhang signed the 2020, 2021 and 2022 10-Ks, all of which contained false and misleading elements, and attested to their accuracy. Furthermore, Defendant Zhang engaged in lucrative insider trading during the Relevant Period, reaping personal profits exceeding $4,960,971. As a Company director, Defendant Zhang was ultimately responsible for all the false and misleading statements and omissions that were made, including those contained in the relevant Forms 10-K and 10-Q. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Zhang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and

thus demand upon him is futile and, therefore, excused.

242.    Additional reasons that demand on Defendant Kompella is futile follow. Defendant Kompella is a co-founder of the Company. Defendant Kompella has served as a Company director since September 2019. Defendant Kompella also serves as Chair of the Science and Technology Committee and as a member of the Compensation Committee and Nominating and Corporate Governance Committee. In addition, the Company provides him with handsome compensation for his role as a director. Moreover, Defendant Kompella solicited the 2022 Proxy Statement and the 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Current Director Defendants to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Kompella signed the 2020, 2021, and 2022 10-Ks, all of which contained false and misleading elements, and attested to their accuracy. Furthermore, Defendant Kompella engaged in lucrative insider trading during the Relevant Period, reaping personal profits exceeding $4,319,586. As a Company director, Defendant Kompella was ultimately responsible for all the false and misleading statements and omissions that were made, including those contained in the relevant Forms 10-K and 10-Q. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Kompella breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or

disinterested, and thus demand upon him is futile and, therefore, excused.

243.    Additional reasons that demand on Defendant Whittington is futile follow. Defendant Whittington has served as a Company director since March 2022. Defendant Whittington also serves as a member of the Compensation Committee and as Chair of the Audit Committee. In addition, the Company provides her with handsome compensation for her role as a director. Moreover, Defendant Whittington solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Current Director Defendants to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Whittington signed the 2022 10-K, which contained false and misleading elements, and attested to their accuracy. As a Company director, Defendant Whittington was ultimately responsible for all the false and misleading statements and omissions that were made, including those contained in the relevant Forms 10-K and 10-Q. As a trusted Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Whittington breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

244.    Additional reasons that demand on Defendant Castillo is futile follow. Defendant Castillo has served as a Company director since April 2020. Defendant Castillo also serves as a

member of the Compensation Committee, the Science and Technology Committee, the Audit Committee, and as Chair of the Nominating and Corporate Governance Committee. In addition, the Company provides her with handsome compensation for her role as a director. Moreover, Defendant Castillo solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Current Director Defendants to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Castillo signed the 2020, 2021, and 2022 10-Ks, all of which contained false and misleading elements, and attested to their accuracy. Furthermore, Defendant Castillo engaged in lucrative insider trading, reaping personal profits exceeding $447,220. As a Company director, Defendant Castillo was ultimately responsible for all the false and misleading statements and omissions that were made, including those contained in the relevant Forms 10-K and 10-Q. As a trusted Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Castillo breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

245.    Additional reasons that demand on Defendant Fernandes is futile follow. Defendant Fernandes has served as a Company director since 2020. Defendant Fernandes also serves as a member of the Audit Committee and Science and Technology Committee and as the Chair of the

Compensation Committee. In addition, the Company provides her with handsome compensation for her role as a director. Moreover, Defendant Fernandes solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Current Director Defendants to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Fernandes signed the 2020, 2021, and 2022 10-Ks, all of which contained false and misleading elements, and attested to their accuracy. Furthermore, Defendant Fernandes engaged in lucrative insider trading, reaping personal profits exceeding $247,700. As a Company director, Defendant Fernandes was ultimately responsible for all the false and misleading statements and omissions that were made, including those contained in the relevant Forms 10-K and 10-Q. As a trusted Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Fernandes breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

246.    In the event the Court determines that demand futility should be analyzed with respect to the membership of the Company's Board on May 24, 2024 (the "Initial Board"), the date that the first of the pre-consolidation cases was initiated, demand would nonetheless be

excused as futile.[6]

247.    A pre-suit demand on the Initial Board is futile and, therefore, excused. At the time of filing on May 24, 2024, the Initial Board consisted of the following seven individuals: Defendants Musunuri, Kumar, Zhang, Kompella, Whittington, Castillo, and Fernandes (the "Director Defendants"). Plaintiffs need only to allege demand futility as to four of the seven Director Defendants who were on the Initial Board.

248.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

249.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted the Company to issue materially false and misleading statements. Specifically, the Director Defendants caused Ocugen to issue false and misleading statements which were intended to make Ocugen appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face

---

[6] Demand futility is examined with respect to the membership of the Board at the time the amended consolidated complaint is filed unless the asserted terms are "validly in litigation" at the time of the original complaint. *Braddock v Zimmerman*, 906 A.2d 776, 778-79 (Del. 2006).

a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus, excused.

250.    Additional reasons that demand on Defendant Kumar is futile follow. Defendant Kumar served as a Company director from September 2019 until June 2024. Defendant Kumar also served as the Chair of the Audit Committee. In addition, he received handsome compensation from the Company for his role as a director. Moreover, Defendant Kumar solicited the 2022 Proxy Statement and 2023 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of certain Director Defendants to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company. In addition, Defendant Kumar signed the 2020, 2021 and 2022 10-Ks, all of which contained false and misleading elements, and attested to their accuracy. Furthermore, Defendant Kumar engaged in lucrative insider trading, reaping personal profits exceeding $208,935. As a Company director, Defendant Kumar was ultimately responsible for all the false and misleading statements and omissions that were made, including those contained in the relevant Forms 10-K and 10-Q. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Kumar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

251.   Additional reasons that demand on the Director Defendants is futile follow.

252.   Defendants Whittington (Chair), Kumar, Fernandes, and Castillo served as members of the Audit Committee for parts of or the entirety of the Relevant Period. In violation of the Audit Committee Charter, Defendants Whittington, Kumar, Fernandes, and Castillo failed to adequately review and discuss the Company's Forms 10-K and Forms 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, Defendants Whittington, Kumar, Fernandes, and Castillo further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

253.   In violation of the Code of Ethics, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Director Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

254.   Ocugen has been and will continue to be exposed to significant losses due to the

wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Ocugen any part of the damages Ocugen suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

255.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

256.     The acts complained of herein constitute violations of fiduciary duties owed by Ocugen's officers and directors, and these acts are incapable of ratification.

257.     The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ocugen. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director

Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Ocugen, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

258.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Ocugen to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

259.    Thus, for all of the reasons set forth above, all of the Current Director Defendants, and, if not all of them, at least three of the Current Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

260.    Similarly, for all of the reasons set forth above and if the Court so chooses, all of the Director Defendants, and, if not all of them, at least four of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT

261.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

262.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

263.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

264.    Under the direction and watch of the Individual Defendants, the 2022 Proxy Statement and the 2023 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed;

and (2) contrary to the 2022 Proxy Statement's and the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

265.    The 2022 and 2023 Proxy Statements also failed to disclose that: (1) the Company's financial statements from May 8, 2020 to April 1, 2024, including important financial metrics such as collaborative arrangement revenue, research and development expenses, other income (expense), net and accrued expenses and other current liabilities, were materially false and misleading; (2) the Company did not have adequate internal controls over financial reporting; (3) as a result, the Company would have to restate its financial statements, at great cost to the Company, for the entire fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), for each of the first three quarters of the 2023 Fiscal Year, and for each of the quarters of the 2022 Fiscal Year. As a result, Ocugen's statements were materially false and misleading at all relevant times.

266.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement and the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement and the 2023 Proxy Statement, including, but not limited to, the reelection of Defendants Kompella, Whittington, Castillo, and Fernandes to the Board, thus allowing them to continue breaching their fiduciary duties to Ocugen.

267.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 and 2023 Proxy Statements.

268.    Plaintiffs, on behalf of Ocugen, have no adequate remedy at law.

## SECOND CLAIM
### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

269.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

270.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ocugen's business and affairs.

271.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

272.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ocugen.

273.    In breach of their fiduciary duties owed to Ocugen, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's financial statements from May 8, 2020 to April 1, 2024, including important financial metrics such as collaborative arrangement revenue, research and development expenses, other income (expense), net and accrued expenses and other current liabilities, were materially false and misleading; (2)

the Company did not have adequate internal controls over financial reporting; (3) as a result, the

Company would have to restate its financial statements, at great cost to the Company, for the entire

fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), for each of the first three quarters

of the 2023 Fiscal Year, and for each of the quarters of the 2022 Fiscal Year. As a result, Ocugen's

statements were materially false and misleading at all relevant times.

274.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain

adequate internal controls.

275.    The Individual Defendants had actual or constructive knowledge that they had

caused the Company to fail to maintain adequate internal controls. The Individual Defendants had

actual knowledge that internal controls were not adequately maintained, or acted with reckless

disregard for the truth, in that they caused the Company to fail to maintain adequate internal

controls, even though such facts were available to them. Such improper conduct was committed

knowingly or recklessly and for the purpose and effect of artificially inflating the price of Ocugen's

securities. The Individual Defendants, in good faith, should have taken appropriate action to

correct the scheme alleged herein and to prevent it from continuing to occur.

276.    These actions were not a good-faith exercise of prudent business judgment to

protect and promote the Company's corporate interests.

277.    As a direct and proximate result of the Individual Defendants' breaches of their

fiduciary obligations, Ocugen has sustained and continues to sustain significant damages. As a

result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

278.    Plaintiffs, on behalf of Ocugen, have no adequate remedy at law.

### THIRD CLAIM
#### AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

279.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

280.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ocugen.

281.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Ocugen that was tied to the performance or artificially inflated valuation of Ocugen or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

282.    Plaintiffs, as shareholders and representatives of Ocugen, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

283.    Plaintiffs, on behalf of Ocugen, have no adequate remedy at law.

### FOURTH CLAIM
**AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL**

284.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

285.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ocugen, for which they are legally responsible.

286.     As a direct and proximate result of the Individual Defendants' abuse of control, Ocugen has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Ocugen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

287.     Plaintiffs, on behalf of Ocugen, have no adequate remedy at law.

### FIFTH CLAIM
**AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT**

288.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

289.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ocugen in a manner consistent with the operations of a publicly held corporation.

290.     As a direct and proximate result of the Individual Defendants' gross

mismanagement and breaches of duty alleged herein, Ocugen has sustained and will continue to sustain significant damages.

291.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

292.    Plaintiffs, on behalf of Ocugen, have no adequate remedy at law.

<u>**SIXITH CLAIM**</u>
**AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS**

293.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

294.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

295.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Ocugen to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil inquiries, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

296.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

297.    Plaintiffs, on behalf of Ocugen, have no adequate remedy at law.

## SEVENTH CLAIM

### AGAINST DEFENDANTS MUSUNURI, SUBRAMANIAN, AND BREININGER FOR CONTRIBUTION UNDER SECTIONS 10(b) AND 21D OF THE EXCHANGE ACT

298.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

299.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Ocugen shareholders, in which it is a joint tortfeasor in claims brought under Sections 10(b) and Section 20(a) of the Exchange Act.

300.    Federal law provides Ocugen with a cause of action against other alleged joint tortfeasors under Section 10(b) of the Exchange Act.

301.    The plaintiffs in the Securities Class Action allege that the Forms 10-Q and Forms 10-K during the Relevant Period contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

302.    Ocugen is the registrant for the SEC filings. Defendants Musunuri, Subramnian, and Breininger were responsible for the contents and dissemination of the Forms 10-Q and Forms 10-K.

303.    As issuer of the shares, Ocugen is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

304.    The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that

the statements contained in the Registration Statement and other subsequent public filings were true and without omissions of any material facts and were not misleading.

305.    Defendants Musunuri, Subramnian, and Breininger because of their positions of control and authority as controlling shareholders, officers and/or directors of Ocugen, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Ocugen, including the wrongful acts complained of herein and in the Securities Class Action.

306.    Accordingly, Defendants Musunuri, Subramnian, and Breininger are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

307.    As such, Ocugen is entitled to receive all appropriate contribution or indemnification from Defendants Musunuri, Subramnian, and Breininger.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Ocugen, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ocugen;

(c)    Determining and awarding to Ocugen the damages sustained by it as a result of the

violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Ocugen and the Individual Defendants to take all necessary actions to reform and improve Ocugen's corporate governance and internal procedures to comply with applicable laws and to protect Ocugen and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of Ocugen to nominate at least three candidates for election to the board; and

3.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Ocugen restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: June 4, 2025

**THE BROWN LAW FIRM, P.C.**

*/s/ Elizabeth Donohoe*
Elizabeth Donohoe
Saadia Hashmi (*pro hac vice*)
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
        shashmi@thebrownlawfirm.net
        tbrown@thebrownlawfirm.net

**HYNES & HERNANDEZ, LLC**

*/s/ Ligaya T. Hernandez*
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Facsimile: (484) 875-9273
Email: mhynes@hh-lawfirm.com
        lhernandez@hh-lawfirm.com

**BRAGAR EAGEL & SQUIRE, P.C.**
Marion C. Passmore
Melissa A. Fortunato
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (212) 308-5858
Facsimile: (212) 214-0506
Email: passmore@bespc.com
        fortunato@bespc.com

***Counsel for Plaintiffs***

121

## <u>VERIFICATION</u>

I, Jeffrey Watts, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _____ day of May, 2025.

5/29/2025

DocuSigned by:

371A288F598341F...

Jeffrey Watts

**VERIFICATION**

I, Priyank Garg, hereby verify that I have authorized the filing of the attached Amended Verified Stockholder Derivative Complaint ("Complaint"). I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further verify that I am a current holder, and have been a holder, of Ocugen, Inc common stock at all relevant times.  I declare under penalty of perjury that the foregoing is true and correct.

Executed this___2___day of June, 2025.

Priyank Garg (Jun 2, 2025 22:13 CDT)

Priyank Garg